NON-CONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC, <br><br> Plaintiffs, <br><br> and <br><br> Precision Components, Inc, Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd and Hebei Xintai Bearing Forging Co., Ltd, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> United States. <br><br> Defendant. | Cons. Ct No. 22-0038 |

**MEMORANDUM OF LAW IN SUPPORT OF THE
RULE 56.2 MOTION OF CONSOLIDATED PLAINTIFFS
SHANGHAI TAINAI BEARING CO., LTD. AND
C&U AMERICAS, LLC, FOR JUDGMENT
UPON THE AGENCY RECORD**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel for Plaintiffs

Dated: July 26, 2022

# TABLE OF CONTENTS

Table of Contents ................................................................................... i

Table of Authorities ............................................................................ iii

I.  Introduction ..................................................................................... 1

II.  Statement Pursuant to Rule 56.2(C) ............................................ 2

   A. Administrative Determination Under Review ............................ 2

   B. Issues of Law ............................................................................ 3

   C. Summary of Arguments ............................................................ 3

   D. Statement of Facts .................................................................... 5

III.  Standard Of Review ...................................................................... 9

IV.  Argument ..................................................................................... 13

   A. The Department Should Not Apply Partial Adverse Facts to a Fully
      Cooperative Entity ................................................................... 13

      1.  Tainai was fully cooperative and answered all of the
          Department Questionnaires .............................................. 16

      2.  Tainai attempted to obtain information from its third party
          suppliers, but was  unable to obtain cooperation ............. 17

      3.  Court precedent does not require a party to provide information
          not in its possession and which it cannot reasonably obtain .............. 21

   B. The Department Should Not Value Inputs of Finished Components
      with Partial Adverse Facts ...................................................... 23

   C. The Values Selected by the Department as Partial Adverse Facts
      were Highly Distorted .............................................................. 24

      1.  The Department did not properly implement its decision .................. 25

      2.  The Department failed to consider any physical characteristics in
          selecting surrogate values .............................................. 27

   D. The Method Selected by the Department to Calculate Partial
      Adverse Facts and the Resultant Rate Bears no Basis to Commercial
      Reality ..................................................................................... 31

      1.  The Magnitude of the Calculated Margin ........................ 32

      2.  Plaintiffs Are Profitable ................................................. 33

    3.  Sales Data Shows Clear Differences Between Small and Large Bearings .............................................................................34

E.  The Department Erred When it Used the Financial Statement of Timken Romania as the Sole Basis for Calculating Surrogate Financial Ratios .......................................................................35

    1.  The Department had Multiple Financial Statements of Record..........37

    2.  The Timken Romania Financial Statement is Badly Flawed.............39

F.  The Department Valued Certain Components Using Surrogate Values for the Finished Components .......................................42

G.  The Department Should Not Have Deducted 301 Duties from the U.S. Price...............................................................................44

H.  The Department Should Not Have Capped the Addition to the U.S. Price for 301 Duties.................................................................46

I.  The Department Should Have Granted a By-Product Offset..................52

V.  Conclusion .......................................................................................53

Certificate of Compliance

TABLE OF AUTHORITIES

***Court Cases:***

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ..........................................................................................................12

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) .............10, 11

*Baoding Mantong Fine Chemistry v United States*, 113 F.Supp. 3d 1332, (Ct. Int'l Trade 2015) ...............................................................................31, 32, 33

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).................................................................. 13

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012)...........................................................................................13

*Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837 (1984) ........9,10

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938) ................10

*Daewoo Elec. Co. v. United States*, 712 F.Supp. 931 (Ct. Int'l Trade 1989) ..........22

*Diamond Sawblades Manufacturers' Coalition v. United States,* 986 F.3d 1351 (Fed. Cir. 2021).............................................................................24, 25

*Diversified Products Corp. v. United States,* 6 CIT 155 (1983) .............................10

*Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)............11

*Dorbest Ltd. v. United States,* 604 F.3d 1363 (Fed.Cir. 2010)................................37

*Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)....................................................................................................22

*Floral Trade Council v. United States,* 41 F.Supp.2d 319 (Ct. Int'l Trade 1999) .....................................................................................................50,52

*Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034 (Fed. Cir. 1996) .........................9

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997).....................11

*Jiaxing Bro. Fastener Co., Ltd. v. United States,* 961 F.Supp 2d. 1323 (Ct. Int'l Trade 2014) ................................................................................................36

*Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183 (Ct. Int'l Trade 2009) ........................................................................................................11

*Lucent Techs. Inc. v. Gateway, Inc.,* 580 F.3d 1301(Fed. Cir. 2009).....................12

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) ..............11

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .....13,14,16,24

*Novosteel SA v. United States,* 284 F. 3d 1261  (Fed. Cir. 2002)...........................12

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ....................24

*Mannesmannrohen-Werke AG v. United States,*  77 F.Supp.2d 1302 (Ct. Int'l Trade 1999)...............................................................................................13,14

*Olympic Adhesives, Inc. v. United States,* 899 F. 2d 1565 (Fed. Cir. 1990) ......21,22

*Peer Bearing Co. v. United States*, 182 F.Supp.2d 1285 (Ct. Int'l Trade 2001) ..............................................................................................................22

*Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372 (Fed. Cir. 2001) ...............................................................................................................9

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990).........11,24,35

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57 (Ct. Intl Trade 1993)...............................................................................................12

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376 (Fed. Cir. 2001) ...........................................................11, 35

*Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d 1339 (Ct. Int'l Trade 2005)....................................................................................14

*Sigma Corp. v. United States*, 117 F.3d 1401 (Fed.Cir.1997)................................32

*SKF USA, Inc. v. United States.* 254 F.3d 1022 (Fed. Cir. 2001) ..........................13

*Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001).............................................................................................12

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ...........12,13

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................10

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) ....................10

*Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020)...................................................................................19,20

*Wheatland Tube Co. v. United States,* 495 F.3d 1355 (Fed. Cir. 2007)..................10

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............................................................................................11,24,36

*Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,* 652 F.3d 1333 (Fed. Cir. 2011).............................................................................................24

***Statutes:***

19 U.S.C. §1516a(a)(2)(B)(iii) ........................................................ 2

19 U.S.C. §1516a(b) ....................................................................... 9

19 U.S.C. §1673d(c)(5) .................................................................. 9

19 U.S.C. § 1677a(c)(2)(a) and (b) ................................................50

19 U.S.C. § 1677a ...................................................................... 49 - 51

19 U.S.C. § 1677b(c)(1) .................................................................31

19 U.S.C. § 2411 ...........................................................................45

19 U.S.C. § 3512(d) .......................................................................25

***Regulations***

19 CFR 152.101(d) .........................................................................47

19 CFR 351.401(c) .........................................................................48

***Administrative***

H.R. Doc. No. 103-316, vol. 1, at 869 (1994), *reprinted in* 1994
U.S.C.C.A.N. 4040, 4179 ..............................................................25

*Certain Malleable Iron Pipe Fittings from the People's Republic of China*,
70 Fed. Reg. 76,234, 76,237 (Dec. 23, 2005), as modified, 71 Fed.
Reg. 37,051 (June 29, 2006) ...........................................................36

*Certain Non-Refillable Steel Cylinders from the People's Republic of China,*
86 Fed. Reg 15188 (March 22, 2021) (Decision Memorandum of
March 15, 2021) .............................................................................36

## I.    INTRODUCTION

This is an appeal of the 2020/21 administrative review of the antidumping order on Antifriction Bearings from the People's Republic of China.  Plaintiff Shanghai Tainai Bearing Co., Ltd. was a mandatory respondent in the review, and Plaintiff C&U Americas, LLC is the importer and CEP entity.  Both Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC,  were parties to the proceeding, having submitted numerous questionnaire responses and comments, as well as case briefs.

The Plaintiffs assert the following errors in the Commerce Department's ("Commerce's") final determinations:

- The Department improperly applied adverse inferences to a fully cooperative entity;

- The Department improperly took adverse inferences even though there were no gaps in information;

- The information selected by the Department as partial adverse information was inappropriate.  Such partial adverse information was distortive and produced absurd results;

- The Department used the wrong financial statements as the basis for surrogate financial ratios;

- The Department erred when it applied surrogate financial ratios to those components valued by surrogate values for completed components;

- The Department erred when it deducted 301 duties from U.S. price. Such duties are not "United States import duties" and are special duties akin to antidumping;

- The Department failed to include all monies received by plaintiffs from its customers in payment for goods and improperly decided to "cap" the payments characterized as monies to offset 301 duty at the amount of 301 duties paid;

- The Department failed to grant an offset for valuable by-products and scrap; and

- The method selected by the Department to calculate partial adverse facts was not proper, the resultant rate has no basis in commercial reality, and is so high as to shock the consciousness.

