**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. AND C&U AMERICAS, LLC,<br><br>             Plaintiffs,<br><br>   and<br><br>PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD,<br><br>             Consolidated Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>             Defendant. | Cons. Court No. 22-0038<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information (BPI) Removed From Pp. 5, 14, 19 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
Jesus N. Saenz
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade

KELLY A. KRYSTYNIAK
Trial Attorney
U.S. Department of Justice
Civil Division

Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 307-0163
Fax: (202) 514-8640
Email: Kelly.a.krystyniak@usdoj.gov

Dated:  October 19, 2022

Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 2

    I.    The Administrative Determination Under Review ................................. 2

    II.   Issues Presented For Review ................................................................ 2

STATEMENT OF FACTS ....................................................................................... 3

SUMMARY OF ARGUMENT ................................................................................ 5

ARGUMENT ........................................................................................................... 6

    I.    Standard Of Review .............................................................................. 6

    II.   Commerce's Determination To Apply Partial Adverse Facts Available To Tainai's Unreported Factors Of Production Is Supported By Substantial Evidence And Otherwise In Accordance With Law ............................... 8

        A.  Legal Framework ........................................................................ 8

        B.  Commerce's Application Of Partial Adverse Facts Available With An Adverse Inference Is Supported By Substantial Evidence And Consistent With Past Practice ...................................................... 9

            i.    Commerce's Determination To Apply AFA ......................... 9

            ii.   Tainai And Its Unaffiliated Suppliers Failed To Cooperate To The Best Of Their Abilities ......................................................... 12

            iii.  Commerce's Determination To Fill The Gap In The Record, As Partial AFA, With Tainai's Own Data Is Supported By Substantial Evidence And In Accordance With Law ...................................................... 16

    III.  Tainai's Dumping Margin Is Supported By Substantial Evidence And In Accordance with Law .............................................................................. 22

    IV.  Commerce's Reasonably Rejected Tainai's Ministerial Error Allegations ............. 25

    V.   Commerce Reasonably Found That Timken Romania's Financial Statement Was The Best Available Information For Calculating Surrogate Financial Ratios ...................................................................................... 28

        A.  Legal Framework for Surrogate Country Selection ........................... 28

B.  Commerce Reasonably Found That The Timken Romania Financial Statement Was The Best Available Information For Calculating Surrogate Financial Ratios ................................................................................ 30

VI.   Commerce Reasonably Deducted Section 301 Duties from the U.S. Price, And Capped Section 301 Duty Payments ........................................................... 34

A.  Deducting Section 301 Duties ............................................................ 34

B.  Commerce Reasonably Capped Section 301 Duty Payments To The Actual Duty Amount, Excluding Additional Revenue ........................................ 36

VII.   Commerce Reasonably Denied Tainai A By-Product Offset ................................. 38

VIII.   Consolidated Plaintiffs' Claims ................................................................. 40

CONCLUSION ................................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Am. Tubular Prod., LLC v. United States,*
   847 F.3d 1354 (Fed. Cir. 2017)....................................................................... 37, 38

*Arch Chems., Inc. v. United States,*
   33 C.I.T. 954 (2009)............................................................................................ 36

*Baoding Mantong Fine Chemistry Company v. United States,*
   113 F. Supp. 3d 1332 (Ct. Int'l Trade 2015)........................................................ 24

*Baoding Mantong Fine Chemistry Company v. United States,*
   279 F. Supp. 3d 1321 (Ct. Int'l Trade 2017)........................................................ 24

*Carpenter Tech. Corp. v. United States,*
   510 F.3d 1370 (Fed. Cir. 2007)........................................................................... 25

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984)............................................................................................... 7

*Consol. Edison Co. of N.Y. v. NLRB,*
   305 U.S. 197 (1938)............................................................................................... 6

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966)............................................................................................... 7

*F. Lii De Cecco Di Filipo Fara S. Martino S.pA v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000)........................................................................... 21

*Gallant Ocean (Thai.) Co., Ltd. v. United States,*
   602 F.3d 1319 (Fed. Cir. 2010)........................................................................... 21

*Home Meridian Int'l. Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014)........................................................................... 29

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992)............................................................................................... 7

*Jiaxing Brother Fastener Co. v. United States,*
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014)......................................................... 29

*Jiaxing Brother Fastener Co., Ltd. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016)..................................................................... 29, 30

*Juancheng Kangtai Chem. Co. v. United States,*
  No. 14-56, 2015 WL 4999467, at *40 (Ct. Int'l Trade Aug. 21, 2015) .................................. 37

*MTZ Polyfilms, Ltd. v. United States,*
  659 F. Supp. 2d 1303 (Ct. Int'l Trade 2009) ........................................................................ 25

*Mueller Comercial De Mexico, S. De R.L. De C.V. v. United States*,
  753 F.3d 1227 (Fed. Cir. 2014) ................................................................................. *passim*

*Nan Ya Plastics Corp. v. United States,*
  810 F.3d 1333 (Fed. Cir. 2016) ......................................................................... 22, 23, 24

*Nation Ford Chem. Co. v. United States,*
  166 F.3d 1373 (Fed. Cir. 1999) ............................................................................... 29

*Nippon Steel Corp. v. United States,*
  337 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 9, 16

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
  203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ......................................................... 7

*T.T. International Co., Ltd. v. United States*
  439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ................................................... 22, 24

*Tianjin Magnesium Int'l Co. v. United States,*
  844 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ............................................................. 9

*Timken Co. v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004) ................................................................................. 7

*Torrington Co. v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995) ................................................................................. 7

*United States v. Eurodif S.A.,*
  555 U.S. 305 (2009) .................................................................................................... 7

*Venus Wire Indus. Pvt. v. United States,*
  471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) ......................................................... 21

*Wheatland Tube Co. v United States,*
  495 F.3d 1355 (Fed. Cir. 2007) .............................................................................. 35

*Zhejiang DunAn Hetian Metal Co. v. United States,*
  652 F.3d 1333 (Fed. Cir. 2011) .......................................................................... 29, 30

**Statutes**

19 U.S.C. § 1516a(b) ................................................................................ 6, 23, 25

19 U.S.C. § 1673 ................................................................................................. 28

19 U.S.C. § 1673d(e) .......................................................................................... 26

19 U.S.C. § 1677(9) .................................................................................. 11, 19, 20

19 U.S.C. § 1677(35) .......................................................................................... 22

19 U.S.C. § 1677a(c) ........................................................................................... 34

19 U.S.C. § 1677b(c) .................................................................................... *passim*

19 U.S.C. § 1677e ........................................................................................ *passim*

19 U.S.C. § 1677m(d) ........................................................................................... 8

19 U.S.C. § 2411 ................................................................................................. 35

**Federal Register**

*Certain Activated Carbon From the People's Republic of China,*
   74 Fed. Reg. 21,317, 21,320-21 (Dep't of Commerce May 7, 2009) ...................................... 21

*Certain Activated Carbon From the People's Republic of China,*
   74 Fed. Reg. 57,995 (Dep't of Commerce Nov. 10, 2009) ..................................................... 21

*Certain Ball Bearings and Parts Thereof,*
   68 Fed. Reg. 12,669 (Dep't of Commerce Mar. 17, 2003) ...................................................... 33

*Certain Oil Country Tubular Goods from the People's Republic of China,*
   77 Fed. Reg. 74,644 (Dep't of Commerce Dec. 17, 2012) ...................................................... 31

*Certain Quartz Surface Products from India,*
   85 Fed. Reg. 25,391 (May 1, 2020) ........................................................................................ 36

*Certain Quartz Surface Products from the People's Republic of China,*
   84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019) ...................................................... 31

*Certain Steel Nails From the People's Republic of China: Final Results and Final Partial
   Rescission of the Second Antidumping Duty Administrative Review,*
   77 Fed. Reg. 12,556 (Dep't of Commerce March 1, 2012) ..................................................... 20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020) ......................................... 3

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    85 Fed. Reg. 54,983, 54,990 (Dep't of Commerce Sept. 3, 2020) ............................ 3

*Multilayered Wood Flooring from the People's Republic of China,*
    76 Fed. Reg. 64,318 (Oct. 18, 2011) ..................................................................... 36

*Narrow Women Ribbons With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review; 2012-2013,*
    80 Fed. Reg. 19,635 (Dep't of Commerce Apr. 13, 2015) ....................................... 20

*Notice of Modification in Section 301 Action: China Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,*
    83 Fed. Reg. 47974 (United States Trade Representative, September 21, 2018) ................... 35

*Tapered Roller Bearing and Parts Thereof,*
    66 Fed. Reg. 57,420 (Nov. 15, 2001) .................................................................... 33

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China,*
    86 Fed. Reg. 36,099 (Dep't of Commerce July 8, 2021) ........................................... 3

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China,*
    87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022) ................................... 2, 4, 5

*Xanthan Gum from the People's Republic of China,*
    86 Fed. Reg. 16,189 (Mar. 26, 2021) .................................................................... 35

## Regulations

19 C.F.R. § 351.102(b) ....................................................................................... 35, 36

19 C.F.R. § 351.224(f) ............................................................................................. 26

19 C.F.R. § 351.401 ......................................................................................... 35, 36, 38

19 C.F.R. § 351.408(c) ........................................................................................ 29, 30

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE**

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. AND C&U AMERICAS, LLC, | |
| Plaintiffs, | |
| and | |
| PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD, | Cons. Court No. 22-0038 |
| Consolidated Plaintiffs, | |
| v. | |
| UNITED STATES, | |
| Defendant. | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' AND CONSOLIDATED PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the motions for

judgment upon the agency record filed by plaintiffs Shanghai Tainai Bearing Co., Ltd. (Tainai)

and C&U Americas, LLC (CUA) (together, plaintiffs) (ECF Nos. 32, 33), and by Precision

Components, Inc., Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd.,

and Hebei Xintai Bearing Forging Co., Ltd., (together, consolidated plaintiffs) (ECF No. 34),

challenging the Department of Commerce's (Commerce) final results in its administrative review

of the order on tapered roller bearings (TRBs) from China.  Because Commerce's final results

are supported by substantial evidence and otherwise lawful, we respectfully request that the

Court sustain Commerce's determination.

