Non-Confidential

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  HON. STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC, <br><br>                 Plaintiffs, <br>    and <br><br> Precision Components, Inc, Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd and Hebei Xintai Bearing Forging Co., Ltd, <br><br>               Consolidated Plaintiffs, <br>    v. <br><br> United States. <br><br>               Defendant. | Cons. Ct No. 22-00038 |

**REPLY OF CONSOLIDATED PLAINTIFFS
SHANGHAI TAINAI BEARING CO., LTD. AND
C&U AMERICAS, LLC, TO RESPONSE OF DEFENDANT**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
Counsel for Plaintiffs

Dated: November 16, 2022

# TABLE OF CONTENTS

Table of Contents......................................................................................i

Table of Authorities ............................................................................. ii

I.  INTRODUCTION AND SUMMARY OF ARGUMENT............................1

    *A. Introduction* ...................................................................................*1*

    *B. Summary of Argument* .................................................................*1*

II.  ARGUMENT...................................................................................3

    *A. The Department's Application of Partial Adverse Facts with an Adverse Inference is Not Supported by Substantial Evidence and is not Consistent with Past Practice*...........................................*3*

    *B. The Department Cannot Take Adverse Inferences Against Tainai for the Non-cooperation of Unrelated Suppliers* .................................................*4*

    *C. The Department Cannot Fill the Gap with Partial AFA*.........................*10*

    *D. The Dumping Margin is not Supported by Substantial Evidence and is not in Accordance with Law*....................................................*11*

    *E. The Defendant and the Department Misapprehended the Component Argument* ................................................................................*15*

    *F. There is no Dispute as to the Selection of the Surrogate Country*...........*16*

    *G. The Timken Romania Financial Statement was Fatally Flawed* .............*16*

    *H. The Department Should Not Have Deducted Section 301 Duties from U.S. Price*................................................................................*17*

    *I. The Department Should Not Have Capped Payments Received from Tainai's Customers for 301 Duties* ...........................................*17*

    *J. The Department Should Have Granted a By-Product Offset*...................*18*

III.  CONCLUSION................................................................................18

# TABLE OF AUTHORITIES

*Court:*

*Baoding Mantong Fine Chemistry v United States*, 113 F.Supp. 3d 1332 (Ct. Int'l Trade 2015).........................................................................11,12,13

*Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021)..........................................................................12

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ............................................................11,12

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ....................9

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995) ...................12

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)..................12

*Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed.Cir.1997).....................13

*Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020)...............................................................................6,7

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370 (Fed. Cir. 2013) .......................................................................................12

*Administrative:*

Issues and Decisions Memorandum issued in connection with *Final Results of the Antidumping Duty Administrative Review and Final Results of the New Shipper Review; 2012-2013* 80 Fed. Reg. 4244 (Jan. 27, 2015) .............................................................................8

***Statute, Regulation and Rule:***

19 U.S.C. § 1677b(c)(1)..........................................................................13

Rule 56.2 of the Rules of the U.S. Court of International Trade ..........................1,3

# I.   INTRODUCTION AND SUMMARY OF ARGUMENT

## A. Introduction

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade and the Court's Amended Scheduling Order of July 1, 2022,  Plaintiffs Shanghai Tainai Bearing Co., Ltd  and C&U Americas, LLC  and consolidated plaintiffs Precision Components, Inc, Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd and Hebei Xintai Bearing Forging Co., Ltd, respectfully submit this reply to the Response of defendant United States of America to the Motion and Memorandum presented by plaintiffs ("Memo").  As demonstrated below, the arguments submitted by the defendant are unavailing, and this matter should be remanded to the Department of Commerce with direction that the Department recalculate the margin and cash deposit rate for plaintiffs and consolidated plaintiffs.

## B. Summary of Argument

The primary issues in this appeal are not complicated.   The Department calculated a margin based on partial AFA with adverse inferences due to the failure of certain unrelated suppliers to cooperate with the Department.  There is clear and uncontroverted evidence that plaintiffs fully cooperated and provided all of the information in their possession.   There is also no evidence that plaintiffs had sufficient power to force cooperation with the Department requests by its

Non-Confidential

unaffiliated suppliers.  In its response, the Department ignores the facts of record and focuses on general legal principles which are not in dispute and which ultimately do not apply.