## II.   STATEMENT PURSUANT TO RULE 56.2(c)

A. Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest Commerce's determination in its §751 administrative review of *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic*

*of China* ("Final Results") 87 Fed. Reg. 1,120 (January 10, 2022). PO.[1] as amplified by the Issues and Decision Memorandum PO.

In the Final Results, Commerce calculated a margin of 538.79% for plaintiff Tainai. APPX001002 Commerce also calculated a margin, based on total adverse facts of 92.84% for a wholly uncooperative respondent. APPX001002

B.  Issues of Law

The Plaintiffs present the following issues of law.  In each instance, Commerce's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law.  The issues are:

1.  **Issue.**  Whether the Department's application of adverse facts to a fully cooperative respondent was arbitrary and capricious and an abuse of discretion.

2.  **Issue.**  Whether the Department's selection of certain surrogate values and ratios was arbitrary and capricious and an abuse of discretion.

3.  **Issue.**  Whether the Department's calculations were factual and legally inaccurate and thus resultant rate was not accurate.

C.  Summary of Arguments

- The Department cannot apply partial adverse facts to a fully cooperative

---

[1] Pursuant to direction of Chambers, the record will be reported by number.  Public documents are in the range 1000 +  and confidential documents are in the range 80,000+.

entity.   Tainai supplied  all of the information in its possession, and to the extent that any information was not of record, such information was that of third parties. Tainai tried, but was unable, to obtain such information from third parties due to the non-cooperation of the third parties.

- The Department had all of the information necessary to calculate margins and thus had no gaps to be filed.   Accordingly, to the extent that certain information was not provided from third parties, such information was not needed.  In the absence of missing information, the Department has no gaps to fill.

- The information selected as partial adverse facts were highly distorted and bore no reasonable relationship to the factors being valued.  This resulted in highly distorted values.

- The Department erred when it used the financial statement of Timken Romania as the sole basis for surrogate financial ratios.  The Timken Romania financial statement was badly flawed and should not have been used.  To the extent that the Timken Romania financial statement is to be used, it should be averaged with the other financial statements of record.

- Certain components were valued using surrogate values for finished articles. The Department should not have applied financial ratios to these finished articles as by doing so, the Department engaged in double counting of the

4

ratios.

- The Department should not have deducted the 301 duties paid from U.S. price. Such 301 duties are not ordinary duties, but rather are remedial duties akin to Antidumping duties.   By deducting these duties, the Department is imposing remedial duties based on remedial duties.

- All monies received in payment of the goods, whether characterized as 301 duty payments or payments for goods, should have been included in the price for the U.S. goods.   The Department's decision to "cap" these payments is contrary to law.

- The Department failed to grant an offset for valuable by-products and scrap.

- The method selected by the Department to calculate rates based on partial adverse facts was not proper and the resultant rate bears no relationship to commercial reality.  Such rate is so high as to shock the consciousness.

D. Statement of Facts

The antidumping order on Tapered Roller Bearings ("TRB's") from China was published on June 15, 1987.  See *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China*, 52 Fed. Reg. 22667 (June 15, 1987), as amended, *Tapered Roller Bearings from the People's Republic of China; Amendment to Final Determination of Sales*

*at Less Than Fair Value and Antidumping Duty Order in Accordance With Decision Upon Remand*, 55 Fed. Reg. 6669 (February 26, 1990).  This appeal concerns the 2020/21 administrative review. In the segment of the proceeding under appeal, Commerce issued its preliminary results as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Intent to Rescind the Review, in Part; 2019 – 2020*, 86 Fed. Reg 36099 (July 8, 2021). APPX013059 Commerce calculated a preliminary rate of 36.75% for Tainai.  Commerce's Final Results and final IDM were issued as set forth in the "Administrative Determination Under Review," *supra*.  APPX013069.

On August 6, 2020, pursuant to a request for review filed on June 30, 2020 by Koyo Bearings North America LLC on behalf of the U.S. domestic industry APPX001052, the Department initiated the Administrative Review underlying this matter.  See *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85  Fed. Reg. 47731 (August 6, 2020). APPX001070.

The Timken Company (Timken") also filed an appearance as a member of the U.S. domestic industry.  APPX001078.  Timken also filed comments and briefs.

Between October 21, 2020 and August 31, 2021, plaintiffs submitted responses to the Department's questionnaires.  Plaintiffs fully and completely responded in a timely fashion to all questionnaires and supplemental questionnaires issued by the Department.

On May 17, 2021, in response to a question from the Department, Tainai explained that it was unable to get Bill of Materials from its unaffiliated suppliers of turned cups and cones. APPX082201.

On July 8, 2021 the Department published the preliminary results for the administrative review.  Plaintiff Tainai was assigned a rate of 36.75%.  See *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Intent to Rescind the Review, in Part; 2019 – 2020*, 86 Fed. Reg 36099 (July 8, 2021). APPX013059.

On August 31, 2021, in request to a question from the Department, APPX013171 Tainai again confirmed that certain unaffiliated suppliers were unwilling to provide FOP data. APPX084316, APPX084320.  Tainai also provided copies of communications with the unrelated suppliers where the unrelated suppliers indicated that they were unwilling to cooperate. APPX084407 – 084416.  There is no evidence of record that Tainai had sufficient market power to compel a response.

As stated in its Section D response and the supplements thereto, Tainai used multiple suppliers, each of which only supplied a small portion of Tainai's needs. Tainai used [#] suppliers of turned cups and cones, #] suppliers of rollers, and [#] suppliers of cages. The related suppliers provided [X.xx%] of the turned cups and cones, [xx.xx%] of the rollers, and [XX.xx%] of the cages. APPX081310 –081312.

On September 9, 2021, plaintiffs and the domestic industry filed

administrative case briefs with the Department of Commerce challenging the preliminary results. APPX013281, APPX013266, APPX013255

On September 17, 2021, plaintiffs and the domestic industry filed administrative rebuttal briefs with the Department of Commerce. APPX013300, APPX013306, APPX013322

On January 4, 2022, the Department issued the final results. On January 10, 2022, these results were published in the Federal Register as *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China* ("Final Results") 87 Fed. Reg. 1,120 (January 10, 2022). The Department also issued an "Issues and Decisions Memorandum" in connection with the final results. In the final results the Department found one entity had not cooperated, found that this uncooperative entity was thus part of the China-Wide entity and assigned a rate of 92.84% based on total adverse facts. The Department assigned to Tainai a ra.te of 538.79% based on "partial" adverse facts. The rate assigned to Tainai was assigned to all other respondents found to be qualified to receive a separate rate.

The partial adverse facts were determined by taking the single highest weighted applying this in lieu of the reported weight. APPX084514 - 084515

## III.   STANDARD OF REVIEW

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law. 19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).

If the statute is silent or ambiguous with respect to the specific issue, the Federal Circuit has held that *Chevron* deference is owed Commerce's statutory interpretations as to appropriate methodology. *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001). That analysis entails determining whether Commerce's construction of an ambiguous statute is "permissible." *See Chevron,* 467 U.S. at 843. A "permissible" construction is understood in terms of reasonableness; only reasonable interpretations will be upheld by the Court. *See Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) *('Chevron* requires us to defer to the agency's interpretation of its own statute as long as the interpretation is reasonable."). To determine reasonableness, courts look to the express terms of the statute, the objectives of the

statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co. v. United States,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938).  Furthermore, "substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (quotations omitted).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to {that} view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S. at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *USX Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).  The substantial evidence standard requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory

evidence or evidence from which conflicting inferences could be drawn.'"  *Gerald*

*Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

Commerce is required to objectively evaluate all data on the record.  Thus, the agency must hold its preferences to the same test as it uses to evaluate respondent's proffered data.  *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a <u>mathematical and factual matter</u>…"  (Emphasis

added).   To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) (".. .the Department has honored one of the fundamental principles underlying the trade statute –accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

Moreover, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001).  Additionally, "to avoid distortions, the Department must consider all relevant factors, including those not present in most antidumping determinations." *Id*.

When substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

Further, it is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner.  *See, e.g., Tung Mung Dev. Co., v. United States*, 354

F.3d 1371, 1378 (Fed. Cir. 2004).   Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while   "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

## IV.   ARGUMENT:

### A. The Department Should Not Apply Partial Adverse Facts to a Fully Cooperative Entity

During an antidumping duty administrative review the Department issues questionnaires and supplemental questionnaires to entities selected as mandatory respondents.   It is the mandatory respondent's obligation to use its best efforts to respond to the Department questionnaires. The Courts have stated:

> The statute does not provide an express definition of "the best of its ability," although the Federal Circuit has determined that "the statutory mandate that a respondent act to `the best of its ability' requires the respondent to do the maximum it is able to do." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed.Cir.2003). To meet this standard, Commerce "needs to articulate why it concluded that a party failed to act to the best of its ability, and explain why the absence of this information is of significance...." *Mannesmannrohen-Werke AG v.*

*United States,* 23 CIT 826, 839, 77 F.Supp.2d 1302, 1313-14 (1999).
*Shanghai Taoen Int'l Trading Co., Ltd. v. United States*, 360 F.Supp.2d
1339 (Ct. Int'l Trade 2005) at 1344.

It is axiomatic that the Department should not apply partial adverse facts to a fully cooperative entity. This does not mean that the Department cannot fill in gaps of missing information. To the extent that necessary information is not available, the missing information should be selected from neutral facts, not adverse facts. It does mean that the Department should fill in any gaps with values that do not result in punitive determinations.

In order for an entity to be found not to be cooperative, it requires more than a showing of an error or a mistake. *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), clearly outlines the requirements. In *Nippon Steel* the plaintiff had failed to provide certain conversion data in its possession in a timely manner. The issue was whether such failure justified the application of adverse inferences. The court found that there were two circumstances where information might not be complete. The Court of Appeals for the Federal Circuit stated:

> The statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination. Under subsection (a), if a respondent "fails to provide {requested} information by the deadlines for submission," Commerce shall fill in the gaps with "facts otherwise available." The focus of subsection (a) is respondent's failure to provide information. The reason for the failure is of no moment. The mere failure of a respondent to furnish requested information — for any reason — requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination. As

a separate matter, subsection (b) permits Commerce to "use an inference that is adverse to the interests of {a respondent} in selecting from among the facts otherwise available," only if Commerce makes the separate determination that the respondent "has failed to cooperate by not acting to the best of its ability to comply." The focus of subsection (b) is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information.

The legislative history found in the Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), confirms the distinction between the two sections. . . .  In adopting the URAA, Congress changed the terminology and noted:

> New section {1677e(a)} requires Commerce and the Commission to make determinations on the basis of facts available where the requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information.
> * * *
> {N}ew section {1677e(b)} permits Commerce and the Commission to draw an adverse inference where a party has not cooperated in a proceeding. A party is uncooperative if it has not acted to the best of its ability to comply with requests for necessary information. Where a party has not cooperated, Commerce and the Commission may employ adverse inferences about the information to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.

SAA at 869-70, reprinted in 1994 U.S.C.C.A.N. 4040, 4198-99. * * * Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not

condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

*Nippon Steel* at 1380 – 1383.

In the case of *Nippon Steel*, the plaintiff was ultimately found to have the records in its possession, and thus, as the plaintiff had control of the records, the failure to provide them was a failure to use best efforts.   However, the test enumerated clear states that if a party does not have or maintain a particular record, they cannot be found to have failed to use best efforts for failing to provide such record.   As discussed below, Tainai's conduct, in contrast, met all of the requirements for best efforts and cooperation.

1. *Tainai was fully cooperative and answered all of the Department Questionnaires*

The first prerequisite for the application of AFA is a finding that a party did not use its "best efforts" in responding to the Department.   While the term "best efforts" is somewhat nebulous, under any definition of "best efforts" Tainai was fully cooperative.   As set forth above, best efforts include:

- Reasonable steps to maintain full and complete records – Tainai did

this, able to provide whatever information the Department needed from Tainai's own records at a high level of detail as required by the Department

- Have familiarity with records in its possession, custody or control – Tainai had such familiarity.  Tainai knows the records in its possession, custody and control and provided those documents requested by the Department.  The key is that the documents that were not provided were records not in Tainai's possession, custody or control.
- Conduct prompt, careful and comprehensive investigations of all relevant records to the full extent of the importers ability to do so – Tainai did just that.   It carefully and comprehensively provided the records in its control

Critically,  Tainai advised the Department early in the process that certain unrelated suppliers were unwilling to cooperate with Tainai and provide their confidential data.  APPX084316, APPX084320.   Tainai continued to seek cooperation from these third-party entities.  APPX084407 – 084416 The Department has not claimed that Tainai itself failed to cooperate, and in fact if it had done so, Tainai's rate would have been less than 1/5[th] of the calculated final rate as the Department would have applied the adverse facts rate of 92.84%.   Rather the purported lack of cooperation was the result of unrelated third-parties – companies which the Department alleged Tainai could have forced to participate, and which Tainai argued would not cooperate.

   2. *Tainai attempted to obtain information from its third party suppliers, but was  unable to obtain cooperation*

The inability of a respondent to obtain information from unrelated third-parties is neither new nor unique.  In the complex business world of today producers

Non-Confidential

frequently obtain materials and services from third-parties.  Historically, the Department has refused to find that the failure of third parties to provide information does not establish non-cooperation of the respondent.  Recently, as reflected in the cases cited by the Department in the final determination, the Department has refined this practice to require that parties obtain information from unrelated third-parties when the parties have the power to do so.

The recent precedent does not compel Tainai to provide this third-party data to demonstrate cooperation.  Tainai does not have the market power to obtain this information[2].   The record demonstrates that Tainai used [XX] suppliers of turned cups and cones, [Xx] suppliers of rollers, and [XX] suppliers of cages. The related suppliers provided [XX.XX%] of the turned cups and cones, [XX.XX%] of the rollers, and [XX.XX%] of the cages.   Thus the [XX] unrelated suppliers provided

---

[2] In its case rebuttal brief, Precision Components speculates that U.S producer the Timken Company has sufficient market power to influence, and in fact does influence, the market and perhaps compel non-cooperation.  Precision Components stated:

> {w}e adamantly oppose the use of surrogate values from The Timken Company's (Timken's) like party affiliate, Timken Romania. It's common knowledge that multinational corporations have the ability to perform intercompany transfers, an issue that when used in competition of the petitioner, requires Commerce to investigate like party circumstances and implement anticircumvention measures. The suggestion to use surrogate values from within the petitioner's own organization is a gross misuse of the Antidumping Laws, and if allowed provides petitioners the unchecked potential for manipulation to artificially inflate the dumping margins. APPX013300.

[XX.XX%] of the turned cups and cones, or an average of just [X%] each of the total needs, the [XX] unrelated suppliers of rollers provided [XX.XX%] of the rollers, or an average of just [X.X%] each of the total needs, and the [XX] unrelated suppliers of the cages supplied [XX.XX%]  of the cages, or an average of just [X.X%] each of the total needs.  APPX081310 – 081312. The significant number of suppliers, and the small percentages of material supplied by each, establishes that Tainai does not have the market power to compel these entities to respond.   Tainai asked these unrelated suppliers to cooperate and these suppliers said no.

For example,  [Company and supplier name       ] refused to provide the requested data stating "We are very sorry that we cannot provide the relevant information because it is the internal secrets of our company.  Please understand!" APPX084415.

The Court has held that Commerce must consider the evidence showing why the efforts for cooperation failed and whether the respondent had the practical ability to force cooperation.   The Court's decision in *Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) is instructive.  In *Venus* the issue was whether the e-mails from Venus to its  unrelated suppliers served as  a sufficiently strong inducement to  cooperate.  In rejecting the application of AFA, the Court stated in relevant part:

> For its conclusion that Venus failed to act to the best of its ability to
> obtain its unaffiliated suppliers' cost information, Commerce relied on

its subsidiary finding that Venus's emails to its suppliers "did not serve as a strong inducement to cooperate." However, Commerce's reliance on *Mueller's* observation that the existence of a buyer-seller relationship means that an exporter could potentially refuse to do business with its supplier to induce cooperation placed undue emphasis on Venus's warnings to its suppliers, thereby truncating the *Mueller* analysis and leading the agency to disregard relevant record evidence. Thus, as discussed below, Commerce's determination is unsupported by substantial evidence and not in accordance with the law.