**STATEMENT PURSUANT TO RULE 56.2**

I.    **The Administrative Determination Under Review**

The administrative determination under review is *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China,* 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022) (Final Results) (APPX001000-02), and accompanying Issues and Decision Memorandum (IDM) (APPX001003-34).  This administrative review covers the period from June 1, 2019, to May 31, 2020.

II.   **Issues Presented For Review**

1.    Whether Commerce's application of partial adverse facts available to Tainai's unreported factors of production is supported by substantial evidence and otherwise lawful.

2.    Whether Commerce's calculation of Tainai's dumping margin is supported by substantial evidence and otherwise lawful.

3.    Whether Commerce's rejection of Tainai's ministerial error allegations is supported by substantial evidence and otherwise lawful.

4.    Whether Commerce's selection of Timken Romania's financial statements as the best available information for calculating surrogate financial ratios is supported by substantial evidence and otherwise lawful.

5.    Whether Commerce reasonably deducted Section 301 duties from the U.S. price, and capped Section 301 duty payments.

6.    Whether Commerce's denial of a by-product offset for Tainai is supported by substantial evidence and otherwise lawful.

2

## STATEMENT OF FACTS

On August 6, 2020, Commerce initiated the thirty-third administrative review of the antidumping duty order covering tapered roller bearings from China, for the period June 1, 2019, through May 31, 2020.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 47,731 (Dep't of Commerce Aug. 6, 2020) (*Initiation Notice*) (APPX001069); *see also Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 85 Fed. Reg. 54,983, 54,990 (Dep't of Commerce Sept. 3, 2020) (APPX001133) correcting the *Initiation Notice*.  Commerce determined that it could only reasonably examine one company and selected Tainai because it was the exporter accounting for the largest volume of entries of TRBs from China.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 86 Fed. Reg. 36,099 (Dep't of Commerce July 8, 2021) (Prelim. Results) (P.R. 189) (APPX013162), and accompanying Preliminary Decision Memorandum (PDM) at PDM at 2 (P.R. 181) (APPX013071); Respondent Selection Memorandum (Sept. 21, 2020) (P.R. 55; C.R. 25) (APPX080381).  The consolidated plaintiffs were not selected for individual examination.  Respondent Selection Memorandum (Sept. 21, 2020) at Attachment (APPX080387).

On July 8, 2021, Commerce published its preliminary results.  Prelim Results.  In the preliminary results, Commerce identified a number of deficiencies and inconsistencies in Tainai's reporting of its factors of production data.  PDM at 15 (APPX013085).  Accordingly, Commerce applied facts available (without an adverse inference) to accurately reflect Tainai's deficient and inconsistently reported factors of production data.  *Id.* at 15-16.  However, Commerce's preliminary determination also flagged missing information in Tainai's questionnaire responses, including "direct input bills of materials {} for production of subject

3

merchandise" from Tainai's affiliated and unaffiliated suppliers, which is information required to substantiate Tainai's reported factors of production.  *Id.*  Relying on the factors of production as reported by Tainai (but without the required substantiating documentation), Commerce preliminarily calculated an estimated weighted-average dumping margin of 36.75 percent for Tainai.  Prelim. Results at 36,100.

Following the preliminary results, Commerce issued a supplemental questionnaire to Tainai to provide it with an opportunity to clarify and remedy its reported factors of production data.  Supplemental Questionnaire (P.R. 191) (APPX084307).  Commerce also sent questionnaires to Tainai's unaffiliated suppliers to in attempt to collect missing data.  While Tainai timely responded to the questionnaire, Commerce did not receive a the requested factors of production data from Tainai or any of the unaffiliated suppliers.  IDM at 7 (APPX013393); *see also* Commerce's Request for Information Letter (Aug. 17, 2021) (P.R. 192) (APPX013173).

On January 10, 2022, Commerce published its final results.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022) (Final Results) (P.R. 222) (APPX001000), and accompanying Issues and Decision Memorandum (IDM) (P.R. 214) (APPX013387).  In the Final Results, Commerce found that it could no longer rely on Tainai's reported allocation methodology for factors of production that it purchased from unaffiliated suppliers because the suppliers had refused to cooperate with Commerce's request for information on their factors of production.  IDM at 10-14 (APPX013396-00).  Accordingly, Commerce applied partial adverse facts available for Tainai's missing factors of production data, substituting *Tainai's own data* – that is, Commerce used the factors of production for similar items reported by Tainai's affiliated suppliers.  *Id.*  Moreover, Commerce explained why it believed Tainai has the ability to induce

compliance with requests from Commerce in future reviews:

> Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise during the {period of review}.  Based on Tainai's large volume of entries during the POR and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.

IDM at 13 (APPX013400).

However, because the missing data accounted for [          ] of merchandise, the substituted data changed the rate calculated based on Tainai's estimated costs as employed in the preliminary determination.  Tainai Calculation Memorandum at Attachment III, tab Exhibit SSD-1.1 (establishing that [             ] of CONNUMs were supplied in whole or in part by unaffiliated suppliers) (P.R. 217, C.R. 210).  As Commerce explained, because Tainai does not produce TRB components but rather is only "involved in the finishing and grinding stages in the TRBs supply chain," Tainai's "extrapolation of data from certain affiliated suppliers to account for its unaffiliated suppliers' {factors of production} usage rates is nothing more than speculation and insufficient to justify Tainai's allocation methodology."  IDM at 11 (APPX013397).  Accordingly, Commerce calculated a weighted-average dumping margin, based on partial adverse facts available, of 538.79 percent.  *Final Results* at 1,121.  The consolidated plaintiffs, who were not individually examined, were assigned the same rate as Tainai.

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's final results.  Commerce's application of partial adverse facts available to Tainai's unreported factors of production is supported by substantial evidence because it is uncontested that Tainai did not provide Commerce with required data notwithstanding the fact that information concerning factors of production is the sort of basic

information typically requested by Commerce.  The Court is reviewing the *thirty-third administrative review* of the order on TRBs; that Tainai evidently failed to collect factor of production information from its downstream suppliers is inexcusable, particularly where Tainai does not actually produce *any* TRBs, but rather purchases and further finishes them.  In the same vein, Tainai's suppliers are "interested parties" under the applicable statute and similarly failed to respond to Commerce's questionnaire requesting the information.  Moreover, Commerce's application of AFA was tailored only to factors of production for which no information was available.  That this includes nearly all the factors of production speaks only to the scale of the gap in the record created by Tainai's failure to gather and keep data needed to comply with Commerce's requests, not any "punitive" intent on the part of Commerce.

Commerce also reasonably rejected Tainai's ministerial error allegations because the alleged "error" falls far outside the regulatory definition requiring correction.  And Commerce's selection of Timken Romania's financial statement as the best information on the record for calculating surrogate financial ratios is supported by substantial evidence and in accordance with law because the statement represented the best available surrogate information.  Commerce also acted consistent with its recent practice and reasonably deducted Section 301 duties from U.S. price and capped Section 301 duty payments.  Finally, because Tainai concedes that it did not record the necessary data, Commerce reasonably denied it a by-product offset.  Commerce's determination is supported by substantial evidence and in accordance with law.

## ARGUMENT

### I.   Standard Of Review

This Court sustains any determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B).  "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting tremendous deference to Commerce's factual findings).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with that clear intent. *Id*. at 842-43.  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.  In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted).  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.*; *see also Torrington Co. v. United States*, 68 F.3d 1347,

1351 (Fed. Cir. 1995) (recognizing Commerce as "master" of antidumping laws).

**II.     Commerce's Determination To Apply Partial Adverse Facts Available To Tainai's Unreported Factors Of Production Is Supported By Substantial Evidence And In Accordance With Law**

Commerce applied the statute's facts available provision, 19 U.S.C. § 1677e(a), because the record lacks necessary information to value unreported factors of production for TRBs and parts thereof from suppliers, and because Tainai withheld information that Commerce had requested, failed to provide information in a timely manner or in the form or manner that Commerce requested, and significantly impeded the proceeding.  *See* IDM at 6-8 (APPX013392-94).  Commerce also determined that it was appropriate to apply an adverse inference under 19 U.S.C. § 1677e(b), because Tainai failed to cooperate to the best of its ability in responding to Commerce's requests for information.  *Id*.  Commerce's determination to apply partial AFA to Tainai's unreported TRBs inputs is lawful and consistent with past practice.

**A.     Legal Framework**

Commerce gathers information from respondent foreign producers and exporters to determine whether dumping has occurred and, if it has, to calculate dumping margins.  When necessary information is not available on the record or an interested party withholds information that has been requested by Commerce, fails to provide information by deadlines in the form and manner requested, significantly impedes an antidumping proceeding, or provides information that cannot be verified, Commerce shall "use the facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1677e(a)(1)-(2).