The Department compounded this error by selected as adverse facts information which had no basis in commercial reality and which amount is not a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.

Rather than doing so, the Department selected as adverse facts alternate data which was absurd on its face – such as using FOP data for a bearing weighing [      ] as AFA factors of production for a bearing weighing [          ]. APPX081217-081225  The Department sought to justify the appropriateness of this decision by noting that the data in question was the data of Tainai.   While this is true, this is also not relevant.   The mere fact that the data is of the same company does not make it comparable.  Companies commonly produce similar products of varying sizes and complexity with dissimilar cost structure.

While these were the primary errors, the Department made other errors as well.  One of the most significant is that the Department misapprehended the nature of the components and found that factors of production were missing for components that did not need factors of production to be properly valued.   Specifically, the purchased inputs were articles for which the selected surrogate value was for the

complete input, and thus the selected surrogate value necessarily included the factors of production that went into produced the particular input.

The Department also improperly used as the only financial statement for the purposes of calculating financial ratios a significantly flawed financial statement. The Department had before it an additional financial statement, admittedly flawed, but did not consider which statement was more flawed.

Finally, the Department erred in its treatment of the Section 301 duties.  The Department both improperly required that the duties to be deducted in calculating U.S. price and also refused to include the full value of additional monies collected at the time of sale from the customers as "301 duties".

## II.   ARGUMENT:

### A.  *The Department's Application of Partial Adverse Facts with an Adverse Inference is Not Supported by Substantial Evidence and is not Consistent with Past Practice*

At pages 9 to 12 of the defendant's response to plaintiffs' motion for judgment pursuant to Rule 56.2 ("Def. Resp"), the defendant argues that it was appropriate to take partial adverse facts with an adverse inference.   In its argument the defendant claims that as plaintiffs did not provide all of the necessary information, there was a gap in the record.  This gap, defendant argues, was the result of plaintiffs' failure to cooperate fully with the Department's request for information.  The failure, as noted by the Department, was not of information within the control of Tainai, but rather

was information of unaffiliated suppliers that refused to respond. (Def. Resp. at 11) The Department then sought to fill this gap with information provided by Tainai's affiliated suppliers.

With respect to this argument, as an initial matter Tainai disagrees that the Department needed the FOP information for the production of the components.  As discussed in section III.E below, Tainai purchased raw components, finished those components, and assembled such components into completed bearings. APPX081191  The factors of production for the components were ultimately not needed as the selected surrogate values for the components ultimately incorporated all of the factors of production.   Tainai agrees, to the extent that the Department needs factors of production for certain components, which it did not, that such information was not provided by Tainai as such information was not in the control of Tainai.  Rather such information was that of the unaffiliated suppliers – entities over which Tainai had no control.

### B. The Department Cannot Take Adverse Inferences Against Tainai for the Non-cooperation of Unrelated Suppliers

At pages 12 to 16 of its response, the defendant argues that it was appropriate to take partial adverse inferences against Tainai as a result of the non-cooperation of Tainai's unrelated suppliers and Tainai's failure to provide such information.  This argument was predicated on a number of points:

- The absence of a response from Tainai's component suppliers to questionnaires sent directly to the component suppliers by the Department of Commerce;

- The failure of Tainai to provide the FOP data of the component suppliers;

- The existence of thirty-three prior reviews of the order and thus the need for FOP is known and critical;

- The purported fact that Tainai is not a producer of bearings, but rather is a mere finisher and assembler;

- The fact that Tainai has previously participated as a mandatory respondent in a new shipper review and should have been aware of the need for the data; and

- The erroneous conclusion that Tainai is a large producer as evidenced by the fact that it was a mandatory respondent in this administrative review.

Defendant's arguments fail on a number of points.