To begin with, Commerce created an arbitrary linguistic line when it measured Venus's degree of cooperation based on Venus's use of a certain word in its emails to unaffiliated suppliers. While Commerce clearly permits some equivocation by a respondent in its attempts to induce cooperation, the agency has not provided any explanation supporting the distinction it seeks to draw in this case.

Further, while *Mueller* recognizes that an unwillingness to export goods produced by an uncooperative supplier "would potentially induce {the supplier} to cooperate," the appellate court also stated that "if the {respondent} has no control over the noncooperating suppliers, a **resulting adverse inference is potentially unfair to the {respondent}**." The concept of "control," as discussed in *Mueller*, does not require actual control, but, instead, it requires Commerce to consider record evidence concerning the **practical ability of a respondent to induce the supplier's cooperation**.

Here, Commerce did not adequately consider evidence tending to show that Venus's efforts to induce cooperation failed, at least in part, because of circumstances beyond Venus's control; to wit, the suppliers' own concerns that providing the cost information did not serve the suppliers' respective interests. Moreover, Commerce failed to point to any evidence indicating that Venus could induce its unaffiliated suppliers' cooperation. Instead, Commerce appeared to assume that Venus had leverage over its unaffiliated suppliers and simply failed to properly apply it. Commerce's reasoning is inconsistent with *Mueller*, which recognizes the possibility of inducing cooperation, but not the certainty.

*Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) at 1307-1308.

20

The Tainai factual situation closely parallels that in Venus. Tainai, just like Venus, tried to obtain the information from the unrelated third-parties, but was unable to do so. There is no evidence that Tainai had any leverage over its unaffiliated suppliers to induce cooperation. Tainai had multiple suppliers, all of which only supplied a small portion of Tainai's needs. APPX081310 –081312 Simply put, Tainai was not a significant enough customer of any of these entities to assert any market power over these entities. Tainai sought the cooperation of these third parties, as directed by the Department, but ultimately failed to obtain this information. Tainai's efforts to obtain this information constituted best efforts by Tainai, and Tainai should not be punished by the application of adverse facts to it for this missing information.

3. *Court precedent does not require a party to provide information not in its possession and which it cannot reasonably obtain.*

The Courts have long held that a party can only be required to provide the information that is actually in the possession of the party or is information which the party would have been expected to create and maintain in the ordinary course of business. In examining the "best information available" rules (the predecessor to AFA) the Court in *Olympic Adhesives, Inc. v. United States,* 899 F. 2d 1565 (Fed. Cir. 1990) stated:

But we agree with Olympic that this "incompleteness" or "deficiency"

is not attributable to any deficiency in the answers provided by Extraco. The ITA may not properly conclude that resort to the best information rule is justified in circumstances where a questionnaire is sent and completely answered, just because the ITA concludes that the answers do not definitely resolve the overall issue presented. Although the ITA may properly request additional supplemental information, if needed, to fully resolve the issue, section 1677e(b) clearly requires noncompliance with an information request before resort to the best information rule is justified, whether due to refusal or mere inability. See, e.g., *Daewoo Elec. Co. v. United States*, 712 F.Supp. 931, 944 (Ct.Int'l Trade 1989). The ITA suggests that Extraco should have made efforts apart from the questionnaire to rebut the allegations of fictitious sales. **However, section 1677e(b) does not place that obligation on the submitter. To avoid the threat of § 1677e(b), a submitter need only provide complete answers to the questions presented in an information request.**
*Olympic Adhesives, Inc* at 1574. (Citations omitted.)

Subsequent Court decisions have further expanded upon *Olympic* and further confirmed that the Department does not have unlimited discretion and cannot resort of facts available where the requested information does not exist.   In *Peer Bearing Co. v. United States*, 182 F.Supp.2d 1285 (Ct. Int'l Trade 2001) the Court stated:

Consequently, Commerce enjoys very broad, although not unlimited, discretion with regard to the propriety of its use of BIA. See generally, *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir.1990) (acknowledging Commerce's broad discretion with regard to the use of facts available but pointing out that Commerce's resort to facts available is an abuse of discretion where the information Commerce requests does not and could not exist).
*Peer Bearing* at 1295. See also, *Ferrostaal Metals Gmbh v. United States*, 518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) at 1374

In the case at bar, there is no allegation that the information not provided by Tainai was information in the possession of Tainai.   Quite to the contrary, the

requested information was the confidential information of the unrelated supplier. APPX084319 – 084320.  The Department's allegation is that this was information of third parties not obtained by Tainai.   Simply put, at least with respect to Tainai, the information requested by the Department was not in the possession or control of Tainai. Thus, at least with respect to Tainai, such information does not and could not exist.

### B.  The Department Should Not Value Inputs of Finished Components with Partial Adverse Facts

The Department values a number of the inputs for which it took partial adverse inferences with surrogate value information for **finished goods**.  Specifically, the surrogate values for the turned cups and cones, cages and rollers were based on the HTS provisions for turned cups and cones, cages and rollers. APPX013116, APPX013424,   As such, the underlying material inputs that went into the production of these components was not necessary and would not be used.  As Tainai reported the weights of the completed components, information that would primarily be in the possession to Tainai, there was no missing information. APPX083814 – 083833. While the third parties did not provide to Tainai bills of materials and factors of production, the selected surrogate values made the use of such data not provided by the third parties unnecessary.  Simply put, since it was a roller, or a turned cup or cone or a cage, and since the surrogate value data valued the roller, turned cup or cone or cage, the amount of raw material consumed, the labor and energy expended

and the like which went into the roller was irrelevant.  Such values were already

included in the finished components.  In the absence of missing information, the

Department has no gaps to fill, and to the extent that information was "missing" it

was not relevant.

### C. The Values Selected by the Department as Partial Adverse Facts were Highly Distorted

The Department selected as partial adverse facts information which was

highly distorted and bore no reasonable relationship to the factors being valued.  This

resulted in highly distorted calculated values and created rates that have no

relationship to actual reality.    A critical factor to be taken into account by the

Department in calculating rates is that of accuracy.    (See *NTN Bearing Corp. v.

United States*, 74 F.3d 1204 (Fed. Cir. 1995), *Rhone Poulenc, Inc. v. United States,*

899 F.2d 1185 (Fed. Cir. 1990))   In the recent *Diamond Sawblades Manufacturers'*

*Coalition v. United States,* 986 F.3d 1351 (Fed. Cir. 2021) the Court stated:

> We have explained that "{a}n overriding purpose of Commerce's
> administration of antidumping laws is to calculate dumping margins as
> accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co. v. United
> States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc,
> Inc. v. United States,* 899 F.2d 1185, 1191 (Fed. Cir. 1990)); *see
> also Mid Continent Steel,* 941 F.3d at 542. More particularly, we have
> often focused, when applying § 1677e(a), on the subsection's role as a
> command to Commerce "to fill a gap in the record" when information
> is missing or compromised. *Zhejiang DunAn Hetian Metal Co., Ltd. v.
> United States,* 652 F.3d 1333, 1348 (Fed. Cir. 2011); *see also Nippon
> Steel,* 337 F.3d at 1381. To the extent that information supplied is
> reliable, *i.e.,* not in fact tainted by its supplier's conduct, "gap" seems
> an  inapt  characterization.  And  the  authoritative  Statement  of

Administrative Action, *see* 19 U.S.C. § 3512(d), states that subsection 1677e(a) pertains to situations "where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information," and when needed information is missing, Commerce "must make {its} determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration," H.R. Doc. No. 103-316, vol. 1, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4179. That explanation, on its own, suggests an information-specific consideration of probativeness rather than any blanket disregard of all information supplied by a person whenever some of the information supplied by that person is unreliable

*Diamond Sawblades* at 1365

This important goal calculating dumping margins as accurately as possible was not met in the case.   A rate which is not based on a reasonable approximation of actual factors of production is inherently inaccurate.