Using "facts available" fills gaps in the record caused by the respondent's failure to provide information about its own business.  *Id*.  Before Commerce applies facts otherwise available, it must inform the respondent about the nature of the deficiency and allow the

8

respondent an opportunity to explain or to remedy the deficiency to the extent practicable.  19 U.S.C. § 1677e(a)(2); § 1677m(d).

If the record deficiency was caused by an interested party's failure to "cooperate by not acting to the best of its ability to comply with a request for information," Commerce may use an adverse inference.  19 U.S.C. § 1677e(b).  An interested party's failure to cooperate to the best of its ability is "determined by assessing whether {it} has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Additionally, "while the {best of ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Id*.  "Commerce enjoys broad discretion when considering whether to apply adverse facts available in antidumping proceedings." *Tianjin Magnesium Int'l Co. v. United States*, 844 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2012).  "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of the respondent's ability, regardless of motivation or intent." *Nippon Steel*, 337 F.3d at 1383.

### B. Commerce's Application Of Partial Adverse Facts Available With An Adverse Inference Is Supported By Substantial Evidence And Consistent With Past Practice

#### i. *Commerce's Determination To Apply Partial AFA*

Commerce requests information about respondents' factors of production in order to determine the actual cost of inputs, permitting Commerce to calculate an accurate dumping margin.  As Commerce explained in the IDM, "{w}hen the respondent is the producer of the subject merchandise, it reports its own {factors of production}.  The respondent is also responsible for reporting the {factors of production} for merchandise that it purchases from

affiliated and unaffiliated producers." IDM at 10 (APPX013396). Here, Tainai "is not a producer of TRBs; rather, it is involved in the finishing and grinding stages in the TRBs supply chain." IDM at 11 (APPX013397). Thus, the factors of production for the TRBs imported by plaintiffs are exclusively provided by their affiliated and non-affiliated suppliers.

It is uncontested that plaintiffs failed to provide Commerce with the requested information for factors of production; plaintiffs did not allege before Commerce, nor here, that they complied with Commerce's requests. *See generally* Pls. Br. There was thus a large gap in the record: Commerce lacked necessary information to value unreported factors of production for TRBs and parts thereof from suppliers. *See* IDM at 6-8 (APPX013392-94). Pursuant to 19 U.S.C. § 1677e(a)(1), because "necessary information was not available on the record," Commerce was thus required to rely upon "facts otherwise available" to fill that gap.

In selecting "facts otherwise available" to rely upon in filling a gap in the record, the statue provides that, if Commerce determines that an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce may apply an "adverse inference" in selecting which facts to rely upon to fill the gap in the record. 19 U.S.C. § 16777e(b)(1). Because Tainai's unaffiliated suppliers are producers of subject merchandise – *i.e.* "all TRBs and parts thereof, finished and unfinished, from China" – they are "interested parties"[1] within the meaning of § 1677e. Commerce thus considered whether the suppliers complied with Commerce's requests for information "to the best of their

---

[1] In relevant part, the statute defines an "interested party" as "(A) a foreign manufacturer, producer, or exporter, or the United States importer, of subject merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise. . . ." 19 U.S.C. §1677(9). Commerce determined that Tainai's unaffiliated suppliers are interested parties "because they are producers of subject merchandise (*i.e.*, all TRBs and parts thereof, finished and unfinished, from China are subject merchandise)." IDM at 12 (APPX013398).

ability." Here, Commerce issued questionnaires to both Tainai and its unaffiliated suppliers, requesting data about their factors of production. See Commerce's Questionnaire (Sept. 21, 2020) at D-3; Commerce's Supplemental Questionnaire (Apr. 19, 2021) at 12 (P.R. 149; C.R. 108) (APPX082142); Commerce's Second Supplemental Questionnaire (Aug. 17, 2021) at 5 (P.R. 191; C.R. 197) (APPX084307); and Commerce's Questionnaire to Affiliates (Aug. 17, 2021) (P.R. 192) (APPX013173). The unaffiliated suppliers failed to respond to Commerce's questionnaires, and Tainai similarly was not able to provide the data from its suppliers. IDM at 12 (APPX013398). Commerce was thus faced with a record containing essentially *no* actual data about the factors of production underlying the TRBs imported by Tainai, handicapping Commerce's ability to calculate an accurate dumping margin. Because the suppliers provided *no response* to Commerce's questionnaires – as opposed to partial or incorrectly formatted data, which may be deemed acceptable in some circumstances – Commerce determined that they had failed to act to the best of their ability.

Having determined that interested parties failed to cooperate to the best of their ability, the statute permitted Commerce to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available," or, fill the gap in the data with information that may result in a higher dumping margin in order to induce future cooperation with Commerce's requests. 19 U.S.C. § 1677e(b)(1)(A). To fill the gap, Commerce relied upon data from *Tainai's own affiliated suppliers:* "the missing data are the inputs for TURNCPCO, ROLLERER, or CAGECAGE that are then assembled by Tainai into finished TRBs. Accordingly, as partial AFA, we are applying the highest {factors of production} usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages within each product type sourced solely from the unaffiliated suppliers for each associated

11

CONNUM."  IDM at 13 (APPX013399).  Along with its IDM, Commerce submitted a "Final

Calculation Memo," detailing its calculation of Tainai's dumping margin.  Final Calculation

Memorandum (Jan. 4, 2022) (P.R. 216, C.R. 209)(APPX084513).

    ii.   *Tainai And Its Unaffiliated Suppliers Failed To Cooperate To The Best Of Their*
            *Abilities*

Plaintiffs assert that Commerce's partial adverse facts available finding is unwarranted

because Tainai fully participated in Commerce's administrative review to the best of its ability.

Pls. Br. at 13-17.  Plaintiffs further contend that Tainai demonstrated its "best efforts" during the

administrative review because it:  maintained a high level of detail as required by Commerce;

kept the records in its control, custody, and possession; and provided the records to Commerce.

*Id*. at 16-17.  Plaintiffs also point to their communications with certain unaffiliated suppliers

requesting cooperation with Commerce's administrative review as additional efforts to solicit the

missing factors of production data.  *Id.* at 17-18.  Plaintiffs moreover claim that the number of

suppliers, and small percentages of material supplied by each renders Tainai incapable of

exerting market power to compel the suppliers to respond to Commerce's requests, such that the

application of partial AFA was not warranted.  Pls. Br. at 19.  Thus, plaintiffs argue that because

they did not have possession or control of the missing factors of production data, Tainai "met all

of the requirements for best efforts and cooperation."  Pls. Br. at 16.

Contrary to plaintiffs' assertions, substantial evidence supports Commerce's finding that

Tainai and its unaffiliated suppliers failed to cooperate by not acting to the best of their ability in

providing a complete and accurate response to requests for production information.  As an initial

matter, Commerce here undertook the *thirty-third* administrative review of the order on TRBs.

Factors of production are a fundamental data point relied upon by Commerce in calculating any

dumping margin, and Tainai and its suppliers are – or should be – aware that Commerce requires

this data, as it participated in the 2012-13 new shipper review of TRBs. *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 80 Fed. Reg. 4,244 (Dep't of Commerce Jan. 27, 2015). This is *fundamental* data that any producer or importer should be prepared to provide.

Moreover, Commerce afforded Tainai multiple opportunities to provide the needed data, issuing several questionnaires to Tainai. *See* Commerce's Questionnaire (Sept. 21, 2020) at D-3; Commerce's Supplemental Questionnaire (Apr. 19, 2021) at 12 (APPX082142); Commerce's Second Supplemental Questionnaire (Aug. 17, 2021) at 5 (P.R. XX; C.R. XX) (APPX084307). Additionally, Commerce issued the antidumping duty questionnaire to Tainai's unaffiliated TRB component suppliers. Commerce's Second Supplemental Questionnaire to Affiliates (Aug. 17, 2021) (APPX013173). Despite Commerce's requests, Tainai and its unaffiliated suppliers failed to provide the missing bills of materials regarding the factors of production information. The failure to provide this fundamental data despite multiple opportunities and over thirty prior administrative reviews – is a failure to cooperate to the best of a parties' ability. 19 U.S.C. § 1677e. Notwithstanding this, Commerce did not apply "total" AFA, but rather took Tainai's efforts into account in reaching its determination, limiting its application of adverse facts available to only the missing information where Tainai's unaffiliated suppliers provided 100 percent of the factors of production for chrome steel, rollers, and turned cups and cones. IDM at 12 APPX013398; *see also* Final Calculation Memorandum (APPX084513).

Contrary to plaintiffs' assertions, Tainai's "best efforts" cannot excuse its failure to provide this fundamental data. Tainai is not a producer of TRBs, but rather only finishes and grinds subject merchandise. IDM at 11 (APPX013397). Because Tainai does not produce TRBs, Commerce issued multiple requests that Tainai provide its suppliers' direct input bills of

13

materials for the production of subject merchandise.  *See* Commerce's Supplemental

Questionnaire (Apr. 19, 2021) at 12 (APPX084307); and Commerce's Second Supplemental

Questionnaire (Aug. 17, 2021) at 5 (APPX084307).  In response to these requests, Tainai stated,

> During the POR, for the cups and cones sold in the U.S., Tainai purchased
> the certain parts of turned cups and cones from the unaffiliated suppliers.
> Tainai does not know the {bill of materials} for these components and has
> no{} way of knowing this {bill of materials}.  For these cups and cones
> produced by Tainai's affiliates, Tainai is able to trace the consumption of
> the subject merchandise sold to the United States from chrome steel to
> finished goods.  However, Neither (*sic*) [            ] nor [        ] has
> {bills of materials}.  Tainai also purchased a part of rollers and cages from
> its affiliates, [        ] and [            ] separately.  For forged goods, the
> only needed input for cage are cold rolled coil and for roller only steel
> wire.