Initially, the fact that Tainai accounted for the largest volume of exports during the POR does not mean that Tainai is particularly large. Rather, it merely means that Tainai is the largest exporter to the United States out of the limited pool of exporters subject to this particular administrative review. While the Department did not ask for information during the review respecting the relative size of Tainai, nor was the need for such data apparent during the review, the only evidence of record is that Tainai is not particularly large. In the surrogate value submission, the petitioner provided the financial statement for Timken Romania, a Romanian Bearing producer which is part of the Timken Group. This financial report lists total sales of 410,358,618 Leu in 2018 and 442,074,574 Leu in 2019. APPX011554-

011555  This is approximately 96,310,000 USD in 2018 103,753,000 USD in 2019. (Using an Exchange rate of 1 USD = 4.2608 Leu) APPX011560-011561  In contrast, total income for Shanghai Tainai was 108,236,331 rmb or approximately 15,364,656 USD APPX080787, APPX080789, or about 16% of the sales volume of Timken Romania.  Critically, Timken Romania is owned by a much larger entity, the Timken Group APPX011540-011541 with multiple entities around the world APPX011544-011545.  The Timken Romania also lists major bearing manufacturers SKF Group, Shaeffler Group, NTN Corporation, JTEKT Corporation and NSK Ltd APPX011577, APPX011587.  Tainai is not listed

In sum, there is no evidence that Tainai is, in the world of bearing producers, a large bearing producer and has the size to assert power over its suppliers.

Secondly, contrary to the assertions of the defendant, Tainai does not have sufficient market power to induce the cooperation of its unrelated suppliers.  This is important.  If Tainai does not have the power to induce cooperation, it would be "potentially unfair to the {respondent}" to impose adverse facts.   As noted by the Court of International Trade in *Venus Wire*:

> Further, while *Mueller* recognizes that an unwillingness to export goods produced by an uncooperative supplier "would potentially induce {the supplier} to cooperate," the appellate court also stated that "if the {respondent} has no control over the noncooperating suppliers, a **resulting adverse inference is potentially unfair to the {respondent}**." The concept of "control," as discussed in *Mueller*, does not require actual control, but, instead, it requires Commerce to

consider record evidence concerning the **practical ability of a respondent to induce the supplier's cooperation**.

Here, Commerce did not adequately consider evidence tending to show that Venus's efforts to induce cooperation failed, at least in part, because of circumstances beyond Venus's control; to wit, the suppliers' own concerns that providing the cost information did not serve the suppliers' respective interests. Moreover, Commerce failed to point to any evidence indicating that Venus could induce its unaffiliated suppliers' cooperation. Instead, Commerce appeared to assume that Venus had leverage over its unaffiliated suppliers and simply failed to properly apply it. Commerce's reasoning is inconsistent with *Mueller*, which recognizes the possibility of inducing cooperation, but not the certainty.

*Venus Wire Industries Pvt. Ltd. v United States,* 417 F.Supp.3d 1289 (Ct. Int'l Trade 2020) at 1307-1308 (emphasis added).

A critical question is determining whether a party has the power to compel another entity to provide information is the volume of purchases.  In this matter, Tainai does not have high volumes of purchases.  Contrary to the suggestion of the defendant, Tainai does not use only one or two unaffiliated suppliers.   Rather, the record demonstrates that Tainai used [    ] suppliers of turned cups and cones, [    ] suppliers of rollers, and [    ] suppliers of cages. The related suppliers provided [        ] of the turned cups and cones, [        ] of the rollers, and [        ] of the cages.    APPX081310 –081312.   Thus the [    ] unrelated suppliers provided [        ] of the turned cups and cones, or an average of just [    ] each of the total needs, the [    ] unrelated suppliers of rollers provided [        ] of the rollers, or an average of just [        ] each of the total needs, and the [    ] unrelated suppliers of the cages supplied [        ]  of the cages, or an average of just [        ] each of the total

7

needs.  APPX081310 – 081312. The significant number of suppliers to Tainai, and the small percentages of material supplied by each, does not appear to have been considered by the Department, rather the Department only focused on the fact that Tainai was a mandatory respondent.  Simply put, Tainai does not have the market power to compel these unaffiliated entities to respond.  Tainai asked these unrelated suppliers to cooperate and these suppliers said no.

Thirdly, while the Department has conducted multiple reviews of the order and while Tainai has participated in a prior review (new shipper), the issues as to non-availability of FOP of uncooperative unaffiliated suppliers did not arise in Tainai's only prior review. The only issue involving AFA related to a discrepancy between the number of turned cones and forged cones.  See Issues and Decisions Memorandum issued in connection with *Final Results of the Antidumping Duty Administrative Review and Final Results of the New Shipper Review; 2012-2013* 80 Fed. Reg. 4244 (Jan. 27, 2015) at Comment 10.   Simply put, Tainai did not have significant prior experience in seeking FOP data from uncooperative third-party unrelated suppliers.