In the final results, the Department made two significant errors which impacted accuracy.  The Department did not properly implement its decision, and the Department erred in the selection of the substitute factors of production.

1.  *The Department did not properly implement its decision*

The Department stated that "we relied on Tainai's highest reported usage rate for each of the FOPs on a product-specific rate for each control number (CONNUM)." APPX013376 - APPX013384 and APPX013385 - APPX013416. The Department did not properly implement this decision.

In calculating margins, the Department assigns to all products a CONNUM. This CONNUM is based on certain physical characteristics and all bearings with the

Non-Confidential

same physical characteristics designated by the Department are assigned the same CONNUM, even if they carry different part numbers or are not identical.   As noted in the original questionnaire, a CONNUM is defined as follows:

> Assign a control number to each **unique product** reported in the section C sales data file**. Identical products** should be assigned the same control number in each record in every file in which the product is referenced.
> Questionnaire at Field Number 2.0 (Emphasis Added) APPX001448

In other words, a CONNUM consists of at least one specific product, and no specific product can be found in 2 or more CONNUM's. The Department further goes on to define the product field as consisting of "components", as opposed to specific products and multiple physical characteristics including the outer and inner Diameter is of the "TRB under consideration".

In making its selection of the alternate factors and values, the Department did not follow its stated decision, and did not select the alternate FOP on a product specific basis or a CONNUM basis, but rather selected the FOP on a **component** level basis, which is less detailed than the CONNUM and thus necessarily included multiple unique products and CONNUM's.   This resulted in lumping together products with significantly dis-similar physical characteristics such as finding a bearing with a weight of [X.XX kg] was similar to a bearing with a weight of [X.XXkg]. APPX084514 – 084515.

2. *The Department failed to consider any physical characteristics in selecting surrogate values*

The second error was not considering any other facts in selecting surrogate values. In making its selection, the Department ignored all but one of CONNUM factors in assigning the surrogate value. In this matter, the CONNUM consists of 4 data points. They are:

| Field Name | Description |
|---|---|
| PRODUCTU | Identify the name in English of each CONNUM, such as: hub assembly, hub unit, cup, cone, cone assembly, cup and cone assembly, roller, or other component. Accurately identify each separate type of component included in the response, and provide a detailed technical description of each component that you list. APPX001449. |
| ODU | Provide the nominal measurement of the outer diameter of the TRB under consideration, or for which the component part is intended. APPX001450. |
| IDU | Provide the nominal measurement of the inner diameter of the TRB under consideration, or for which the component part is intended. APPX001450. |
| WEIGHTU | Report the total weight of the finished merchandise net of packing in kilograms. APPX001450. |

Rather than taking into account any of these physical characteristics, which the Department used to place bearings into categories for analysis, the Department applied a metaphorical meat axe to the data, arbitrarily selecting a value without any consideration as to the enumerated factors identified by the Department as important in dividing, categorizing and analyzing the bearings.

This is readily illustrated by the following:

Product code [NNNNN] is assigned CONNUM [CONNUM                    ].
SALES DB This is a TRB with an outer diameter of [XX] and an inner diameter of
[XX] and a weight of [XX] KG. The Department reported as an alternate usage for
the FOP a TRB with product code NNNNN] assigned CONNUM [CONNUM

"] with an outer diameter of [XXX] and a weight of [X.XXKG]. APPX084730
– 084740 and APPX083545. While these are both TRB's, there are radically
different products and differ significantly on each and every measure and are not
interchangeable in any fashion. The only "common" factor is that both are the same
general type of component (assembly, cup or cone) – something established in the
questionnaire as only one factor which goes into the calculation of the CONNUM,
which is at a less detailed level than a product specific basis. The [NNNN] bearing
weighs [.XX] KG. The [NNNNN] bearing weights [X.XX] KG. This is a multiple
of more than 5 times the weight. The [NNNNN] bearing has an OUTER Diameter
of [XX] and the [NNNNN] bearing has an OUTER diameter of [XX] or nearly
double. Further, critically, the INNER diameter of the [NNNN] bearing is as large
as the OUTER diameter of the [NNNNN]. APPX083545.

The Department used this significantly dissimilar bearing to calculate the
following:

| Product Code | Turned Cups and Cones | Rollers | Cages | NET WEIGHT |
|---|---|---|---|---|
| [NNN as reported | | | | KG |
| NNNNN as modified by the Department | | | | KG |
| NNNNN | | | | KG] |

These inputs are distorted on their face.  Two of the three inputs have been calculated with an input which individually weighs significantly more than the **finished product** for which it is being used as an input. (A multiple of more than 5 times.)  The proposition that a finished bearing with a weight of [Statement of fact

] is simply unsupportable.  This is not even the most extreme example, the Department applied these same factors ([Weights  of bearings

]).

In contrast, for product code [                ], which is a bearing for which the Department did not substitute FOP Weights, the inputs were [

] for a bearing with a net weight of [            ] KG.   Thus, the total of these three inputs was [                        ], or after operations performed on these three materials, the total weight of these three inputs was the essentially the weight of the product.

The following chart shows that the consistent ratio of materials to final bearing

weight fell within a very narrow range.

| Product Code | Turned Steel | Roller | Cage | Weight of inputs | Net Weight | Percentage of Inputs to Net Weight |
|---|---|---|---|---|---|---|
| [Code | | | | | | % |
| Code | | | | | | % |
| Code | | | | | | ] |

In contrast the resultant percentages using the Department Partial AFA produce very different results.

| Product Code | Turned Steel | Roller | Cage | Weight of inputs | Net Weight | Percentage of Inputs to Net Weight |
|---|---|---|---|---|---|---|
| [Code | | | | | | % |
| Code | | | | | | % |
| Code | | | | | | %][3] |

The Department should have taken into account weights in selecting surrogate values, as to fail to do so, resulted in factors of production which resulted in weights

---

[3] Had these been calculated as reported, the percentages would have been from [percentage] or exactly in line with the other calculations

of raw materials that not only were far in excess of the weight of the factor, these factors were a multiple of the total weight of the finished product.

In sum, because the Department ignored all but one of the physical criteria used to establish the CONNUM and categorize the TRB's in selecting alternate factors of production, it selected factors of production which bore no relationship to the actual products.

### D. The Method Selected by the Department to Calculate Partial Adverse Facts and the Resultant Rate Bears no Basis to Commercial Reality

The Department does not have unlimited discretion is calculating margins. The Department must calculate a margin which is an accurate reflection of the conduct of the reviewed party.  Such margins must be reasonable, even if the calculation is made for a non-market economy.   In *Baoding Mantong Fine Chemistry v United States*, 113 F.Supp. 3d 1332, 1334 (Ct. Int'l Trade 2015) the Court rejected weighted average dumping margins which defy "commercial and economic reality".   The Court stated:

> Where, as here, Commerce is determining the normal value of subject merchandise according to specialized procedures applicable to goods produced in nonmarket economies**, Commerce is no less obligated to determine margins as accurately as possible, and it is no less obligated to determine, fairly and equitably, margins that are remedial and not punitive**. Congress directed generally that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1) (emphasis added). Although calculating normal value "for a producer in a nonmarket

economy country is difficult and necessarily imprecise," the method used by Commerce still must fall within "the limits of permissible approximation." *Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed.Cir.1997). Here, Commerce fell far short of this obligation: the assignment of so prohibitive a dumping margin as 453.79% as a remedial measure is difficult to comprehend from a commercial or economic standpoint. To take an extremely simplified example of the statutory formula (one that does not require calculation of a weighted average from multiple sales), a foreign exporter assigned a percentage dumping margin of 453.79% on a good with a normal value of $100 would have had to have sold the good at an export price, or constructed export price, of approximately $18.06 (i.e., in rounded numbers, the dumping margin would be $81.94 and the percentage dumping margin would be $81.94 divided by $18.06, or 453.71%.).
*Baoding Mantong* at 1337 – 1338.

The margins in the case at bar defy commercial and economic reality. This is reflected in numerous data points.

### 1. The Magnitude of the Calculated Margin

The first of these is the simple magnitude of the calculated margin.   The "partial adverse facts" rate was calculated 538.79%, while the total adverse facts rate was 92.84%.   In other words, the selected rate was a multiple of 5 times that of the total adverse rate.  Applying the same mathematics as used by the Court in *Baoding* would result in a selling price of $15.7 for our theoretical $100 normal value bearing.