Tainai's Supplemental Questionnaire Response (May 17, 2021) at 27 (APPX082201).

In other words, Tainai responded to Commerce indicating that that it was unable to obtain

the bills of materials to substantiate its reported factors of production for certain direct inputs

from both its unaffiliated and *affiliated* suppliers.  As a result of the missing factors of

production data, Commerce "identified a number of deficiencies in Tainai's reporting in its May

17, 2021 supplemental questionnaire regarding {chrome steel, rollers, and turned cups and

cones} factors of production," and applied facts available at the preliminary results.  PDM at 15

(APPX013085).

Subsequent to the preliminary results, Commerce issued a supplemental questionnaire

providing Tainai with yet another opportunity to solicit the missing factors of production

information from its unaffiliated suppliers.  Commerce's Second Supplemental Questionnaire

(Aug. 17, 2021) at 5 (APPX084307).  Commerce also issued its antidumping duty questionnaire

to Tainia's unaffiliated suppliers.  Commerce's Questionnaire to Affiliates (Aug. 17, 2021) (P.R.

192) (APPX013173).  Commerce received no response from Tainai's unaffiliated suppliers.

IDM at 7 (APPX013393).

Indeed, it was only *after* Commerce published the preliminary results that Tainai even attempted to directly solicit the required factors of production information from its unaffiliated suppliers.  Tainai Second Supplemental Questionnaire Response (Aug. 31, 2021) (P.R. 193; C.R. 198) (APPX084308).  As evidence of its efforts, Tainai points to a *single round* of correspondence to its four unaffiliated suppliers, dated August 22, 2021, or after the preliminary results.  *Id.* at Ex. SSD-2 (APPX084406).  Despite having participated as a mandatory respondent before, Tainai thus made *no attempt* to obtain the required data upon receipt of Commerce's initial and supplemental questionnaires, instead waiting until Commerce published the preliminary results.  And, in response to the single correspondence attempt, Tainai only evidently received a response from *one* of the unaffiliated suppliers, with the supplier refusing to supply the requested information citing concerns with "internal secrets" of the company.  *Id.* This is the entirety of Tainai's purported "best efforts" to obtain the foundational data required by Commerce to calculate an accurate dumping margin.

Commerce explained why Tainai had not acted to the best of its ability in obtaining the required data from its unaffiliated suppliers, and why it believed Tainai had the ability to induce cooperation:

> {R}ecord evidence supports our finding that Tainai could potentially induce compliance on the part of its unaffiliated suppliers.  Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise during the POR.  Based on Tainai's large volume of entries during the POR and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.  Thus, we find that it is reasonable to conclude that Tainai has some business mechanism to induce its suppliers to cooperate.  Furthermore, Tainai may choose not to do business with these suppliers in the future due to their lack of

> cooperation and instead select suppliers, each of which is an interested party in its own right that has chosen to supply Tainai with subject merchandise destined for the U.S. market, that is willing to commit to participation in an AD review.

IDM at 13-14 (APPX013398-00).

As the Federal Circuit has explained, the "best of its ability" standard "does not require perfection and recognizes that mistakes sometimes occur, {but} it does not condone inattentiveness, carelessness, or *inadequate record keeping*." *Nippon Steel*, 337 F.3d at 1382 (emphasis added). Indeed, the statute "assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries…take reasonable steps to *keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce*." *Id.* (emphasis added). There is no question that factors or production are "information that a reasonable importer should anticipate being called upon to produce," *id.,* yet Tainai did not collect the information from its suppliers and, only after Commerce requested it multiple times, Tainai made a single half-hearted attempt to obtain it – doing so *only after* the preliminary determination was issued. Commerce's determination that Tainai failed to act to the best of its ability is supported by substantial evidence and in accordance with law.

> iii.   *Commerce's Determination To Fill The Gap In The Record, As Partial AFA, With Tainai's Own Data Is Supported By Substantial Evidence And In Accordance With Law*

Having determined that Tainai and its unaffiliated producers failed to act to the best of their ability to provide Commerce with required data, Commerce determined to apply an adverse inference in selecting from "facts otherwise available" to fill the gap in the record. Doing so was in accordance with law and supported by substantial evidence.

16

As Commerce explained in the IDM, because Tainai does not actually make TRBs, but rather buys and refinishes them, "Tainai cannot produce its own standard {factors of production} usage rates as {the interested party} could in *TRBs 2014-2015*, and Tainai does not know the variance of {factors of production} usage rates between its affiliated and unaffiliated suppliers because it is not involved in the forging, turning, or heat treatment stages for TRBs."  IDM at 11 (APPX013397)*.  Moreover, because it is "Tainai's unaffiliated TRB component suppliers who refused to respond to the questionnaire, and Tainai's affiliated suppliers do not record {bills of materials} in the manufacture of subject merchandise," Commerce was left wholly without a method to confirm that Tainai's estimated factors of production were accurate.  *Id*.  As Commerce explained, "Tainai's extrapolation of data from certain affiliated suppliers to account for its unaffiliated suppliers' {factors of production} usage rates is nothing more than speculation and insufficient to justify Tainai's allocation methodology."  *Id*.

Accordingly, Commerce determined in its final results that the necessary factors of production information remained absent from the record.  *Id*. at 10-14.  Faced with a gap in the record, Commerce elected to use *Tainai's own data* to fill it:  "the highest {factors of production} usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM."  *Id*. at 13.  And Commerce explained how its determination complies with the Federal Circuit's decision in *Mueller*, explaining that – though the Court ultimately found that the margin calculated in *Mueller* was not supported by substantial evidence – the concerns raised in that case are not present here.  *Id.*, *Mueller Com. De Mex., S. De R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014).  Unlike in *Mueller*, Commerce applied partial AFA "only where non-cooperative suppliers provided 100 percent of the" missing

factors of production.  IDM at 11 (APPX013397).  As Commerce explained, "the missing data are the inputs for TURNCPCO, ROLLERER, or CAGECAGE that are then assembled by Tainai into finished TRBs."  *Id.*  Commerce thus substituted the "highest {factor of production} usage rate reported by Tainai's affiliated suppliers" for similar items – "turned cups and cones, tapered rollers, and cages."  *Id.*  This has the effect of "calibrat{ing} the remedy so that only purchases from uncooperative producers impact Tainai's weighted-average dumping margin."  *Id.*

Essentially, faced with a gap in the record as to the cost incurred by Tainai's unaffiliated producers to create the inputs that Tainai later processes and sells, Commerce looked to the reported costs for similar inputs from Tainai's affiliated producers.  And Commerce only did so for components that were 100% provided by unaffiliated parties; for components provided by both affiliated and unaffiliated parties, Commerce relied on the factors of production as reported by Tainai.  IDM at 13 (APPX013399).

Commerce further determined that, in filling the gap on the record, partial adverse facts available was necessary to induce future cooperation from Tainai's unaffiliated suppliers to ensure Commerce is able to calculate an accurate dumping margin for Tainai.  *Id*. at 10 (APPX013396).  As Commerce explained, by using Tainai's own data "in determining the normal value of each CONNUM of the TRBs components used to produce TRBs sold to the United States during the" period of review, Commerce's determination is "consistent with the Court's decision in *Mueller* (*i.e.*, consistent with the overriding purpose of the Act of fairness and accuracy) and the purpose of applying AFA, which is to deter non-cooperation without being punitive."  *Id.* (*citing Mueller*, 753 F.3d at 1233).  Indeed, the Federal Circuit has found that Commerce's practice of applying an adverse inference based on an unaffiliated supplier's non-cooperation is a permissible interpretation of the statute "as long as the application of those

policies is reasonable on the particular facts and the predominant interest in accuracy {in calculating a margin} is properly taken into account as well." *Mueller*, 753 F.3d at 1233.

Moreover, in further compliance with *Mueller*, Commerce explained why Tainai has the ability to induce compliance with requests from Commerce in future reviews:

> Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise during the {period of review}. Based on Tainai's large volume of entries during the {period of review} and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.

IDM at 13 (APPX013399). Indeed, Commerce selected Tainai for review *because* it accounted for the largest volume of entries subject merchandise during the POR. *Id.*; Respondent Selection Memorandum (Sept. 21, 2020) at Attachment (APPX080387). Tainai's entries during the POR represent the [                    ] of the volume of *all entries of subject merchandise* during the period of review [        ] percent. *Id.* Notably, the company with the second largest volume of entries during the POR accounts for merely [        ] percent. *Id.* Commerce reasonably determined that Tainai's large volume of entries during the POR demonstrates its importance to Chinese TRB suppliers such that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate. IDM at 13 (APPX013399). Thus, the Federal Circuit's concern in *Mueller* – that "to the extent that Commerce chooses to rely on inducement/evasion considerations, its approach must be reasonable" – is assuaged here. 753 F.3d at 1236.