Fourthly, Tainai disagrees with the claim in the response that Tainai is a mere assembler and minor processor of bearings.  Tainai purchases green or otherwise incomplete bearing components, finishes those components through substantial finishing operations and then assembles them to very specific tolerances.

APPX081191  The Department never made further inquiries with respect to the issue as to whether Tainai was a manufacturer.  Quite to the contrary, the Department applied surrogate financial ratios from a manufacturer of bearings, not a processor or finisher and expressly rejected the financial statements of a company that was a finisher and assembler of components on the basis that this entity was not a producer of comparable merchandise.  APPX001020-001021

Fifthly, the defendant cites to the Federal Circuit decision in *Nippon Steel Corp. v. United States*, 337F.3d 1373 (Fed. Cir. 2003) for the proposition that "best of its ability" includes adequate record keeping and then claims that since Tainai did not have the confidential business records of an unaffiliated party, Tainai did not engage in adequate record keeping.   Tainai disagrees with this contention.  Tainai maintained all of the information required by it in the ordinary course of business and provided all of the requested information in its possession to the Department. There is no allegation that Tainai failed to provide or withheld information in its possession.  The information which Tainai was unable to provide was the highly confidential information of suppliers of certain components – which information would be of use to Tainai in negotiating purchases of components and if in the possession of Tainai, could be used to the detriment of the unaffiliated suppliers.

In sum, based on the data and information of record it is clear that Tainai had insufficient power to compel its suppliers to provide data.

Non-Confidential

### C. *The Department Cannot Fill the Gap with Partial AFA*

At pages 16 to 22 of its response the defendant argued that the Department properly filled the gap by selecting facts otherwise available with adverse inferences. As discussed in Section II.B, Tainai fully cooperated with the Department and the only failure of cooperation was that of Tainai's unrelated suppliers.  As such, to the extent that data was needed to file the gaps, such data should not have been based on adverse inferences.  The defendant further claimed that as it was filling the gap with Tainai's own data, such data was somehow necessarily appropriate.  In contrast, Tainai had provided alternate data extrapolated from the data from the related suppliers for the components in question.   Tainai's extrapolated data was the appropriate "facts otherwise available" and was used as such in the preliminary results.  APPX001011  The primary flaw with the Department's selection of adverse facts, is that the Department selected data without considering the relative sizes of the components, finding that articles of diverse sizes were comparable. APPX013397.  As detailed in Tainai's memo, the size of bearings (and the total material consumed in the production of such bearings) varied greatly from bearings weighing as little as [        ] and as heavy as [ ].  APPX081217-081225

The Department, however, used as AFA the factor of production weights for the heaviest components rather than considering the critical issue of the weight of the actual bearing and the component.  While it is true that the data in question is that of

Tainai, such data is for a range of bearings of a specific size and weight.   The fact that the data was supplied by Tainai is ultimately not relevant to the calculation.

The Department has not explained why the usage of factors of production based on the data of Tainai's largest bearings would produce results which accurate, reasonably related to the rate that would have been assigned, and not unduly punitive.

### D. The Dumping Margin is not Supported by Substantial Evidence and is not in Accordance with Law

At pages 22 to 25 the Department argues that the margins are supported by substantial evidence and in accordance with law.    The Department's analysis, assuming that the application of partial AFA with adverse inferences is appropriate, ignores key legal requirements in selecting the facts and setting the margins.    The Courts have consistently held that  dumping margins which defy "commercial and economic reality" must be rejected (*Baoding Mantong Fine Chemistry v United States*, 113 F.Supp. 3d 1332, 1334 (Ct. Int'l Trade 2015)) and that margins must be accurate and not punitive.  These requirements apply even if the margin is calculated on total or partial AFA as the Courts direct that such AFA margins must not be punitive.  *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

Plaintiffs submit that the selected facts, and the resultant rate, has  no tie with reality.   It is axiomatic that "the purpose of section 1677e(b) is to provide

respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).   In *De Cecco* the Federal Circuit held that an assigned rate is punitive where it is "unjustifiably high" (i.e., aberrational).