If the "assignment of so prohibitive a dumping margin as 453.79% as a remedial measure is difficult to comprehend from a commercial or economic standpoint", then a margin of 538.79% should be even more difficult to comprehend.  Such margin was also far in excess of margins previously calculated in these reviews, and as

discussed herein, significantly exceeded the AFA rate. Simply put, such margin, on its face, defies commercial and economic reality.

### 2. *Plaintiffs Are Profitable*

The second major data point is the financial data of the plaintiffs which clearly establishes that Antidumping was not occurring at anything close to the magnitude of dumping in calculated margin.  This was also a critical factor asserted in *Baoding Mantong*.  The court stated:

> Regarding the enormity of the margin assigned to it, Baoding argues that if the 453.79% margin "reflected commercial reality, Baoding would have suffered huge operating losses during the period of review." Baoding reported during the administrative proceeding that it did not suffer any financial loss on export sales during the POR.  The normal value Commerce calculated for Baoding's subject merchandise — which based on the margin would have had to have been between five and six times the U.S. price — cannot be described as falling within "the limits of permissible approximation." In short, the record lacks substantial evidence to support a finding that the 453.79% margin has any relationship to Baoding's commercial reality, and the record evidence of Baoding's profitability is contrary to any such finding.
> *Baoding Mantong* at 1338-1339 (Citations omitted)

This situation, again, applies to Tainai. Specifically, when taken as a totality, Tainai and its U.S. subsidiary are making a significant operating profit.   During the POR Tainai reported a small operating loss APPX080784 - 080789 while CUA, the American affiliate and CEP seller of the goods, reported an operating profit of [$ ] APPX080802 - 080819. If, in fact, Tainai and CUA were dumping at the level set forth in the final results, the results would not be an operating profit of more than

Non-Confidential

[Value] per month during the 12 months of the POR.  The presence of a significant operating profit in the financial statements is conclusive proof that Tainai was not dumping at the margins found in the final results.  The calculated margin is inherently excessive and must be discarded.

### 3. Sales Data Shows Clear Differences Between Small and Large Bearings

The sales data also conclusively shows that bearings of different sizes and weights have significantly different prices.

*Different Sizes:*

Bearings with an outside diameter of [XX] sell for [$X.XX] each, Bearings with an outside diameter of [XXX] sell for [$XX.XX] each, and Bearings with an outside diameter of [XXX] sell for [$X.XX] each. All of these bearings are in the same "assembly" category apparently used by the Department to assign alternate factors of production.  APPX081051, APPX081053, APPX081077, APPX081079.

*Different Weights:*

Bearings with a weight of [XX] sell for [$ X.XX] each, Bearings with a weight of [X.XX KG] sell for [ $XX.XX ] each, and Bearings with a weight of [ X.XXX KG] sell for [ X.XX] each.  All of these bearings are in the same "assembly" category apparently used by the Department to assign alternate factors of production. APPX081051, APPX081053, APPX081077, APPX081079.

In other words, in commercial use, the dimensional and physical

characteristics of the bearing result in different prices with the larger and heavier bearings selling for greater prices, and thus with higher costs, while the smaller and lighter bearings have lower costs and prices. In contrast, the measures apparently selected by the Department to differentiate products and assign alternate factors of production had no relationship to cost and price and did not differentiate between radically different products.

### E. The Department Erred When it Used the Financial Statement of Timken Romania as the Sole Basis for Calculating Surrogate Financial Ratios

In calculating margins in calculations involving non-market economies, such as in this review of TRB's from the People's Republic of China, the Department assigns values to factors of production and calculates a value or cost for each factor. These values are then multiplied by the various surrogate financial ratios in order to calculate the value.

In the case at bar, the Department had a number of competing financial statements which could be used as the basis for financial ratios. The Department decided to use a single financial statement – that of Timken Romania – and did not use any of the other financial statements submitted for consideration. This decision was in error. The Department's primary objective in selecting surogates and calculating a margin is that of accuracy. Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information. *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268

F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).

The Department's selection of the single Timken Romania financial statement did not work toward satisfiying the objective. The Department's error was two-fold.

It is well established that the Department has a preference for multiple financial statements. The Department has clearly stated its policy to use more than one financial ratio to avoid distortion from using the data from a single entity. As noted by the Department in *Certain Non-Refillable Steel Cylinders from the People's Republic of China*:

> Additionally, selecting Malaysia over Bulgaria as the primary surrogate country allows us to use three financial statements, **thus satisfying our preference for multiple financial statements** to determine surrogate financial ratios to mitigate any potential distortions that may arise from using those of a single producer.
> *Certain Non-Refillable Steel Cylinders from the People's Republic of China,* 86 Fed. Reg 15188 (March 22, 2021) (Decision Memorandum of March 15, 2021

This preference has been recognized by this Court. In *Jiaxing Bro. Fastener Co., Ltd. v. United States,* 961 F.Supp 2d. 1323 (Ct. Int'l Trade 2014) the Court stated:

> In addition, Commerce has an announced criterion of utilizing multiple financial statements when available to eliminate distortions that may arise from using those of a single producer. *Certain Malleable Iron Pipe Fittings from the People's Republic of China*, 70 Fed. Reg. 76,234, 76,237 (Dep't of Commerce Dec. 23, 2005) (prelim, results admin.

review), as modified, 71 Fed.Reg. 37,051 (Dep't of Commerce June 29, 2006) (final results admin. review); see *Dorbest Ltd. v. United States, 604 F.3d 1363, 1368, 1373-75* (Fed.Cir. 2010). Here, there was one Thai financial statement as opposed to three usable Philippine financial statements, undermining Commerce's finding that the Thai financial data were of "similar quality" to the Philippine data. *Jiaxing Bro.* at 1332.

### 1.  The Department had Multiple Financial Statements of Record

 In this case the Department was presented with multiple financial statements:

Compa S.A. (Sibiu); APPX002211 – APPX002408 and

URB Rulmenti Suceava. APPX012952

URB Rulamenti Suceava ("Rulmenti") is a Romanian producer of bearings. The financial statement contains all of the requisite information, with the only flaw is the absence of a profit in 2019.

Compa S.A. (Sibiu) ("Sibiu") is a Romanian producer of automotive components including  pinions, steering gears, components for turbochargers and air conditioning equipment, valves and components for injection systems. APPX002276 – APPX002277.  Compa S.A. (Sibiu) uses numerous metal processing machines including CNC Lathes, Milling machines, and grinding machines APPX002239. While such components are not bearings, they are precision articles made of metal which are subject to grinding and other processing operations.

In sum, Compa S.A. (Sibiu) engages in the precision grinding and finishing of metal components and assembles them into finished goods, just as Tainai engages

in the grinding and finishing of metal components and assembles them in to finished goods.  In contrast, Timken Romania engages in operations which are far more complex and performs processing of metal at a level far closer to the melt stage. Accordingly, Compra S.A. Sibiu provides an appropriate basis for financial ratios.

In the case of Rulmenti it is a Romanian producer of bearings and is in the same industry as plaintiff.  Its  Its sole flaw is the lack of a profit, a defect which can be readily remedied by setting the profit to zero.

The appropriateness of these financial statements, as contrasted to that of Timken Romania is set forth in Section IV.E.2 of this memorandum.

In contrast, Timken Romania's financial statement is badly distorted by a significant number of affiliated party transactions and its active participation as a member of the Timken Group. While Tainai submits that these distortions are so significant as to require the non-use of this financial statement. Tainai further submits that if the Department should decide that the Timken Romania financial statement is still usable (which it is not), the Department should average in the financial statement of Compra S.A. (Sibiu) and Rulmenti to "mitigate any potential distortions that may arise from using those of a single producer".  Tainai submits that in this case it is particularly important to take into account the potential for distortion as Timken Romania is part of the Timken Group, and the Timken Company was an active participant in the review on behalf of the domestic industry.

Tainai submits that these alternate financial statements are usable, and that they better capture the operations undertaken by Tainai, they should be used along with the other financial statements in an average.