Commerce also determined that Tainai's unaffiliated suppliers were interested parties pursuant to 19 U.S.C. § 1677(9)(A) because they are producers of subject merchandise and failed to cooperate by not providing the requested factors of production data. IDM at 12

19

(APPX013398).  Accordingly, Commerce applied AFA to the unaffiliated suppliers, as interested

parties, because they failed to cooperate by not acting to the best of its ability in failing to

respond to Commerce's request for information.  *Id.*

Commerce's determination to apply partial adverse facts available to Tainai's unaffiliated

suppliers is consistent with prior determinations concerning missing data from unaffiliated

suppliers.  For example, in *Narrow Women Ribbons*, Commerce applied partial AFA because

unaffiliated ribbon suppliers declined to report their costs related to subject merchandise and thus

failed to cooperate with Commerce's requests for information.  *See Narrow Women Ribbons*

*With Woven Selvedge From Taiwan; Final Results of Antidumping Duty Administrative Review;*

*2012-2013*, 80 Fed. Reg. 19,635 (Dep't of Commerce Apr. 13, 2015), and accompanying IDM at

Comment 7.  In that matter, Commerce determined that the unaffiliated ribbon suppliers were

interested parties within the meaning of § 1677(9)(A), because the suppliers produced ribbons

and then sold the ribbons to the mandatory respondent who, after further processing, exported the

ribbons to the United States during the period of review.  *Id.*; *see also Certain Steel Nails From*

*the People's Republic of China: Final Results and Final Partial Rescission of the Second*

*Antidumping Duty Administrative Review*, 77 Fed. Reg. 12,556 (Dep't of Commerce March 1,

2012), and accompanying IDM at Comment 5 ("it is crucial for suppliers of subject merchandise

to provide their own factors of production data because suppliers actually provide finished

merchandise independently subject to the Order, in contrast to tollers who only perform a

process at one stage of the production.").  On that basis, Commerce determined that application

of partial AFA was appropriate.  For the same reasons, partial AFA is also appropriate here.

Moreover, Commerce's approach is consistent with the purpose of applying AFA --

deterring non-cooperation without being punitive -- because Commerce narrowly tailored its

application of AFA to address the portion of the missing data.  Thus, Commerce acted

consistently with the overriding requirement that antidumping duty margins be calculated in as

fair and accurate way as possible.  *Mueller*, 753 F.3d at 1235; *F. Lii De Cecco Di Filipo Fara S.*

*Martino S.pA v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).[2]

      Plaintiffs point to *Venus Wire* for the assertion that the application of adverse facts

available is inappropriate here.  Pls. Br. at 19-21 citing *Venus Wire Indus. Pvt. v. United States*,

471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020).  In *Venus Wire*, however, Commerce only requested

the missing supplier information after the preliminary determination.  After the respondent was

unable to procure the information, Commerce applied total adverse facts available to the

otherwise cooperative respondent.  471 F. Supp. 3d at 1306.  Here, the factors of production

information was requested from the outset and repeatedly, and Commerce limited the application

of AFA only to data that was never provided.  *Venus Wire* is inapposite.

      Finally, Commerce's treatment is consistent with its past practice, in which it has excused

respondents from reporting FOPs from some of their smallest suppliers in situations where a

respondent has a large number of suppliers, as well as when the unreported FOP data are of a

limited quantity.  *See Certain Activated Carbon From the People's Republic of China*, 74 Fed.

Reg. 21,317, 21,320-21 (Dep't of Commerce May 7, 2009), unchanged in *Certain Activated*

*Carbon From the People's Republic of China*, 74 Fed. Reg. 57,995 (Dep't of Commerce Nov.

10, 2009).  Here, Commerce only applied partial adverse facts available to the uncooperative

suppliers that provided 100 percent of the missing factors of production data.  IDM at 14

---

[2] As a corollary, the TPEA makes clear that, when selecting an AFA margin, Commerce
is not required to estimate what the dumping margin would have been if the interested party
failing to cooperate had cooperated or to demonstrate that the dumping margin reflects an
"alleged commercial reality" of the interested party.  *See* 19 U.S.C. § 1677e(d)(3).

(APPX013400).  This approach is supported by record evidence, otherwise in accordance with law, and should be sustained.

**III.    Tainai's Dumping Margin Is Supported By Substantial Evidence And In Accordance with Law**

Commerce's margin calculations are supported by substantial evidence and in accordance with law.  "A dumping margin reflects the amount by which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'"  *Nan Ya*, 810 F.3d at 1337; 19 U.S.C. § 1677(35)(A).  To calculate a dumping margin for a producer from a non-market economy country, Commerce compares the producer's price for sales of the subject merchandise to the United States with the "normal value" of such merchandise, calculated based on the producer's own factors of production and surrogate values derived from data from a market-economy country or countries at the same or comparable level of economic development. 19 U.S.C. § 1677b(c)(1). Thus, Commerce's margin calculations consist of three main components: (1) an entity's U.S. prices; (2) an entity's factors of production; and (3) surrogate values.  *See id.*

Plaintiffs claim that Commerce's dumping margin "bears no basis to commercial reality." Pls. Br. at 31.  Plaintiffs argue that the dumping margin "defies commercial and economic reality," Tainai was profitable during the POR, and that the sales data demonstrate differences between products and assigned factors of production.  *Id*.  Plaintiffs' claims, however, do not provide any legal or factual basis to set aside Commerce's margin calculation.

First, plaintiffs point to no legal authority to support its claim that a company's profitability implies that dumping is not occurring. Pls. Br. at 33-34.  Moreover, similar to the plaintiff in *T.T. International Co., Ltd., v. United States*, plaintiffs cite *no authority* imposing such an inquiry as a pre-requisite to imposing a margin.  *Id*.; *see T.T. International Co., Ltd., v.*

*United States*, 439 F. Supp. 3d 1370, 1385 (Ct. Int'l Trade 2020).  The United States Court of Appeals for the Federal Circuit has explained that phrases like "commercial reality" or the term "accurate" "represent reliable guideposts for Commerce's determinations." *Nan Ya*, 810 F.3d at 1343 (sustaining Commerce's use of the highest transaction-specific margin from the ongoing segment as the adverse facts available rate, as supported by that record).  However, "{w}hen Congress directs the agency to measure pricing behavior and otherwise execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties specifically, or of the industry more generally, in some broader sense."  *Id*. at 1344. Instead, "a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law."  *Id*.

Indeed, the Federal Circuit was clear that its guidance does not require new or additional inquiries of Commerce, but rather is shorthand for "what the statutory scheme already requires of Commerce to support its determinations."  *Id*. (citing 19 U.S.C. § 1516a(b)(1)(B)(i) and explaining that Commerce's determination will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law").  As the Court explained, terms and phrases such as "accurate" and "commercial reality" do not apply "in some broader sense, such as to require Commerce to apply the statutory methods to determine the industry-wide commercial realities prevailing during a particular time period."  *Id*. (internal quotations and citation omitted).  "Nor must Commerce prove a negative about a respondent's pricing behavior if that respondent fails to provide evidence that would yield more representative calculations . . . ."  *Id*. (same).

Accordingly, Tainai's assertion that the margin "bears no basis to commercial reality"

and "is inherently excessive and must be discarded" is unavailing, and it is not sufficient to establish any error in the margin calculation.  Pls. Br. at 31, 34.  Rather, such a "results-oriented" process or outcome is "not intended by Congress." *Nan Ya*, 810 F.3d at 1345.  To hold otherwise, "misconceives not only the scope of the agency's statutory responsibility, but also the nature of the administrative process." *Id*.

Relatedly, Tainai's reliance on this Court's decisions in the *Baoding* litigation is misplaced.  *See Baoding Mantong Fine Chemistry Co. v. United States*, 113 F. Supp. 3d 1332 (Ct. Int'l Trade 2015) (*Baoding I*); *Baoding Mantong Fine Chemistry Co. v. United States*, 279 F. Supp. 3d 1321 (Ct. Int'l Trade 2017) (*Baoding III*).  As this Court explained in rejecting a similar argument in *TTI*, based on the specific facts in *Baoding I*—decided prior to *Nan Ya*— the Court did fault the way Commerce calculated certain of the surrogate values in comparison to data from multiple other comparable countries on the record.  *See TTI*, 439 F. Supp. 3d at 1385 (citing *Baoding I*, 113 F. Supp. 3d at 1341-42).  Indeed, the Government in *Baoding* had already requested a voluntary remand to reconsider the surrogate financial ratios, and, as later explained in *Baoding III*, subsequent administrative proceedings identified flaws in the data leading to a revised margin.  *See Baoding I*, 113 F. Supp. 3d at 1341; *Baoding III*, 279 F. Supp. 3d at 1326–32.  In other words, the Court found that Commerce did not base its calculations on the best available information.

But it was the flaws in data that drove the revised margin in *Baoding*; the data were not manipulated or selected simply to ensure a lower margin (with the ends justifying the means).  Thus, as the Court held in *TTI*, the *Baoding* litigation did not establish a separate "backstop" test for high margins that could independently require remand if the Court finds them "commercially impossible."  439 F. Supp. 3d at 1385.