While the Department is granted a high degree of discretion in selecting the information to be used as "adverse facts", this discretion is not unlimited.  It has long been held that adverse facts which are highly distorted and bear no reasonable relationship to reality should not be selected.  Quite to the contrary, a critical factor to be considered by the Department is that of accuracy.   ((See *NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 1995), *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)). In *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351 (Fed. Cir. 2021) the Court stated:

> We have explained that "{a}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." <u>*Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1379 (Fed. Cir. 2013)</u> (citing <u>*Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed. Cir. 1990)</u>); *see also* <u>*Mid Continent Steel,* 941 F.3d at 542</u>.
> *Diamond Sawblades* at 1365 (Emphasis Added)

Critically, the Court has rejected weighted average dumping margins which defy "commercial and economic reality".   In *Baoding Mantong Fine Chemistry Company v. United States,* 113 F.Supp.3d 1332 (Ct. Int'l Trade 2015) the Court

stated:

> Where, as here, Commerce is determining the normal value of subject merchandise according to specialized procedures applicable to goods produced in nonmarket economies, **Commerce is no less obligated to determine margins as accurately as possible, and it is no less obligated to determine, fairly and equitably, margins that are remedial and not punitive**. Congress directed generally that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1) (emphasis added). Although calculating normal value "for a producer in a nonmarket economy country is difficult and necessarily imprecise," the method used by Commerce still must fall within "the limits of permissible approximation." *Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed.Cir.1997). Here, Commerce fell far short of this obligation: the assignment of so prohibitive a dumping margin as 453.79% as a remedial measure is difficult to comprehend from a commercial or economic standpoint. To take an extremely simplified example of the statutory formula (one that does not require calculation of a weighted average from multiple sales), a foreign exporter assigned a percentage dumping margin of 453.79% on a good with a normal value of $100 would have had to have sold the good at an export price, or constructed export price, of approximately $18.06 (i.e., in rounded numbers, the dumping margin would be $81.94 and the percentage dumping margin would be $81.94 divided by $18.06, or 453.71%.).
> *Baoding Mantong* at 1337 – 1338.

In this matter, the margin is inherently inaccurate.   There are no feasible commercial circumstances under which the calculated margin based on partial adverse facts is accurate.  Quite to the contrary, the calculated "partial adverse facts" rate is a multiple of the "China-Wide" rate which applies to companies that wholly and completely fail to cooperate with the Department.

While *Baoding* was primarily focusing on calculated margins without the

application of partial adverse facts, the underlying factors discussed therein are important as they go to the issue of accuracy and reasonableness. Contrary to defendant's assertions, profitability is a factor which should be examined. A company which is selling at a profit is inherently not engaged in significant dumping. For if it were doing so, it would be selling as a massive loss. Defendant's suggestion that dumping would result in a significant volume of sales which in turn would produce sufficient revenue to offset the dumping defies logic. Def. Resp. at 25. A significant volume of dumped sales at a high rate would simply increase the loss. Any large margin attributed to a company that was profitable or nearly profitable would inherently be inaccurate.

Further, with respect to the issue as to pricing, a detailed explanation is not necessary for understanding of the basic point. The pricing of the bearings shows that small bearings cost less than large bearings – reflecting the fact that large bearings are more costly to produce than small bearings. This shows that this is a product where size is important. As such, applying factors of production which imposes the costs of large bearings on small bearings inherently results in heavily distorted costs for such smaller bearings and such distortions are reflected in the normal value calculation. The specific price data is not directly relevant, what is relevant is that the price data establishes that for this product, size is an important part of cost and pricing.

### E. *The Defendant and the Department Misapprehended the Component Argument*

At pages 25 to 28 the defendant appears to focus on the ministerial error correction, while ignoring the substance of plaintiffs' actual arguments.  At pages 25 – 26 of its memo in support, plaintiffs argued, outside of the context of any ministerial error allegation, that defendant had failed to properly implement its decision.  The defendant's response to this is that the choice of words by the Department was less than exact, but that its intent was reflected in the overall language of the memorandum and the programing and that the Department "fully considered" the physical characteristics of the reported CONNUMS. This is an unsupported statement.  The Department does not, in any fashion, appear to have considered the weights of components.  Accordingly, the statement that the Department fully considered the physical characteristics is not accurate. In contrast, if the Department had engaged in a product specific analysis, as stated in the decision, such weights would have been considered.