### 2. *The Timken Romania Financial Statement is Badly Flawed*

The Department erred when it used the financial statement of Timken Romania as a basis for surrogate financial ratios.   The Timken financial statement was badly flawed and should not have been used.

The Department used only the Financial Statement and the Financial Results of Timken Romania SA as the basis for the Financial Ratios used in the Surrogate Value calculation.  In doing so, the Department rejected the use of Compa S.A. (Sibiu) a Romanian producer of precision metal products and Rulmenti, a Romanian producer of bearings, both of which were provided by Tainai.    Timken Romania should not be used as the source for financial ratios as its corporate operations are radically dissimilar to those of Tainai, and critically, are badly distorted by the nature of Timken Romania's operations.  While Tainai produces antifriction bearings [ discussion of nature of operations

]

APPX001584 - 001585    In contrast, Timken Romania is a full-line producer of bearings which uses steel as a primary raw material. APPX011589    It is part of the Timken Group, a large group of inter-related bearing producers including U.S.

producers with an incentive to exclude, or otherwise limit, international competitors such as Tainai from the U.S. market . APPX011543. Its operations are significantly more complex than the operations undertaken by Tainai and thus using Timken Romania as the basis for financial statement would be distortive and include values for significant operations.

Critically, in addition to operations which are not comparable, Timken Romania, because of the numerous related parties, also has heavily distorted sales and purchases. The sales and results are badly distorted due to the very high percentage of related party transactions. As clearly stated in the financial statement, Timken Romania had L421,113,434[4] in sales to affiliated parties APPX011547 – 011548 out of total sales of L441,806,260 APPX011488. This means that only L20,692,826[5] in sales were, in fact, to unaffiliated parties (less than 5%)[6]. The very high percentage of affiliated sales, and the relationship with the other members of the Timken Group, means that the financial statements are subject to significant manipulation. Timken Romania acknowledged that this relationship impacted its business. Timken Romania wrote:

> The company had during 2019, related party transactions that quantify approximately 96.09% of the total number of business. Within the group, Timken Romania acts as a complex producer with limited

---

[4] A Leu (the Romanian unit of currency) is approximately .25 USD.

[5] Derived by subtracting 421,113,424 from 441,806,260.

[6] Derived by placing 20,692,826 over 441,806,260.

functions and risks.
APPX11557.   See also APPX011588.

Similar data can be found for purchases by Timken Romania. In sum, the Timken Romania financial statement is significantly impacted by these related party transactions and its place as part of the Timken Group.  Timken Romania should not be used as the basis for financial ratios.

The non-representative nature of the Timken Romania financial statement is further demonstrated by the financial data of URB Rulmenti Suceava ("Rulmenti") APPX012952.  Rulmenti is a Romanian producer of bearings.  As noted by the Department, Rulmenti ran at a loss in 2019 and thus the Department refused to use this entity.   Where we have two companies in the same country in the same industry. One company is making healthy profits and another is losing money, the differences are critical.  The primary difference appears to be that Timken Romania has a significant number of related party transactions which may have artificially inflated its profits and potentially deflated its raw material costs while Rulmenti does not have these related party transactions.   In other words, the absence of profit for Rulmenti is evidence of the distortion of the financial statement of Timken Romania.

In contrast, the financial statement for Compra S.A. (Sibiu), does not contain the same defects.  While Compra S.A. (Sibiu) does not produce Bearings, it is involved in the processing and assembly of alloy metals into precision articles with moving parts. APPX002276 – APPX002277 and APPX002239. The Compra S.A.

(Sibiu) financial statement established the purchases of milling, grinding, and measuring machines, the same operations undertaken by Tainai.   These products are comparable to tapered roller bearings which are also precision articles made of alloy metals.

Accordingly, based on the foregoing, the Department should not have used the financial statement of Timken Romania as the basis for financial ratios.  The operations are far more complex than the operations undertaken by Tainai, and critically, the high percentage of related party transactions render the Timken Romania data unusable.   The Department should use, as an alternative, the financial statement and ratios of Compa S.A. (Sibiu) and the financial statement and ratios of Rulmenti, setting the profit for Rulmenti to zero.

If, notwithstanding the foregoing, the financial data of Timken Romania is to be used, it should average this ratio with those of Compa S.A. (Sibiu) and Rulmenti. This will help to avoid the distortion that results from the use of a single financial statement.

### F. The Department Valued Certain Components Using Surrogate Values for the Finished Components.

Tainai purchased a [statement of magnitude] of finished rollers for assembly into finished bearings. APPX081267   These finished rollers were valued using a surrogate value for rollers. These rollers were not valued using the factors of production that go into the production of the rollers.   The rollers were valued using

Non-Confidential

HTS 8482.91.10.   This provision is for "Tapered Rollers For Bearings; Tapered Rollers For Bearings".  The surrogate value for these rollers, a finished component, thus necessarily included the cost for the materials as well as the cost of the processing to convert the raw materials into rollers and the profit for the producer of the rollers.

In a similar fashion, Tainai purchased a [statement of magnitude] of finished cages for assembly into finished bearings. APPX081263.  These finished cages were valued using a surrogate value for cages.  These cages were not valued using the factors of production that go into the production of the cages.   The cages were valued using HTS 8482.99.00.   This provision is for "Parts of Ball or Roller Bearings (Excl. Balls, Needles And Rollers), NES; Parts Of Ball Or Roller Bearings (Excl. Balls, Needles And Rollers), NES".   The surrogate value for these cages, a finished component, thus necessarily included the cost for the materials as well as the cost of the processing to convert the raw materials into cages and the profit for the producer of the cages.

Finally, Tainai purchased a [statement of magnitude] of Turned Cups and Cones for assembly into finished bearings.  APPX 081257 – 081258. These finished Cups and Cones were valued using a surrogate value for Cups and Cones.  These Cups and Cones were not valued using the factors of production that go into the production of the Cups and Cones.   The Cups and Cones were valued using HTS

Non-Confidential

8482.99.00.   This provision is for "Parts of Ball Or Roller Bearings (Excl. Balls, Needles And Rollers), NES; Parts Of Ball Or Roller Bearings (Excl. Balls, Needles And Rollers), NES ".  The surrogate value for these Cups and Cones, a finished component, thus necessarily included the cost for the materials as well as the cost of the processing to convert the raw materials into Cups and Cones and the profit for the producer of the Cups and Cones.

Tainai's operations were far more limited and constituted [nature of operations

.] APPX081193. As the Department valued these components using SV for finished components, the financial ratios should not be applied as the ratios are already built into the surrogate value for the finished goods, and equally important, the FOP that go into these finished components is ultimately irrelevant as such data would not be used.

### G. The Department Should Not Have Deducted 301 Duties from the U.S. Price

In the determination, the Department adjusted the U.S. price by deducting from this price the amount of the Section 301 duties paid by Tainai's U.S. affiliate at the time of importation.   Such Section 301 duties were imposed by the United States, pursuant to International Agreements, to address certain conduct by the

People's Republic of China and to force China to modify its conduct.[7]  These 301

duties are not ordinary duties, and are more akin to remedial Antidumping duties

and thus should not be deducted from U.S. price.

It is well established that Antidumping Duties are not imposed on other trade

corrective duties.   The Department avoids doing this as a matter of policy, not as a

matter of law.  In calculating the amount of antidumping duties, the Department does

not deduct either countervailing or antidumping duties from the U.S. price as to do

otherwise would create a cascade and would result in the imposition of antidumping

duties based solely on the imposition of such duties.   While the deduction of the

countervailing duties is provided by Section 772(c)(1)(C), Antidumping duties are

also not deducted from U.S. price as a matter of policy.   Rather, this is a statutory

construction consistently applied by the Department.  Tainai submits that the term

"United States import duties" referenced in Section 772(c)(2)(A) refers to "ordinary

customs duties" and not duties imposed under Section 301.

It is important to note that the Section 301 duties are inherently temporary in

nature as they are imposed under U.S. law implementing international agreements

and in response to a specific conditions. See 19 USC § 2411  Once this specific

---

[7] *See*, Notice of Action and Request for Public Comment Concerning Proposed Determination of
Action Pursuant to Section 301:  China's Acts, Policies and Practices Related to Technology
Transfer, Intellectual Property, and Innovation, 8e *Fed. Reg.* 28710 (June 20, 2018).  The notice
expressly states that the purpose is "to obtain elimination of China's harmful acts, policies and
practices".

condition is resolved, the Section 301 duties must be lifted.   These duties are akin to other conditional duties – Antidumping and Countervailing – where a change in conduct will result in a change in the duties, including potentially eliminating them in full.  In contrast, ordinary customs duties are those duties which are not contingent on external events, but rather are ordinary duties at bound rates and cannot be "avoided" by taking actions to comply with demands for action.