Plaintiffs' arguments concerning profitability also fail.  As Commerce explained, the argument that plaintiffs' profitability proves that its margin reflects commercial impossibility does not consider that "profit is a function of not only the revenue a company earns, but also the costs that it incurs."  IDM at 30 (APPX013416).  Thus, while Tainai's financial statements may show a profit, "such sales may still generate revenue that the company would not have incurred absent the dumping behavior, and, therefore, the dumping behavior would still serve to increase company revenue and could be profitable."  *Id.*

Finally, plaintiffs' argument that "sales data shows clear differences between small and large bearings," is undeveloped and unexplained.  Pls. Br. at 34-35.  Plaintiffs merely state that there are differences in sales prices data due to these physical differences, and as a result the "alternate factors of production" assigned by Commerce had no relationship to cost and price. *Id.*  But this "court's mandate is to sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1309 (Ct. Int'l Trade 2009) (citing *Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Plaintiffs' bare assertions place the burden of explaining and supporting their arguments on Commerce, and this Court should not entertain them.

IV.  <u>**Commerce Reasonably Rejected Tainai's Ministerial Error Allegations**</u>

Plaintiffs' brief reprises two arguments addressed in Commerce's Ministerial Error Memorandum.  First, plaintiffs argue that the data Commerce relied upon in its partial adverse facts available calculation is distorted.  Pls. Br. at 24.  Specifically, plaintiffs claim that Commerce did "not properly implement its {final} decision" because it did not "select the alternate factors of production on a product specific basis or CONNUM specific basis, but rather

selected the factors of production on a component level basis." Pls. Br. at 25-31. Plaintiffs claim that this error lumped together products that share "significantly dis-similar physical characteristics." Pls. Br. at 26. Tainai presented this argument as a ministerial error allegation after Commerce's final results. Ministerial Error Allegation (Jan. 12, 2022) at 6-8 (P.R. 224; C.R. 216) (APPX084872).

Commerce found that Tainai's allegations did not qualify as a ministerial error pursuant to 19 CFR 351.224(f). Per the regulation, a ministerial error is an error "an addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial." 19 U.S.C. § 1673d(e) (emphasis added); *see also* 19 C.F.R. § 351.224(f).

As Commerce's Ministerial Error Memorandum explained:

> In the *Final Results*, we stated that, "as partial AFA, we are applying the highest { factors of production} usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM." In the Final Analysis Memorandum, we further explained that, "where Tainai reported that it purchased 100 percent of turned cups and cones (TURNCPCO), rollers (ROLLERER), or cages (CAGECAGE) from non-cooperative suppliers, we relied on Tainai's highest reported usage rate for each of the {factors of production} on a product-specific rate for each control number (CONNUM)." We also provided the relevant SAS language that we used to reassign Tainai's highest reported affiliated usage rate for these {factors of production} values based on the product type listed in the CONNUM (*i.e.*, assembly, cone, or cup) where the product was only sourced from an unaffiliated producer.

Ministerial Error Memorandum at 3 (APPX013469).

Accordingly, contrary to Tainai's claims, Commerce explained that it "clearly intended to identify products by the product description in the reported CONNUM. While we were less than exact in our phrasing, the language in our memoranda and programing indicates our intention to

apply the AFA on a product description basis as that product was reported in the CONNUM."
*Id*.  Tainai's claims are thus unsupported; as evidenced by Commerce's calculation methodology
in the final results, Commerce fully considered the physical characteristics of the reported
CONNUMs.  *See* Final Calculation Memorandum (APPX084513); *see also* Ministerial Error
Memorandum at 3 (APPX013469).

Second, Tainai's claim that Commerce should not value inputs of finished components
using partial facts available.  Pls. Br. at 23.  Instead, Tainai argues that Commerce should value
the missing input data for turned cups or cones and cages with surrogate value information for
the finished product.  *Id.*  It further claims that the selected surrogate values made the use of the
missing bill of materials and factors of production unnecessary.  *Id.*  Tainai claims Commerce
had "no gaps to fill, and to the extent that information was 'missing' it was not relevant." *Id*. at
23-24.

But Tainai provides no basis for its claim that surrogate values can somehow fill the gaps
of a respondent's production data necessary for calculating dumping margins.  Nor does Tainai
point to any legal authority as support for its assertion.  *Id.*  Instead Tainai misconstrues the
purpose for which Commerce requested factors of production data or surrogate values.  To be
clear, for purposes of determining surrogate values under 19 U.S.C. § 1677b(c)(3), factors of
production include, but are not limited to:  hours of labor required, quantities of raw materials,
employed, amounts of energy and other utilities consumed, representative capital costs, and
transportation costs.  The information Commerce requested, and which remains missing from the
record (as described in detail above), are the factors of production for the chrome steel, rollers,
and turned cups and cones, which provide the production data for these inputs of subject
merchandise.  That cannot be substituted by surrogate values.  Surrogate values are merely used

to value factors of production; if the factors of production used to produce subject merchandise are not on the record, then Commerce is unable to determine "a producer or supplier's actual production experience." IDM at 11 (APPX013397). Moreover, Commerce's practice requires that, "in all NME antidumping proceedings, respondent companies must report the total consumption for the factors of production from each of their facilities that manufacture the product under investigation or review, regardless of the destination of that merchandise or the production facility." Policy Bulletin 10.3. Here, as Commerce stated, "Tainai does not know the variance of FOP usage rates between its affiliated and unaffiliated suppliers because it is not involved in the forging, turning, or heat treatment stages for TRBs." IDM at 11 (APPX013397). Indeed, if Commerce was capable of calculating a dumping margin solely based on surrogate value information, there would seemingly be no be point to requesting *any actual* company information from respondents; Commerce could instead rely on the surrogate values offered by respondents. Tainai's claims that Commerce "selected as partial adverse facts information which was highly distorted and bore no reasonable relationship to the factors being valued" is unsupported by record evidence. Pls. Br. at 24.

## V.    Commerce Reasonably Found That Timken Romania's Financial Statement Was The Best Available Information For Calculating Surrogate Financial Ratios

Commerce's selection of Timken Romania's financial statement as the best available information to value financial ratios is supported by substantial evidence and in accordance with law.

### A.    Legal Framework For Surrogate Country Selection

Antidumping duties represent the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)." 19 U.S.C. § 1673. In proceedings involving a non-market economy country, such as China, Commerce determines the

subject merchandise's normal value by relying on information from a market economy country

or countries to derive surrogate valuations for the Chinese entity's factors of production,

including raw materials, labor, utilities, and capital costs.   19 U.S.C. § 1677b(c).

 The statute requires Commerce, "to the extent possible," to use surrogate factors from

one or more market economy countries that are (1) "at a level of economic development

comparable to that of the nonmarket economy country," and (2) "significant producers of

comparable merchandise."   *Id*. § 1677b(c)(4)(A)-(B).   If more than one market economy country

satisfies those criteria, Commerce evaluates and compares the reliability and completeness of the

record data from those countries.   *See* Policy Bulletin 04.1: Nonmarket Economy Surrogate

Country Selection Process (Mar. 2004), *available at* http://enforcement.trade.gov/policy/bull04-

1.html (Policy Bulletin 04.1).

 By statute, Commerce ultimately must select the "best available information" on the

record to value the factors of production.   *Jiaxing Brother Fastener Co., Ltd. v. United States,*

822 F.3d 1289, 1293 (Fed. Cir. 2016) (citing 19 U.S.C. § 1677b(c)(1)).   However, because the

statute is silent regarding what constitutes the "best available information," Commerce has

"broad discretion" in deciding what record evidence meets the criteria.   *Zhejiang DunAn Hetian*

*Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted); *Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (discussing Commerce's

"wide discretion").   In practice, Commerce strives to select, to the extent practicable, surrogate

values that are product-specific, representative of a broad-market average, publicly available,

contemporaneous with the period of review, and tax and duty exclusive.   *See* Policy Bulletin

04.1; *Jiaxing Bro*., 822 F.3d at 1293.

 Commerce also has a regulatory preference to use as much data as possible from a single

29

primary surrogate country.  19 C.F.R. § 351.408(c)(2); *Jiaxing Bro.*, 822 F.3d at 1294 & n.3

(citing Policy Bulletin 04.1).  Commerce will "only resort to a secondary surrogate country if

data from the primary surrogate country are unavailable or unreliable."  *Jiaxing Brother Fastener*

*Co. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014) (citation omitted),

*aff'd*, 822 F.3d 1289.

The data Commerce relies on need not be perfect.  *See Jiaxing Bro.*, 822 F.3d at 1301

(quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor

is Commerce required to duplicate the non-market economy manufacturer's experience.  *See*

*Nation Ford*, 166 F.3d at 1377.  Instead, Commerce seeks to rely on record information that

"most accurately represents the fair market value" of the relevant factor of production.  *Id.*

Given Commerce's discretion and the fact-specific nature of this inquiry, a review of

Commerce's determination should question "not whether the information Commerce used was

the best available, but rather whether a reasonable mind could conclude that Commerce chose

the best available information."  *Jiaxing Brother*, 822 F.3d at 1300-01 (citing *Zhejiang DunAn*,

652 F.3d at 1341).

## B. Commerce Reasonably Found That The Timken Romania Financial Statement Was The Best Available Information For Calculating Surrogate Financial Ratios

Commerce determined that Brazil, Malaysia, Mexico, Romania, Russia, and Turkey were

economically comparable to China and were significant exporters of comparable merchandise

during the period of review.  PDM at 6-7 (APPX013076-77).  However, the record only

contained complete surrogate value data for Romania.  PDM at 7 (APPX013077).  Thus,

Commerce did not further consider Brazil, Malaysia, Mexico, Russia, or Turkey as the primary

surrogate country.  *Id.*  Accordingly, Commerce relied on Romanian surrogate value data for

valuing respondent's factors of production because it was the only country that met all of the

surrogate value hierarchical methodology's criteria; specifically, the Romanian data was 1) at the same level of economic development, 2) a significant producer of comparable merchandise, and 3) the best available information on the record for valuing factors of production.  PDM at 8-9 (APPX013078-79).