Secondly, the defendant misapprehends the argument presented by plaintiffs at page 42 to 44 of its memo.  In section of the memo, plaintiffs explain why the surrogate values selected eliminated the need for factors of production for certain components.  While, as defendants note, factors of production are normally needed for components, in this case, factors of production were not needed for certain components.  Specifically, for certain articles, such as rollers, the selected surrogate

value was also for rollers.   Thus, the entire factor of production (the roller) used by Tainai was reflected in the surrogate value and the data of the unaffiliated supplier was not needed.   In such case, the factors of production used to produce the roller would not be considered as the surrogate value inherently included all of the inputs going into production of the roller, which component was reported in the data.  This follows Department practice as factors of production are not required for other inputs if the inputs are, themselves, valued by the surrogate values.  For example, if sheet steel is used in the production of an article, the sheet steel is the input to be valued using a surrogate value, not the factors of production going into the production of the sheet steel input.   The defendants do not explain why it would need factors of production to calculate a value for the roller input where the selected surrogate value is for rollers, which inherently incorporate all of the factors of production.

### F. There is no Dispute as to the Selection of the Surrogate Country

At pages 28 to 30 the defendant discusses the methods by which the Department selects a surrogate country and whether it is appropriate to use data from more than one surrogate country.   This is not an issue in this matter and plaintiffs have no comment on this section.

### G. The Timken Romania Financial Statement was Fatally Flawed

At pages 30 to 34 the defendants seek to justify the use of only the Timken Romania statement by arguing that since Romania is the selected surrogate country,

and the other potential Romanian financial statements were flawed, the Timken Romania financial statement should be the sole source of surrogate financial ratios. Plaintiffs argued, and continue to argue, that the Timken Romania financial statement is also flawed, and that where the Department has one flawed financial statements and one financial statement for a producer of a related product, the Department should not simply select one of the two flawed financial statements.

Plaintiffs have explained in its memo in detail, the issue and direct the Court to such further explanation.

### H. The Department Should Not Have Deducted Section 301 Duties from U.S. Price

At pages 34 to 36 the defendant argues that the Department properly did not deduct Section 301 duties from U.S. price.   Plaintiffs refer to its memo and submit that defendants' arguments do not overcome the arguments presented in the memo.

### I. The Department Should Not Have Capped Payments Received from Tainai's Customers for 301 Duties

At pages 36 to 38 the defendant argues that the Department properly capped payments received from Tainai's customers for 301 duties. As with the issue for the deduction of Section 301 duties, this was substantially briefed in the memo.  In its response, the defendant ignores the clear language of the regulations, and the fact that these payments were negotiated with the customer prior to the sales, were included in the initial invoice for the purchase of the goods, were based on the sale

of the goods and calculated based on an amount per unit. Such amounts were not subject to refund and such amounts were fixed at the time of sale. In sum, they were akin to a discount on sale, albeit an inverse discount.

### J. The Department Should Have Granted a By-Product Offset

At pages 38 to 40 the defendant argued that the Department properly denied a by-product offset. In doing so, the defendant argued that plaintiffs had failed to comply with the technical requirements imposed by the Department. Plaintiffs do not dispute that they did not meet the technical requirements but submit that it established by sufficient evidence that it produced valuable by-product and should have received an offset for such by-products. Plaintiffs refer to the memorandum submitted in support of the motion for judgment.

## III.  CONCLUSION

Shanghai Tainai Bearing Co., Ltd. and Plaintiff C&U Americas, LLC submits that the arguments presented by defendant are unavailing and that this matter should be remanded to Commerce with instructions consistent with the points set forth in this memorandum. Specifically, the Court should find:

- That the Department improperly applied partial adverse facts to Tainai;
- That the Department failed to properly determine whether there were any gaps in information for which alternate data was needed;
- That the Department improperly used the financial statement of Timken Romania to calculate financial ratios;
- That the Department improperly required the deduction of Section 301 duties from U.S. price;

18

- That the Department improperly capped certain payments and did not include such payments in U.S. price; and
- That the Department erred by not granting Tainai a by-product offset.

This matter should be remanded to the Department with direction that the

Department modify the final results to correct the errors in the final determination.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC

Dated: November 16, 2022