In sum, it is clear that Section 301 duties are special duties, not ordinary duties.   These Section 301 duties are focused on resolving certain conduct by China and Chinese exporters, just as Antidumping duties are focused on resolving certain other conduct by China and Chinese exporters.  In contrast, ordinary duties are not focused on resolving specific conduct, but rather are applied across the board to all trading partners.  As such, deducting Section 301 duties in calculating U.S. price is distortive and such deductions should not be taken.

### H. The Department Should Not Have Capped the Addition to the U.S. Price for 301 Duties

The Department did not apply all payments reported as received from the Customers as part of the price paid or payable.  Rather, the Department limited those payments denominated as "additional revenue for 301" to the amount of Section 301 duties paid on the goods.  This was a legal error.  Whether or not these payments were collected because of the Section 301 duties, these payments ultimately represented revenue received by Tainai on a specific sale.  Even if the Section 301

duties were ultimately refunded, the additional revenue collected by Tainai would be retained and would not be refunded to the customer.

In evaluating the inappropriate nature of this cap, it is critical to examine the treatment of payments generally in international trade.   In the case of Customs valuation, the price actually paid or payable is the total payment.   19 CFR 152.101(d) states:

> Price actually paid or payable.  "Price actually paid or payable" means the **total payment** (whether direct or indirect, and exclusive of any charges, costs, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.
> 19 CFR 152.101(d) (Emphasis Added)

Thus, with respect to Customs valuation, the total payment, no matter how characterized is included as part of the price paid or payable.   This language is clear and unequivocal.

The antidumping duty law also contemplates the use of a price which is the money received from the customer and for which only limited adjustments are made. The regulation states:

> Use of price net of price adjustments.  In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party

demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.
19 CFR 351.401(c)

This regulation also reflects the statute.   The Statute, at 19 U.S.C. 1677(a)

states:

(a)Export price
The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

(b)Constructed export price
The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

(c)Adjustments for export price and constructed export price
     The price used to establish export price and constructed export price shall be—
(1)increased by—
 (A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,
 (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and
 (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and
(2)reduced by—

48

(A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

(d) Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price shall also be reduced by—

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

(A) commissions for selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser; and

(D) any selling expenses not deducted under subparagraph (A), (B), or (C);

(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and

(3) the profit allocated to the expenses described in paragraphs (1) and (2)

19 U.S.C. 1677a

The statute clearly provides that the price is the price at which the subject merchandise is to be sold. In the case of Tainai, this price includes both the bearing price and the additional amounts collected to compensate for duties.

The statute clearly lays out the limited circumstances where the price can be

increased or decreased.  In this case, the question is whether the price can be reduced by the difference between the duty paid and the portion of the price attributed to the duty paid.  The statute does not provide for such reduction.   The statute makes it clear that the price can only be reduced by:

- Additional costs and duties attendant to bringing the subject merchandise to the United States.   This is already present in the calculation for Tainai for items such as Customs Duties.   It does not, however, include the difference between the 301 duties and the amount denominated as additional monies collected.

- Export taxes imposed on the exportation of goods.    This does not apply to the issue at bar.

This is revenue received and should be treated as such.   There is no legal basis to distinguish between these payments and other payments made for the goods. None of the deductions set forth in the statute apply.  The only potential argument is that the total price, including the additional money denominated as 301 reimbursement, could be reduced by the amount of the 301 duties.  This, however, is addressed in section IV.G above, and in any event, the purported additional deduction in the form of a cap.  It does not consist of duty paid, it consists of a deduction for duty NOT paid – which is directly contrary to the express language of 19 U.S.C. 1677a(c)(2)(a) and (b).

The inclusion of these charges in the starting price is also supported by the decision in *Floral Trade Council v. United States,* 41 F.Supp.2d 319 (Ct. Int'l Trade 1999) In this case, the question was whether a surcharge imposed to cover the cost

of antidumping duties was part of the price paid or payable.   Commerce had

challenged whether the surcharge should be deducted from the U.S. price in

calculating CEP for unaffiliated consignees.   There was no dispute that including

this surcharge in U.S. price was proper for affiliated consignees.  The Court rejected

the argument finding that such surcharges were included, whether for affiliated on

unaffiliated consignees.  The Court stated:

> Section 1677a enumerates numerous expenses, included in the starting
> price, that do not accrue to the producer, including international air
> freight, Customs' clearance fees, selling expenses, and other charges.
> Congress specifically required that these expenses be deducted from
> CEP in subsections (c)(2) and subsection (d). See 19 U.S.C. §
> 1677a(c)(2)-(d). Again, as these expenses comprise part of the starting
> price, they are included in the starting price. Therefore, if, as Commerce
> contends, Congress intended to restrict the CEP starting price to
> components of that price that actually accrue to the producer, the
> adjustments provided for in subsections (c)(2) and (d) would be
> superfluous. The canons of statutory construction provide that "{a}
> statute should be construed so that effect is given to all its provisions,
> so that no part will be inoperative or superfluous, void or
> insignificant{.}" SUTHERLAND STAT CONST § 46.06 (5th
> ed.1992). Commerce's interpretation of the provision would render its
> subsections superfluous; therefore, the Court concludes that
> Commerce's interpretation is contrary to Congress's intent.
>
> Finally, the SAA provides that, "constructed export price will be
> calculated by reducing the price of the first sale to an unaffiliated
> customer in the United States by the amount of the following
> expenses{.}" SAA at 823. The price of the first sale in the United States
> includes the antidumping surcharge, and the surcharge is not listed as
> one of the adjusted expenses. Therefore, the legislative history indicates
> that the CEP should include the antidumping surcharge.
>
> The statute's language and legislative history, examined according to
> the accepted canons of construction, indicate that Congress intended to

include antidumping surcharges in the starting price whether or not the consignee is related to the producer/exporter. Therefore, Commerce's application of the provision is not in accordance with law.
*Floral Trade Council* at 335

These 301 duty charges are akin to items such as antidumping surcharges and material surcharges.   The are ordinarily part of the starting price and, in the absence of a provision directing their non-inclusion, should be included in the price.   In sum, the Department had no legal authority to "cap" these payments and such cap cannot stand.

## I.   The Department Should Have Granted a By-Product Offset

The Department did not grant a by-product offset.  This was incorrect.  Tainai provided the sales information for the scrap that it sold.  However, due to the record maintained in the ordinary course of business, the quantity of scrap produced is not directly recorded.   As such, Tainai explained, in detail, how it allocated the scrap that it sold to the product that it produced.APPX081182 – 081185, APPX081322. Critically, the quantity of scrap produced is the same as the quantity of scrap sold as Tainai would have no business purpose for retaining scrap.  There is no evidence of record, for example, that Tainai purchased and resold steel scrap, and in fact, the scrap produced and sold is a natural consequence of the production process.    The failure to provide a by-product offset, after such by-product has been sustained by the ordinary business records of the company, results in an artificial increase in the margin and results in a margin which is not accurately calculated.

## V.   <u>CONCLUSION</u>

Shanghai Tainai Bearing Co., Ltd. and Plaintiff C&U Americans, LLC therefore respectfully request that this Court grant its motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this memorandum.  Specifically, the Court should find:

That the Department improperly applied partial adverse facts to Tainai;

That the Department failed to properly determine whether there were any gaps in information for which alternate data was needed;

That the Department improperly used the financial statement of Timken Romania to calculate financial ratios;

That the Department improperly required the deduction of Section 301 duties from U.S. price;

That the Department improperly capped certain payments and did not include such payments in U.S. price; and

That the Department erred by not granting Tainai a by-product offset.

This matter should be remanded to the Department with direction that the Department modify the final results to correct the errors in the final determination. By doing so, the Department will be properly instructed by the Court to correct these clear errors.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to Shanghai Tainai Bearing Co., Ltd. and C&U Americans, LLC

Dated July 26, 2022