Under 19 U.S.C. § 1677b(c)(3), factors of production include, but are not limited to: hours of labor required, quantities of raw materials employed, amounts of energy and other utilities consumed, representative capital costs, and transportation costs.  Commerce values respondent's capital costs incurred in the production of subject merchandise (*i.e.*, factory overhead, selling, general and administrative expenses, and profit) by deriving financial ratios in accordance with 19 C.F.R. § 351.408(c)(4).  To determine these capital costs and thus calculate surrogate financial ratios, Commerce relies on complete financial statements.  As Commerce explained, its "preference is to derive surrogate overhead expenses, SG&A expenses, and profit using financial statements covering a period that is contemporaneous with the POR, that show a profit, from companies with a production experience similar to the mandatory respondent's production experience, and that are not distorted or otherwise unreliable, such as financial statements that indicate the company received subsidies."  IDM at 18 (APPX013404).

Here, Commerce reasonably determined that Timken Romania's financial statement was the best available information for calculating surrogate financial ratios.  Specifically, Commerce selected the financial statement from Timken Romania because it is "a producer of comparable merchandise, {and the financial statements} are contemporaneous with the POR, demonstrate profitability, are publicly available, are free of known countervailed subsidies, and generally satisfy Commerce's criteria for selecting surrogate companies."  IDM at 19-20 (APPX013405-6).

Plaintiffs' allegations that the data in the Compra S.A. Sibiu or URB Rulmenti Suceava statements on the record are superior to the data contained in Timken Romania's financial statements are unsupported by record evidence.  Pl. Br. at 37.  Compa S.A Sibiu is not a producer of comparable merchandise, and thus, its financial statements are not suitable for use. IDM at 18 (APPX013404).  Rather, record evidence demonstrates that Compa S.A Sibiu "principally manufactures valves, windscreen wiper components, and components for turbocharges and injection systems, none of which are comparable to TRBs." *Id.*; *see also* Petitioner Surrogate Value Rebuttal Comments (Dec. 18, 2020) at Exhibit 1 (APPX011617).

URB Rulmenti Suceava also operated at a loss during the period of review.  IDM at 18 (APPX013404).  Commerce's practice is not to consider financial statements that operated at a loss during the period of review.  *Id.*; *see also Certain Oil Country Tubular Goods from the People's Republic of China*, 77 Fed. Reg. 74,644 (Dep't of Commerce Dec. 17, 2012) and accompanying IDM at Comment 4; and *Certain Quartz Surface Products from the People's Republic of China*, 84 Fed. Reg. 23,767 (Dep't of Commerce May 23, 2019) and accompanying IDM at Comment 11.  Accordingly, Commerce relied on record evidence to determine that the financial statements of Compra S.A. Sibiu and URB Rulmenti Suceava are unusable.

Plaintiffs argue that Commerce's reliance on the financial statements of Timken Romania is flawed for three reasons.  Pls. Br. at 35-42.  First, plaintiffs fault Commerce for not using multiple financial statements.  *Id*. at 36.  Second, plaintiffs claim that Timken Romania's financial statement is "badly distorted" by certain affiliated party transactions and by being a member of the Timken Group, who Tainai claims is "an active participant in this review on behalf of the domestic industry."  *Id*. at 38.  Third, plaintiffs contend that Timken Romania's "corporate operations are radically dissimilar to those of Tainai."  *Id*. at 39.  Plaintiffs'

arguments, however, misunderstand Commerce's practice and are not supported by record evidence.

First, while plaintiffs are correct that Commerce has in the past used averaged financial ratios from multiple financial statements, Commerce determined that the record of the instant review only contains one usable financial statement.  During the administrative review and here, Tainai has failed to demonstrate that Compa S.A. Sibiu's or URB Rulmenti Suceava's financial statements are useable for calculating surrogate financial ratios in accordance with Commerce's selection practice.  Thus, there is no usable financial statement, aside for that of Timken Romania, for Commerce to calculate a financial ratio.

Second, plaintiffs' claim that Timken Romania's financial statement is "badly distorted" falls short of articulating a basis for finding the financial statement unusable.  *Id*. at 35-42. Plaintiffs allege that the distortion in Timken Romania's financial statement is the result of "a significant number of affiliated party transactions and its active participation as a member of the Timken Group, and the Timken Company was an active participant in the review on behalf of the domestic industry."  *Id*. at 38.  Plaintiffs also claim that less than 5 percent of Timken Romania's sales were to unaffiliated parties and that the Timken Group has an incentive to limit international competition.  *Id*. at 39-40.  But Commerce explained that it has previously used surrogate financial statements of entities that are affiliated with the petitioners and such a status does not disqualify a given financial statement from consideration. IDM at 19 (APPX013405) (citing *Certain Ball Bearings and Parts Thereof*, 68 Fed. Reg. 12,669 (Dep't of Commerce Mar. 17, 2003), and accompanying IDM at Comment 1.H (citing *Tapered Roller Bearing and Parts Thereof*, 66 Fed. Reg. 57,420 (Nov. 15, 2001), and accompanying IDM).  Furthermore, Commerce indicated that Timken Romania's financial statements are accompanied by an

auditor's report that identified no irregularities. *Id.* (citing Petitioner's Surrogate Value Comments Letter (Dec. 11, 2020) at Exhibit 13) (APPX011471).  Commerce found that Tainai also failed to point to any evidence that indicates Timken Romania's profit is artificially inflated. IDM at 19 (APPX013405).  Plaintiffs' unsupported allegations provide no further detail on the claim that Timken Romania's financial statement is "badly distorted" or why its unusable for purposes of calculating surrogate financial ratios. *See generally* Pls. Br.

Commerce also addressed plaintiffs' argument that Timken Romania's operations are "radically dissimilar to those of Tainai."  IDM at 19 (APPX013405); *see also* Pls. Br. at 39. Plaintiffs contend that Timken Romania financial statement is flawed because it is a "full-line producer of bearings" and is a member of the Timken Group, "a large group of inter-related bearing producers." *Id.*  Commerce, however, found that Tainai, too, is a member of a multination group of inter-related bearing producers.  IDM at 19 (APPX013405), citing Tainai's Section A Questionnaire Response (Oct. 20, 2020) at 14-17 and Ex. A-8 (P.R. 75; C.R. 31, 36) (APPX080437-40), and Tainai Supplemental Questionnaire Response (May 17, 2021) at 2-3 and Ex. SA-1 (APPX082176-77, APPX082212).  Tainai fails to articulate why the structure of the Romanian entity should disqualify the financial statements from consideration.

Accordingly, record evidence supports that Timken Romania's financial statement is the best available information in this administrative review for selecting surrogate financial ratios.

## VI. Commerce Reasonably Deducted Section 301 Duties From The U.S. Price, And Capped Section 301 Duty Payments

### A. Deducting Section 301 Duties

Commerce deducted Section 301 duties from U.S. price in calculating Tainai's dumping margin in accordance with 19 U.S.C. § 1677a(c)(2)(A).  IDM at 22.  Under 19 U.S.C. § 1677a(c)(2)(A), "{U.S. price} shall be reduced by the amount, if any, included in such price,

attributable to any … United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

Tainai claims that the Section 301 duties are "not ordinary duties, and more akin to remedial Antidumping (sic) duties and thus should not be deducted from U.S. price." Pls. Br. at 45. Tainai also claims that ""United States import duties" referenced in {section 19 U.S.C. § 1677a(c)(2)(A)} refers to ordinary customs duties" and not duties imposed under Section 301. Pls. Br. at 45. Tainai further contends that "Antidumping Duties are not imposed on other trade corrective duties." Pls. Br. at 45. Yet, Tainai points to no legal authority to support its claims, citing the relevant statute in passing. Instead, Tainai merely claims that Section 301 duties are "inherently temporary in nature," as they are in "imposed under U.S. law implementing international agreements and in response to specific conditions." Pls. Br. at 45.

Commerce's consistent practice is to treat Section 301 duties as import duties in the context of antidumping proceedings. *See Xanthan Gum from the People's Republic of China*, 86 Fed. Reg. 16,189 (Mar. 26, 2021), and accompanying IDM at Comment 3. The Federal Circuit has previously held that "{n}ormal customs duties…have no termination provision and are permanent unless modified by Congress." *Wheatland Tube Co. v United States,* 495 F.3d 1355 at 1362 (Fed. Cir. 2007*)*. Commerce has determined that Section 301 duties are normal customs duties as they have been imposed without a termination date. *See generally* 19 U.S.C. § 2411; *see also* IDM at 22 (*citing Notice of Modification in Section 301 Action: China Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation,* 83 Fed. Reg. 47974 (United States Trade Representative, September 21, 2018)). Moreover, Section 301 duties are "imposed to address a variety of unfair trading acts, policies, and practices of U.S.

trading partners." IDM at 22 (APPX013408). Accordingly, Commerce reasonably deducted Section 301 duties from U.S. price in calculating Tainai's dumping margin.

      **B.**      **Commerce Reasonably Capped Section 301 Duty Payments To The Actual Duty Amount, Excluding Additional Revenue**

As explained above, Commerce "will normally reduce U.S. price by United States import duties if they are included in U.S. price" and it is Commerce's practice to consider Section 301 duties to be normal import duties. IDM at 23 (APPX013409). Thus, it is Commerce's practice that Section 301 duties "should be removed from U.S. price." *Id.* Here, consistent with its practice, Commerce adjusted Tainai's U.S. price by the amount of the Section 301 duties. Plaintiffs assert that revenue – *i.e.* profit – associated with the Section 301 duties should *also* be deducted from U.S. price. Pls. Br. at 46 ("the Department limited those payments denominated as 'additional revenue for 301' to the amount of Section 301 duties paid on the goods.") However, Commerce's determination not to further adjust the U.S. price – capping it at only the actual Section 301 duties – is supported by substantial evidence in accordance with both law and Commerce's prior practice.

The regulation "directs Commerce to use, in calculating U.S. price, a price which is net of price adjustment that is reasonably attributable to the subject merchandise." IDM at 23 (APPX013412), citing 19 C.F.R. § 351.401(c). The regulation further defines a "price adjustment" as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale that is reflected in the purchaser's net outlay." *Id.* citing 19 CFR § 351.102(b)(38). Commerce determined that this additional revenue – beyond the payment of Section 301 duties – should not result in a further price adjustment because "it would be inappropriate to treat the excess revenues associated with Tainai's expenses as price

adjustments {} because these revenues do not represent 'changes in the price for subject merchandise,' such as discounts, rebates, and post-sale price adjustments." *Id.*  Rather, Commerce explained, the additional revenue should form the basis of a further price adjustment because it "represents profit on the sale of *services*, not profit on the sale of the *merchandise*." IDM at 24 (APPX013411).

Plaintiffs claim that, notwithstanding the fact that the payments collected due to Section 301 duty overpayments were not related to a charge for subject merchandise, such payments "represented revenue received by Tainai on a specific sale" and thus should have been resulted in a price adjustment.  Pl. br. at 46. Plaintiffs attempt to support its redefinition of "payment" by ignoring Commerce's regulations and relying on U.S. Customs and Border Protection's regulations.  Pls. Br. at 47.  Plaintiffs further claim there is "no legal basis to distinguish between these payments and other payments made for goods."  Pls. Br. at 50.

Commerce, however, reasonably capped the price adjustment to only the Section 301 duty payments – and not additional revenue – in accordance with its regulations and practice. Commerce's regulations under 19 CFR § 351.401(c) provide that "the Secretary normally will use a price that is net of price adjustments, as defined in 19 CFR § 351.102(b), that are reasonably attributable to the subject merchandise."  Additionally, 19 CFR § 351.102(b)(38), defines "price adjustment" as "any change in the price charged for subject merchandise or the foreign like product, such as discounts, rebates and or other adjustments, including, under certain circumstances, a change that is made after the time of sale that is reflected in the purchaser's net outlay."  Based on this regulatory guidance, Commerce determined that revenues from Tainai's collection of Section 301 duties did not represent "changes in the price for subject merchandise," such as discounts, rebates, and post-sale adjustments.  IDM at 24 (APPX013411); *see also* 19

CFR § 351.102(b)(38).  As such, Commerce capped the price adjustment to only the Section 301 duty payments.  IDM at 24 (APPX013411).

It is Commerce's practice "not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profit on the sale of services, not profit on the sale of the merchandise."  *Id.* (citing *Certain Quartz Surface Products from India*, 85 Fed. Reg. 25,391 (May 1, 2020), and accompanying IDM at Comment 2); *see also Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318 (Oct. 18, 2011), and accompanying IDM at Comment 39.  Here, Commerce found that "these additional revenues directly relate to U.S. import duties (*i.e.*, Section 301 duties) and not the TRBs themselves" and thus "it would be inappropriate to attribute this revenue to subject merchandise when it is attributable to U.S. import duties."  IDM at 25 (APPX013412).  Because the additional revenue associated with the Section 301 duties "represents profit on the sale of services, not profit on the sale of the merchandise," Commerce's determination not to do a further price reduction is in accordance with its practice and supported by substantial evidence.

## VII.   Commerce Reasonably Denied Tainai A By-Product Offset

Commerce grants offsets to normal value "for sales of byproducts generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process." *Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (2009).  The evidentiary burden is on the respondent and the respondent must "substantiate by-product offsets by providing {Commerce} with sufficient information to support its claims." *Id.*; 19 C.F.R. § 351.401(b)(1)-(2).  This is because Commerce must determine whether the respondent's production process actually generated the amount of scrap claimed as a byproduct offset.  *See Am. Tubular Prod., LLC v.*

38

*United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017) ("{a}bsent evidence linking the scrap sold with any scrap generated resulting from the production of OCTG during the period of review, Commerce properly found that Chengde's submissions were insufficient and properly denied the requested offset").  The permitted offset amount is then limited to the total byproduct production quantity. *Juancheng Kangtai Chem. Co. v. United States*, No. 14-56, 2015 WL 4999467, at *40 (Ct. Int'l Trade Aug. 21, 2015) ("Commerce has described its normal by-product offset practice as limited to the total production quantity of the by-product…produced during the {period of review}, so long as it is shown that the byproduct has commercial value.") (quotation omitted).

Here, Commerce denied Tainai a byproduct offset because it failed to substantiate that the adjustment was warranted.  *See* IDM at 26-27 (APPX013412-13).  Tainai admits that "due to the record maintained in the ordinary course of business, *the quantity of scrap produced is not directly recorded*."  Pls. Br. at 52 (emphasis added).  Tainai thus concedes that it does not keep records such that it can demonstrate entitlement to an offset.

Notwithstanding this, Tainai argues that Commerce's procedures should be ignored because Tainai explains how it allocated and sold the scrap produced.  *Id*.  Tainai further contends that there is no record evidence that it purchased and resold the scrap in question.  *Id*.  However, without Tainai's reporting, Commerce is unable to determine the quantity of the scrap generated during the POR.  IDM at 27 (APPX013413).  Moreover, Commerce explained exactly *why* it needs the requested information:.

> While we find that the sales documentation demonstrates that steel scrap has commercial value, we are still unable to properly reconcile the quantity of the by-products with the raw materials or account for yield loss at every stage in the production of subject merchandise during the POR because that information is not on the record because Tainai does not record the quantity of scrap produced.  Further, Tainai has not provided evidence or precedent

> supporting its allocation methodology and the lack of production
> information to grant it a by-product offset.

*Id.*

Commerce's questionnaire also explicitly states the information needed to quality for an offset: "{b}y-product/co-product offsets are only granted for merchandise that is either sold or reintroduced into production during the POI/POR, up to the amount of that by-product/coproduct actually produced during the POI/POR." Commerce's Questionnaire (Sept. 21, 2020) at D-9 (APPX001479). Tainai does not refute this factual finding, and its mere disagreement with the denial of an offset is not sufficient to overturn Commerce's determination that the record did not provide evidence to support making the adjustment.

Substantial evidence supports Commerce's conclusion that Tainai failed to meet its burden to provide Commerce with information that would substantiate an offset for byproducts. *See Am. Tubular Prod.*, 847 F.3d at 1361; 19 C.F.R. § 351.401(b)(1)-(2).

## VIII.   **Consolidated Plaintiffs' Claims**

The consolidated plaintiffs were not selected for individual review, but rather received the same rata as Tainai, assigned as the "country-wide rate." 87 Fed. Reg. 1,121; see also PDM at 14 (APPX013084. Doing so was in accordance with law . *See* 19 U.S.C. § 1673d(c)(5)(A) (the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually examined). The brief filed by consolidated plaintiffs in this matter raises only one issue, arguing that Commerce "should apply the final rate calculated as a result of judicial review of the mandatory respondent to consolidated plaintiffs." Consol. Pl. Br. at 2. While Commerce believes that the rate assigned to Tainai is in accordance with law and supported by substantial evidence, Commerce agrees that, should this Court remand this matter to Commerce and

Commerce's analysis alter the rate ultimately assigned to Tainai, the rate assigned to the

consolidated plaintiffs would also be revised to reflect any changes.

<u>**CONCLUSION**</u>

For these reasons, we respectfully request that the Court deny plaintiffs' motions for

judgment on the administrative record and sustain Commerce's final results.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                                  /s/Kelly a. Krystyniak
Jesus N. Saenz                               KELLY A. KRYSTYNIAK
Attorney                                     Trial Attorney
U.S. Department of Commerce                  U.S. Department of Justice
Office of the Chief Counsel for Trade        Civil Division
   Enforcement and Compliance  Commercial Litigation Branch
1401 Constitution Avenue, NW                 P.O. Box 480
Washington, D.C. 20230                       Ben Franklin Station
                                             Washington D.C. 20044
                                             Tel: (202) 307-0163
                                             Fax: (202) 514-8640
                                             Email: Kelly.a.krystyniak@usdoj.gov

Dated:  October 19, 2022                     Attorneys for Defendant

41

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the brief was prepared, the applicable portions of this brief contain a total of 12,101 words.

<u>s/ Kelly A. Krystyniak</u>

October 19, 2022