Slip Op. No. 23-132

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANGHAI TAINAI BEARING CO., LTD. AND C&U AMERICAS, LLC, <br><br> *Plaintiffs,* <br><br> *and* <br><br> PRECISION COMPONENTS, INC., XINCHANG NEWSUN XINTIANLONG PRECISION BEARING MANUFACTURING CO., LTD, and HEBEI XINTAI BEARING FORGING CO., LTD, <br><br> *Consolidated Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant.* | Before: Stephen Alexander Vaden, Judge <br><br> Consol. Court No. 1:22-cv-00038 |

## <u>OPINION</u>

[Granting in part and denying in part Plaintiffs' Motion for Judgment on the Agency Record.]

Dated:  September 14, 2023

*David Craven,* Craven Trade Law LLC, of Chicago, IL, for Plaintiffs and Consolidated Plaintiffs.

*L. Misha Preheim*, Assistant Director, and *Kelly Geddes*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With them on the brief were *Brian*

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 2 of 53

Consol. Court No. 1:22-00038                                        Page 2

*M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director, Commercial Litigation Branch; *Claudia Burke*, Assistant Director, Commercial Litigation Branch; and *Jesus N. Saenz*, Of Counsel, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance.

**Vaden, Judge:**  Plaintiffs Shanghai Tainai Bearing Co., Ltd. and C&U Americas, LLC filed suit objecting to Commerce's resolution of the thirty-third administrative review of the antidumping order on tapered roller bearings from China.  Joined by several Consolidated Plaintiffs, Shanghai Tainai brings multiple claims of error against Commerce's final determination.  They find moderate success.  Commerce failed to consider the necessary factors established by the Federal Circuit before applying a partial adverse inference to Shanghai Tainai to punish it for the non-compliance of its suppliers in the underlying investigation. Commerce also failed to justify its decision to deduct certain surcharges Shanghai Tainai included as extra profit on top of the Section 301 duties when calculating the U.S. price.  Plaintiffs' winning streak stops there, however, as the Court rejects their remaining claims, including the claim that the Section 301 duties themselves should have been deducted from the U.S. price.  Consequently, the Motions for Judgment on the Agency Record shall be **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

Shanghai Tainai is a Chinese manufacturer of tapered roller bearings (TRBs), a type of precision bearing that facilitates the rotational movement of an

axle.[1]   Tapered roller bearings are made out of four basic components:   rollers,
cages, cups, and cones.   Rollers are small steel cylinders that are held together in a
circular housing called a cage.   The caged rollers are inserted between two steel
rings, allowing them to move.   The inner ring is called the cone, and the outer ring
is called the cup.   The antidumping order on tapered roller bearings from China (the
Order) has been in place since June 15, 1987, and covers

> . . . tapered roller bearings and parts thereof, finished and
> unfinished, from China; flange, take up cartridge, and
> hanger units incorporating tapered roller bearings; and
> tapered roller housings (except pillow blocks) incorporating
> tapered rollers, with or without spindles, whether or not
> for automotive use.

*Decision Memorandum for the Final Results of the 2019-2020 Administrative Review
of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof,
Finished and Unfinished, from the People's Republic of China* (Decision Memo) at 2–
3 (Jan. 4, 2022), J.A. 1,004–05, ECF No. 43.   Shanghai Tainai's Motion for
Judgment on the Agency Record challenges the final results of the thirty-third
administrative review of the Order, which covers imports of tapered roller bearings
from China during the period of June 1, 2019 through May 31, 2020 (the Period of
Review).   *See Initiation of Antidumping and Countervailing Duty Administrative
Reviews*, 85 Fed. Reg. 47,731 (Dep't of Com. Aug. 6, 2020).

---

[1] Shanghai Tainai has brought its Motion together with another entity, C&U Americas
LLC.   In earlier proceedings before this Court, Shanghai Tainai failed to explain the
relationship between itself and C&U Americas.   *See Shanghai Tainai Bearing Co., Ltd. v.
United States*, 582 F. Supp. 3d 1299, 1308 (CIT 2022) (referring to the "recurring mystery"
of the relationship between Shanghai Tainai and C&U Americas and noting that Plaintiffs'
counsel declined the Court's request to shed light on it.).   The Court therefore refers
generally to Plaintiffs as Shanghai Tainai.

## I.      The Disputed Administrative Review

On August 6, 2020, Commerce initiated the present administrative review of the Order.  *See id.*  Commerce selected Shanghai Tainai as the sole mandatory respondent because it was the largest exporter of tapered roller bearings from China during the Period of Review.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 86 Fed. Reg. 36,099 (Dep't of Com. July 8, 2021) and accompanying Preliminary Decision Memorandum at 3, J.A. at 13,073, ECF No. 43.  Commerce received questionnaire responses from Shanghai Tainai and subsequently published its Preliminary Results on July 8, 2021.  *See* 86 Fed. Reg. 36,099 (Dep't of Com. July 8, 2021).

In its Preliminary Results, Commerce took issue with a number of Shanghai Tainai's questionnaire responses.  Commerce noted that Shanghai Tainai had not provided "bills of materials" from its suppliers that could substantiate Shanghai Tainai's reported "factors of production."  Preliminary Decision Memorandum at 15, J.A. at 13,085, ECF No. 43.   19 U.S.C. § 1677b(c)(1)(B) requires that Commerce determine the normal value of subject merchandise from non-market economies such as China "on the basis of the value of the factors of production utilized in producing the merchandise" and that such value "be based on the best available information regarding the values of such factors in a market economy country . . . considered to be appropriate by [Commerce]."  Commerce therefore requires that Chinese respondents such as Shanghai Tainai provide factors of production data that describe the inputs used to manufacture the merchandise as well as the price

of each input in a surrogate market-economy country.[2]  *See* Response to Section D of

the Department's Initial Questionnaire by Shanghai Tainai Bearing Co., Ltd

(Section D Questionnaire Response) at D-1, J.A. at 81,156, ECF No. 44.   In the

current review, Shanghai Tainai reported the following inputs as factors of

production:  chrome steel, cold-rolled steel, turned cups and cones, rollers, cages,

and anti-rust oil.  *Id.* at D-15, J.A. at 81,170.  Commerce chose Romania as the

surrogate country to value these inputs.[3]  However, when Commerce requested that

Shanghai Tainai substantiate its reported factors of production by submitting bills

of materials from its input suppliers, Shanghai Tainai responded that its affiliated

suppliers "do not maintain production slips" and that it "'had no way of knowing the

direct input bills of materials for the unaffiliated suppliers.'"  Preliminary Decision

Memorandum at 15, J.A. at 13,085 (quoting Response to the Department's A, C and

D Supplemental Questionnaire by Shanghai Tainai Bearing Co., Ltd. at 27, J.A. at

82,201, ECF No. 44).  Commerce further noted that Shanghai Tainai did not report

all the necessary factors of production data for its products.  For example, it omitted

a factor of production value for "rollers" despite a product description indicating

that rollers should be included as a cost.  *Id.* at 15–16, J.A. at 13,085–86.

    For its Preliminary Results, Commerce used Shanghai Tainai's reported

factors of production as "facts available," averaged this data to assign a value to

missing fields, calculated an estimated dumping margin of 36.75 percent, and

---

[2] Shanghai Tainai also included the labor and energy costs of its affiliate suppliers in its factors of production database.  Section D Questionnaire Response at D-15, J.A. at 81,170, ECF No. 44.
[3] Shanghai Tainai does not challenge the selection of Romania.  Oral Arg. Tr. 41:11–12, ECF No. 52 (Mr. Craven:  "We do not object to the use of Romania.").

issued additional supplemental questionnaires to both Shanghai Tainai and its unaffiliated suppliers that sought to substantiate the factors of production data. *Id.*; 86 Fed. Reg. at 36,100.   The unaffiliated suppliers did not respond to Commerce's supplemental questionnaires sent directly to them.  *See* Decision Memo at 7, J.A. at 1,009, ECF No. 43.  Shanghai Tainai maintained that, despite its requests, its suppliers remained unable to provide the factors of production data. *See* Response to the Department's Second Supplemental Questionnaire by Shanghai Tainai Bearing Co., Ltd. (Second Supplemental Questionnaire Response) at 6, J.A. at 84,320, ECF No. 44.  Shanghai Tainai attached letters it had sent to suppliers requesting bills of materials for inputs it had purchased.  *Id.* at Ex. SSD-2, J.A. at 84,406–16.  Shanghai Tainai also attached a single response email from a supplier, who declined to provide the information.  *Id.* at J.A. 84,415.  Shanghai Tainai claimed that, because it was not affiliated with these suppliers, "Tainai has no power to compel their assistance."  *Id.* at J.A. 84,320.

Along with its response to the Second Supplemental Questionnaire, Shanghai Tainai submitted a case brief that challenged numerous other aspects of Commerce's Preliminary Results.  *See* Administrative Case Brief of Shanghai Tainai Bearing Co., Ltd., Sept. 10, 2021 (Shanghai Tainai Case Brief), J.A. at 84,449, ECF No. 44.  Shanghai Tainai first objected to Commerce's use of financial statements from Timken Romania SA, a bearings manufacturer, as the basis for calculating the surrogate values of Shanghai Tainai's factors of production.  *Id.* at 2, J.A. at 84,450.   It claimed that Timken Romania's complex manufacturing

operations and use of related-party transactions made it an inappropriate comparator and that Commerce should have instead used the financial data of alternative surrogate value candidates URB Rulmenti Suceava or Compa S.A. Sibiu.   *Id.* at 4–5, J.A. at 84,452–53.   Shanghai Tainai next objected to what it termed "double counting" in the valuation of rollers, a factor of production in its tapered roller bearings.   *Id.* at 7, J.A. at 84,455.   It argued that, although it purchased finished rollers, Commerce refused to value them using the purchase price.   Instead, Commerce used a surrogate value that "included the cost for the materials as well as the cost of the processing to convert the materials into rollers and the profit for the producer of the rollers."   *Id.*   Shanghai Tainai also claimed that Commerce's dumping margin defied "commercial and economic reality," citing to *Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, 113 F. Supp. 3d 1332 (CIT 2015) for the proposition that such margins must be discarded.   *Id.* at 11, J.A. at 84,459.   Plaintiff asserted that its significant operating profit would be impossible if it were dumping at the margin Commerce calculated in the Preliminary Results.   *Id.*

Shanghai Tainai further alleged that Commerce improperly deducted Section 301 duties from the U.S. price of its tapered roller bearings, resulting in a higher dumping margin.   *Id.* at 8, J.A. at 84,456.   It argued that, although 19 U.S.C. § 1677a(c)(2)(A) requires the deduction of "United States import duties," the statute should be interpreted to refer to ordinary customs duties and not those duties imposed under Section 301, which are temporary "special" duties and therefore

properly included in the U.S. price.  *Id.* at 9, J.A. at 84,457.  Shanghai Tainai also claimed that Commerce improperly capped the U.S. price by deducting customer payments denominated as "additional revenue for 301" from the price, even where Shanghai Tainai charged amounts that exceeded the amount of Section 301 duties.  *Id.* at 10, J.A. at 84,458.  This tended to increase Shanghai Tainai's dumping margin by reducing the U.S. price.  Finally, Shanghai Tainai faulted Commerce for declining to grant a "by-product offset" for scrap metal that it sold, which further increased its dumping margin.  *Id.* at 10–11, J.A. at 84,458–59.

On January 10, 2022, Commerce published its Final Results and accompanying Decision Memo.  *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China:  Final Results and Partial Recission of Review; 2019-2020* (Final Results), 87 Fed. Reg. 1,120 (Dep't Com. Jan. 10, 2022); Decision Memo, J.A. at 1,003, ECF No. 43.  It decided to apply partial facts available with an adverse inference to fill the gaps in Shanghai Tainai's missing factors of production data.  *See* Decision Memo at 7, J.A. at 1,009, ECF No. 43.  When an interested party fails to act to the best of its ability to comply with a request for information from Commerce, Commerce may use an inference adverse to that party in selecting the information that will fill the gap in the record.  *See* 19 U.S.C. § 1677e(b).  Here, Commerce did not find that Shanghai Tainai had failed to cooperate to the best of its ability.  Instead, it based its decision to apply an adverse inference on the lack of cooperation from Shanghai Tainai's suppliers.  *See* Decision Memo at 8, J.A. at 1,010, ECF No. 43 ("[W]e find that Tainai has

cooperated with Commerce's requests for information, but its missing [factors of production] information from unaffiliated suppliers necessitates the use of partial AFA[.]"[4]).  To do this, Commerce relied on *Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014).  *See id*. at 12–13, J.A. at 1,014–15.  In *Mueller*, the Federal Circuit affirmed Commerce's practice of using facts available with an adverse inference to calculate a respondent's dumping margin in situations where the respondent cooperated but the respondent's supplier did not.  *See Mueller*, 753 F.3d at 1233.  The Court described this practice as resting on policy considerations; namely, that doing so may cause the respondent to induce a supplier's compliance by refusing to do business with the supplier unless it cooperates with Commerce's requests for information.  This may deter the supplier's non-cooperation.  *See id.*

Commerce found that Shanghai Tainai "could potentially induce compliance on the part of its unaffiliated suppliers."  Decision Memo at 13, J.A. at 1,015, ECF No. 43.  It wrote:

> Based on Tainai's large volume of entries during the POR[5] and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.  Thus, we find that it is reasonable to conclude that Tainai has some business mechanism to induce its suppliers to cooperate.  Furthermore, Tainai may choose not to do business with these suppliers in the future due to their lack of cooperation and instead select suppliers . . . that [are] willing to commit to participation in an [antidumping] review.  By applying AFA with respect to the missing data, Commerce is relying on

---

[4] Adverse facts available, *i.e.*, the acronym-happy trade bar's way of saying Commerce drew an adverse inference when choosing among the facts available for selection.

[5] Period of review

the statutory means that it has available to induce the cooperation of these parties so that Commerce has the information necessary to calculate accurate dumping margins.

*Id.* at 13–14, J.A. at 1,015–16.  Commerce therefore applied partial facts available with an adverse inference for the missing factors of production data.  It summarized the methodology it used to do so:

> Here, the missing data are the inputs for [turned cups and cones, rollers, or cages] that are then assembled by Tainai into finished TRBs.  Accordingly, as partial AFA, we are applying the highest [factors of production] usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM.[6]

*Id.* at 13, J.A. at 1,015.  Commerce emphasized that (1) it "calibrated the remedy so that only purchases from uncooperative producers impact Tainai's weighted-average dumping margin," and (2) its methodology "uses Tainai's submitted [factors of production] data in determining the normal value of each CONNUM[.]"  *Id.*  It concluded that this manner of applying adverse facts available was "consistent with the overriding purpose of the Act of fairness and accuracy" as well as "the purpose of applying AFA, which is to deter non-cooperation without being punitive."  *Id.*  This methodology yielded a dumping margin of 538.79 percent.  Final Results, 87 Fed. Reg. at 1,121.  By way of comparison, the China-wide entity rate that

---

[6] "CONNUM" is an acronym for "control number" and denotes a distinct tapered roller bearing product.  To ensure that Commerce is comparing like products in the home and U.S. markets, it asks respondents to sort merchandise according to key differentiating categories — in this review, by product description, outer diameter, inner diameter, and weight.  For example, cup-50-25-0.30 would be a distinct product, or CONNUM, with a "cup" design, an outer diameter of 50, an inner diameter of 25, and a weight of 0.30 kilograms.  *See* Request For Information at Section C, J.A. at 1,448–49, ECF No. 43.

Commerce assigned to companies that did not request a separate rate was 92.84 percent. *Id.*

Commerce's Final Results also rejected the other arguments Shanghai Tainai made in its case brief. Commerce first found that it was appropriate to use Timken Romania's financial statements to value Shanghai Tainai's factors of production because neither alternative entity met regulatory criteria: Rulmenti operated at a loss, and Compa S.A. Sibiu did not produce comparable merchandise. Decision Memo at 18, J.A. at 1,020, ECF No. 43. In contrast, Timken Romania's financial statements were usable because (1) Timken Romania produced tapered roller bearings and (2) its financial statements were accompanied by an auditor's report that identified no irregularities. *Id.* at 19, J.A. at 1,021.

Commerce next denied that it double counted the value of Shanghai Tainai's purchases of finished rollers by using a surrogate value rather than the purchase price. *Id.* at 20, J.A. at 1,022. Commerce explained that Shanghai Tainai purchased these rollers from non-market economy suppliers, and 19 U.S.C. § 1677b(c)(1) combined with 19 C.F.R. § 351.408 require Commerce to apply surrogate values to all such factors of production. *Id.* at 21, J.A. at 1,023. Commerce also rejected Shanghai Tainai's argument that its dumping margin defied commercial and economic reality. *Id.* at 28, J.A. at 1,030. Commerce explained that "[t]he fact that the [factor of production] consumption rates we are using as partial AFA are the highest such rates does not *per se* make them unrealistic or unreasonable. The [factor of production] consumption rates are Tainai's own rates and, therefore,

commercial, and nothing on the record indicates they are aberrational." *Id.*
Commerce denied the precedential authority of *Baoding Mantong* and pointed out
that, in *Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016),
the Federal Circuit held that Commerce's determination is accurate "'if it is correct
as a mathematical and factual matter,'" and reflects commercial reality if "'it is
consistent with the method provided in the statute.'" *Id.* at 29, J.A. at 1,031
(quoting *Nan Ya Plastics*, 810 F.3d at 1344). Therefore, Commerce "'need not
examine the economic or commercial reality of the parties, specifically, or of the
industry more generally, in some broader sense.'" *Id.*

Commerce next disagreed that Section 301 duties were improperly deducted
from U.S. price and cited to prior decisions that treated these duties as "U.S. import
duties," which are required by statute to be deducted. *Id.* at 22, J.A. at 1,024.
Commerce also continued to find that amounts Shanghai Tainai charged customers
to offset the Section 301 duties must be capped at the actual amount of the Section
301 duties and that additional amounts could not be included in the U.S. price of
the merchandise. *Id.* at 22–23, J.A. at 1,024–25. Commerce concluded by finding
that it correctly denied Shanghai Tainai's claim for a by-product offset because
Plaintiff had failed to provide production records that could substantiate the
amount of scrap generated from the production of subject merchandise during the
period of review. *Id.* at 26, J.A. at 1,028.

After receiving the Final Results, which contained a far larger dumping
margin than Commerce had found in the Preliminary Results, Shanghai Tainai

submitted a ministerial error allegation.   *See* Ministerial Error Allegations of Shanghai Tainai Bearing Co., Ltd. (Ministerial Error Allegations), J.A. at 84,881, ECF No. 44.   Shanghai Tainai's allegation focused on Commerce's methodology for choosing partial facts available and alleged that it did not properly implement its decision to "rel[y] on Tainai's highest reported usage rate for each of the [factors of production] on a product-specific rate for each control number[.]"   *Id.* at 3, J.A. at 84,883.   Rather than select the factor of production on a product-specific basis, Commerce allegedly selected the factor of production on a more general component-level basis, leading to distortions.   For example, Shanghai Tainai alleged that Commerce took factors of production usage rates from much heavier, more expensive bearings and applied them to lighter, cheaper bearings that shared nothing in common besides being "the same general type of component" but which "are simply not the same product."   *Id.* at 4–5, J.A. at 84,884–85.   Shanghai Tainai further alleged that the absence of factors of production data for the production of finished inputs — such as turned cups and cones, rollers, and cages — was "ultimately irrelevant" because Shanghai Tainai purchased these inputs in a finished state and knew their usage rates.   *Id.* at 6–7, J.A. at 84,886–87.

On February 10, 2022, Commerce published its response to Shanghai Tainai's ministerial error allegations.   *See 2019–2020 Antidumping Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Allegation of Ministerial Errors in the Final Results* (Ministerial Error Response), J.A. at 13,467, ECF No. 43.   Commerce

rejected both of Shanghai Tainai's allegations, describing them as falling outside of 19 CFR § 351.224(f)'s definition of a ministerial error as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error." *Id.* at 3–5, J.A. at 13,469–71.  Commerce wrote, "While we were less than exact in our phrasing, the language in our memoranda and programing indicates our intention to apply the AFA on a product description basis as that product was reported in the CONNUM." *Id.*  It described its manner of selecting facts otherwise available with an adverse inference and applying surrogate values to finished inputs as reflecting intentional methodological choices rather than an unintentional error. *Id.*

## II.      The Present Dispute

On February 24, 2022, Shanghai Tainai filed its Complaint alleging that Commerce's Final Results were unsupported by substantial evidence and arbitrary and capricious.  *See* Complaint, ECF No. 7.  In its Motion for Judgment on the Agency Record, (Pls.' Br.), Shanghai Tainai claimed the same defects that it had alleged during the administrative process:  (1) Commerce improperly applied facts available with an adverse inference to a cooperative entity; (2) the facts that Commerce selected were unreasonable and distortive; (3) the dumping margin that Commerce calculated defied commercial and economic reality; (4) Commerce erred in selecting the financial statements of Timken Romania as the source for the surrogate values of Shanghai Tainai's factors of production; (5) Commerce

improperly valued finished inputs purchased by Shanghai Tainai using surrogate values; (6) Commerce improperly deducted Section 301 duties from the U.S. price of the subject merchandise; (7) Commerce improperly capped amounts that Shanghai Tainai charged its customers and denominated as "additional revenue for 301"; and (8) Commerce should have granted Shanghai Tainai a by-product offset.  Pls.' Br. at 13, 23, 24, 31, 35, 42, 44, 46, 52, ECF No. 32.

Shanghai Tainai's Motion was accompanied by a separate Motion from Chinese entities that were not selected for individual review but received the same rate as Shanghai Tainai.  *See* Consolidated Plaintiffs' Motion for Judgment on the Agency Record, ECF No. 34; *see also* 19 U.S.C. § 1673d(c)(5)(A) (providing that the all-others rate shall be an average of the dumping margin assigned to entities selected for individual review).  These Consolidated Plaintiffs (Precision Components, Inc., Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd. and Hebei Xintai Bearing Forging Co., Ltd.) moved for judgment on the agency record with an accompanying brief whose sole claim was that any new rate resulting from a remand of Commerce's Final Results should also be applied to the Consolidated Plaintiffs.  *See* Consolidated Plaintiffs' Motion for Judgment on the Agency Record at 10, ECF No. 34.

The Government then filed its Response to Plaintiffs' Motion for Judgment on the Agency Record (Def.'s Br.), ECF No. 37, rejecting Shanghai Tainai's arguments.  *See* Def.'s Br., ECF No. 37.  The Government described its decision to apply facts available with an adverse inference as reasonable.  *Id.* at 9.  19 U.S.C. § 1677e(b)(1)

provides for the application of facts available with an adverse inference whenever an "interested party" has failed to cooperate to the best of its ability with a request for information. The Government pointed to Commerce's determination that Shanghai Tainai's unaffiliated suppliers were interested parties in their own right because they were "producers of subject merchandise." *Id.* at 10 (citing the scope of the Order as including "TRBs and parts thereof, finished and unfinished."). Because Commerce had issued questionnaires seeking factors of production data from both Shanghai Tainai and its unaffiliated suppliers, the suppliers' failure to respond meant that "the statute permitted Commerce to 'use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available,' or, fill the gap in the data with information that may result in a higher dumping margin in order to induce future cooperation with Commerce's requests." *Id.* at 11 (quoting 19 U.S.C. § 1677e(b)(1)(A)). The Government also argued that Shanghai Tainai's efforts to collect this data from its suppliers were lacking, noting that Shanghai Tainai only sought the information after the Preliminary Results and could only demonstrate a single round of correspondence with its suppliers. *Id.* at 15. The Government noted that Shanghai Tainai had previously participated in a 2012–13 new shipper review under the Order; therefore, it and its suppliers knew, or should have known, that "[t]his is *fundamental* data that any producer or importer should be prepared to provide." *Id.* at 13 (emphasis in original).

The Government also rejected Shanghai Tainai's other claims. It described Commerce's choice of facts available to fill the gaps in the record as reasonable

because Commerce used "reported costs for similar inputs from Tainai's affiliated producers," did so only for "components that were 100% provided by unaffiliated parties," and determined that choosing facts with an adverse inference was "necessary to induce future cooperation from Tainai's unaffiliated suppliers." *Id.* at 18. The Government denied that Commerce's determination needed to reflect "commercial reality" as an independent standard, citing Federal Circuit precedent. *Id.* at 23. The Government next argued that the claims originating in Shanghai Tainai's ministerial error allegations — namely, that Commerce used factors of production data from highly dissimilar products and that missing factors of production data for finished inputs it purchased were irrelevant — were not ministerial errors and were adequately addressed by Commerce's Ministerial Error Response. *Id.* at 25–27. The Government then claimed that Commerce reasonably determined that Timken Romania's financial statements were the best available information for calculating surrogate value, pointing to Commerce's statutory discretion to make such a determination and to various defects in alternative financial statements that rendered them unusable. *Id.* at 30–31. Regarding the deductibility of Section 301 duties, the Government cited Commerce's consistent practice of deducting them from U.S. price as "U.S. import duties" and argued that Commerce reasonably capped amounts that Shanghai Tainai charged customers and denominated as "additional revenue for 301" by limiting such amounts to the actual amount of the Section 301 duties. *Id.* at 34, 36. Finally, the Government described Commerce's denial of Shanghai Tainai's request for a by-product offset as

a reasonable response to Shanghai Tainai's failure to provide evidence of the amount of scrap it produced during the period of review. *Id.* at 38–39.

On March 23, 2023, the Court held oral argument. *See* Oral Arg. Tr., ECF No. 52. There, the Court ordered supplemental briefing on Shanghai Tainai's two claims related to Section 301 duties. First, the Court asked the parties to consider the deductibility of Section 301 duties from U.S. price in light of the Federal Circuit's decision in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023), which upheld this Court's decision that Section 232 duties are deductible as "U.S. import duties." Second, the Court ordered supplemental briefing on the question of Commerce's capping of amounts charged to customers invoiced as "additional revenue for 301" after Plaintiff clarified the nature of these charges at oral argument. *See* Oral Arg. Tr. 40:13–18, ECF No. 52; *see also* Defendant's Response to the Court's March 23, 2023 Order (Def.'s Supp. Br.), ECF No. 53; Plaintiffs' Response to the Court's March 23, 2023 Order (Pls.' Supp. Br.), ECF No. 54. With the record now complete, the Court decides the parties' claims.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiffs' challenge to the Final Results under 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting final determinations in antidumping reviews. The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise

not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). If they are unsupported by substantial evidence or not in accordance with the law, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* "[T]he question is not whether the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New American Keg v. United States*, No. 20-00008, 2021 WL 1206153, at \*6 (CIT Mar. 23, 2021). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

Reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

### I. Summary

Commerce may apply facts otherwise available with an adverse inference against a cooperating respondent on the theory that doing so will incentivize the respondent's non-cooperative suppliers to provide information sought during an antidumping review.  However, when it does so, Commerce must satisfy specific requirements that the Federal Circuit has identified — namely, Commerce must make a case-specific determination that the respondent can influence its suppliers' decision to cooperate, and Commerce must take into account the predominant interest in accuracy and explain any deterrence-based rationale that is used against the cooperating party.  The Court finds that Commerce failed to meet this standard and remands Commerce's Final Results for additional explanation consistent with those requirements.  In doing so, the Court does not accept Shanghai Tainai's claim that Commerce calculated a dumping margin that had no basis in commercial reality.  The Court also rejects Plaintiffs' argument that Commerce improperly selected the financial statements of Timken Romania when calculating surrogate values.  That entity's information was the best available to Commerce.

The Court agrees with Shanghai Tainai that Commerce did not sufficiently explain its decision to cap price increases that Shanghai Tainai masked by invoicing its customers for Section 301 duty payments.  The Court takes issue with Commerce's attribution of these amounts to the sale of services, rather than merchandise, and additionally rejects its unacceptably narrow interpretation of the

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 21 of 53

Consol. Court No. 1:22-00038                                          Page 21

regulation defining price adjustments.  However, Commerce was correct to deduct the actual Section 301 duty payments from U.S. price, as doing otherwise would ignore the clear textual command in the presidential order enacting the duties that they must be in addition to existing duties.  Finally, Commerce's rejection of Shanghai Tainai's request for a by-product offset was proper because Plaintiff conceded that it failed to record the quantity of by-product it produced during the period of review.

## II.  Application of Partial Facts Available with an Adverse Inference

When foreign merchandise is sold in the United States at less than its fair value — thereby injuring a domestic industry — the law allows Commerce to impose antidumping duties on the merchandise.  Antidumping duties equal the amount by which the foreign market value, known as the "normal value," of the merchandise exceeds the U.S. price of the merchandise.  19 U.S.C. § 1677b(a).  When Commerce is missing data necessary to calculate the normal value of merchandise subject to an antidumping investigation, the antidumping statute provides a two-part process to fill the gap.  *See* 19 U.S.C. § 1677e(a).  The statute enables Commerce to use "facts otherwise available" in place of the missing information if:

(1) Necessary information is not available on the record, or

(2) An interested party or any other person —

    (A) Withholds information that has been requested by [Commerce],

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 22 of 53

Consol. Court No. 1:22-00038                                             Page 22

(B) Fails to provide such information by the deadlines for submission of

the information or in the form and manner requested, . . .

(C) Significantly impedes a proceeding under this subtitle, or

(D) Provides such information but the information cannot be verified[.]

Separately, 19 U.S.C. § 1677e(b) permits those facts otherwise available to be chosen with an adverse inference if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." Although § 1677e(a) and § 1677e(b) are often collapsed into "adverse facts available" or "AFA," the two statutory processes require distinct analyses rather than the single analysis implied by the term "AFA." Commerce first must determine that it is missing necessary information; and, if it wishes to fill the resulting gap with facts that reflect an adverse inference against an interested party, Commerce must secondarily determine that the party has failed to cooperate by not acting to the best of its ability. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011).

Here, Commerce chose an unorthodox path to justify its application of facts otherwise available with an adverse inference to Shanghai Tainai. After first determining in its Preliminary Results that Shanghai Tainai had failed to provide bills of materials for its factors of production, Commerce notified Shanghai Tainai of the deficiency and used Shanghai Tainai's reported factors of production information as facts otherwise available — without an adverse inference — to fill the gap in the record. *See* Decision Memo at 10, J.A. at 1,012, ECF No. 43.

Commerce then sent a supplemental questionnaire to both Shanghai Tainai and its unaffiliated suppliers, seeking the missing information. Shanghai Tainai reported to Commerce its fruitless attempts to elicit the information from its suppliers; meanwhile, the suppliers ignored Commerce's questionnaire. *See id.* at 6–7, J.A. at 1,008–09; *see also* Second Supplemental Questionnaire Response at Ex. SSD-2, J.A. at 84,406–16, ECF No. 44. Commerce therefore concluded in its Final Results that, although "Tainai has been cooperative throughout this review . . . its suppliers have not." Decision Memo at 7, J.A. at 1,009, ECF No. 43. Commerce's ultimate decision to apply facts otherwise available with an adverse inference against Shanghai Tainai's missing factors of production data was therefore *not* grounded in Plaintiff's failure to "act to the best of its ability to comply with a request for information," as § 1677e(b) would seem to require. Rather, it was based on the *suppliers'* failure to cooperate. Commerce found that "Tainai's unaffiliated TRB component suppliers are interested parties within the meaning of [19 U.S.C. § 1677(9)] because they are producers of subject merchandise (*i.e.*, all TRBs and parts thereof, finished and unfinished, from China are subject merchandise) and they failed to cooperate by not providing their [factors of production] data, either through Tainai or directly to Commerce." *Id.* at 12, J.A. at 1,014. Commerce therefore determined that, "consistent with [§ 1677e(b)], which states that Commerce may apply AFA when an interested party has failed to cooperate by not acting to the best of its ability in responding to Commerce's requests for information, we find the use of partial AFA with respect to the uncooperative producers to be appropriate." *Id.*

The legal standard that Commerce must meet in order to apply facts available with an adverse inference against a respondent on the basis of its suppliers' non-compliance is explained in *Mueller Comercial De Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014).  In the administrative proceeding underlying that case, respondent Mueller's supplier, Ternium, failed to report production cost data on a product-specific basis because it claimed such data was not "readily available."  *Id.* at 1230.  The Federal Circuit found that "[i]n this case, Mueller is a cooperating party, while Ternium is not."  *Id.* at 1232.  Commerce nonetheless calculated Mueller's dumping margin using an adverse inference because it "found that Mueller could and should have induced Ternium's cooperation by refusing to do business with Ternium, and Ternium would not be sufficiently deterred if Mueller were unaffected by Ternium's non-cooperation[.]" *Id.* at 1233.  The Federal Circuit concluded that "Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller, *as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account as well*."  *Id.* (emphasis added).

The Federal Circuit explained that this doctrine requires more than a mere deterrence rationale.  It cited *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) for the proposition that, for non-cooperating parties, § 1677e(b) must be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 25 of 53

Consol. Court No. 1:22-00038                                          Page 25

as a deterrent to noncompliance." *Mueller*, 753 F.3d at 1234. This was "[a]ll the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix." *Id.* Indeed, "Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies." *Id.* In cases of supplier non-cooperation, Commerce must carefully consider whether the cooperating respondent has a mechanism to force the non-cooperating supplier's cooperation. "[I]f the cooperating entity has no control over the non-cooperating suppliers, a resulting adverse inference is potentially unfair to the cooperating party." *Id.* at 1235. Therefore, "Commerce must take into account that Mueller itself was a cooperating party and that Commerce's inducement/evasion approach to Mueller's rate calculation could discourage Mueller's own cooperation." *Id.* at 1236.

In sum, if Commerce has either (1) failed to consider evidence that reasonably detracts from the conclusion that Shanghai Tainai had sufficient control over its suppliers to force their cooperation by declining to do business with them; or (2) failed to properly take into account the predominant interest in accuracy — for instance, by failing to carry out a case-specific analysis of its deterrence rationale or failing to take into account whether a cooperating party will be discouraged from future cooperation — then Commerce lacks substantial evidence to apply facts available with an adverse inference against a cooperating party on the basis of supplier non-cooperation. Here, Commerce failed to meet either standard.

"The concept of 'control,' as discussed in *Mueller*, does not require actual control. Instead, it requires Commerce to consider record evidence concerning the practical ability of a respondent to induce the supplier's cooperation." *Venus Wire Industries Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1309 (CIT 2020). Commerce did not conduct such an analysis here. Its discussion of Shanghai Tainai's ability to induce its suppliers' cooperation consisted of the following paragraph:

> While Tainai argues that it could not persuade its suppliers to cooperate with Commerce's requests for information, the record evidence supports our finding that Tainai could potentially induce compliance on the part of its unaffiliated suppliers. Commerce chose Tainai as a mandatory respondent in this review because it accounted for the largest volume of entries of subject merchandise during the POR. *Based on Tainai's large volume of entries during the POR and the quantity of TRBs that it purchased from suppliers, it is reasonable to conclude that Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise its leverage over its TRB suppliers to induce them to cooperate.* Thus, we find that it is reasonable to conclude that Tainai has some business mechanism to induce its suppliers to cooperate. Furthermore, Taiani may choose not to do business with these suppliers in the future due to their lack of cooperation and instead select suppliers . . . willing to commit to participation in an AD review. By applying AFA with respect to the missing data, Commerce is relying on the statutory means that it has available to induce the cooperation of these parties so that Commerce has the information necessary to calculate accurate dumping margins.

Decision Memo at 13–14, J.A. at 1,015–16, ECF No. 43 (emphasis added). Although it is true that Shanghai Tainai purchased a large quantity of tapered roller bearing parts from its suppliers as a collective group, Commerce's analysis ignored the other side of the equation — whether such quantity was significant as to each supplier. Shanghai Tainai cited record evidence that "Tainai had multiple suppliers, all of

which only supplied a small portion of Tainai's needs . . . . Simply put, Tainai was not a significant enough customer of any of these entities to assert any market power over these entities." Pls.' Br. at 21, ECF No. 32 (citing to Shanghai Tainai's Response to Section D of the Department's Initial Questionnaire at Ex. D-7, J.A. at 81,310–12, ECF No. 44, providing a diversified supplier chart and recording the percentage of total input quantity purchased from each supplier). Whether Shanghai Tainai's claim was true as a factual matter was not established because Commerce failed to consider the question. *See* Oral Arg. Tr. 15:13–16, ECF No. 52 (The Court: "[Commerce] seems to speak in terms of generalities of what may be true in a large number of cases and not to the specific supplier scenario that [Shanghai Tainai] put data in the record to support."). Such one-sided analysis is barred by the requirements that Commerce's determinations be supported by substantial evidence and that the evidence be "case specific." *See Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Mueller*, 753 F.3d at 1234 ("Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies.").

The Government's arguments to the contrary miss the mark. Its brief depends heavily on the idea that Shanghai Tainai failed to use its best efforts to cooperate with Commerce's requests for data because it waited until after the publication of the Preliminary Results to seek what it should have known was necessary data and then only asked its suppliers once for the information. *See*

Def.'s Br. at 15, ECF No. 37; *see also id.* at 12 ("Substantial evidence supports Commerce's finding that Tainai and its unaffiliated suppliers failed to cooperate by not acting to the best of their ability in providing a complete and accurate response to requests for production information"); *id.* at 16 ("Commerce's determination that Tainai failed to act to the best of its ability is supported by substantial evidence[.]"). Commerce, however, made no such determination.  It concluded precisely the opposite, writing "we find that Tainai has cooperated with Commerce's requests for information[.]"  Decision Memo at 8, J.A. at 1,010, ECF No. 43.  The Government's arguments otherwise are not merely *post hoc* rationalizations; they are directly contradicted by Commerce's Final Results.  *See Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]").  And when the Government did address Shanghai Tainai's arguments concerning the diversity of its supplier network, it did so by merely restating Commerce's finding that Shanghai Tainai accounted for the largest volume of entries of subject merchandise during the period of review and purchased a large quantity of tapered roller bearings from its suppliers.  *See* Def.'s Br. at 19, ECF No. 37.  That ignored Plaintiff's argument and data suggesting that it was not a large enough customer of any one supplier to induce compliance with Commerce's information requests.  *See* Pls.' Br. at 21, ECF No. 32.

Commerce's determination to apply facts available with an adverse inference was also deficient for a second, independent reason:  It failed to properly take into account the predominant interest in accuracy.  *See Mueller*, 753 F.3d at 1233

("Commerce may rely on such policies as part of a margin determination for a cooperating party like Mueller, as long as the application of those policies is reasonable on the particular facts *and the predominant interest in accuracy is properly taken into account as well*.") (emphasis added).  It is true that, under the antidumping statute, Commerce has discretion to choose among facts available in order to draw an adverse inference.  *See* 19 U.S.C. § 1677e(b)(2) (providing that an adverse inference may rely on any information placed on the record).  However, "Commerce's discretion in these matters . . . is not unbounded" — especially for a cooperating party.  *De Cecco*, 216 F.3d at 1032.  The Federal Circuit has recognized that Commerce must appropriately balance the competing goals of accuracy and deterrence when it selects facts otherwise available with an adverse inference.  Although adverse facts are chosen in order to deter non-cooperation, "We find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the overriding purpose of the antidumping statute when calculating a rate for a cooperating party."  *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012); *see also Mueller,* 753 F.3d at 1234 (Adverse inferences must be applied to arrive at "'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance,'" but for a cooperating party "the equities would suggest greater emphasis on accuracy in the overall mix.") (quoting *De Cecco*, 216 F.3d at 1032).  And, as the Government acknowledges, Commerce must support its selection of facts otherwise available with a reasonable

explanation.    *See* Oral Arg. Tr. 10:12–23, ECF No. 52 (The Court:  "[T]he Government would agree that however broad the discretion Commerce may have to pick among the facts available when drawing an adverse [inference], if there is a limit of some sort, that limit would at least be . . . Commerce needs to have an adequate explanation for its methodology about why it picked a particular fact . . . . Would that be fair?"  Ms. Westercamp:  "That's correct, Your Honor.").

Despite assigning Shanghai Tainai an eye-popping dumping margin of 538.79 percent, Commerce asserts that it carefully calibrated its choice of facts available to prioritize accuracy rather than deterrence.  *See, e.g.*, Decision Memo at 13, J.A. at 1,015, ECF No. 43 ("[T]he manner in which we have applied partial AFA in this review is consistent with the Court's decision in *Mueller* (*i.e.*, consistent with the overriding purpose of the Act of fairness and accuracy) and the purpose of applying AFA, which is to deter non-cooperation without being punitive.").  The Government catalogued what it presented as reasonable concessions that Commerce made when calculating Shanghai Tainai's dumping margin, arguing that "Commerce did not apply 'total' AFA, but rather took Tainai's efforts into account in reaching its determination, limiting its application of adverse facts available to only the missing information where Tainai's unaffiliated suppliers provided 100 percent of the factors of production for chrome steel, rollers, and turned cups and cones."  Def.'s Br. at 13, ECF No. 37.  Commerce "use[d] Tainai's own data" and substituted "the highest factor of production usage rate reported by Tainai's affiliated suppliers" for these inputs, which "has the effect of 'calibrating the remedy so that only purchases

from uncooperative producers impact Tainai's weighted-average dumping margin.'"
*Id.* at 17–18 (quoting Decision Memo at 13, J.A. at 1,105, ECF No. 43).

It is hard to see how Commerce's methodology could have effectively "[taken] Tainai's efforts into account" or "calibrat[ed] the remedy."  *Id.*  The dumping margin that Commerce calculated — 538.79 percent — wildly exceeded both the margin calculated in the Preliminary Results (36.75 percent) and the China-wide rate assigned to entities that did not participate in the investigation at all (92.84 percent).  Despite Commerce's finding that Shanghai Tainai was a cooperative entity, the margin it calculated could hardly have been more punitive had Shanghai Tainai refused to participate.  Commerce did not discuss how assigning such a high rate to a cooperating party could potentially disincentivize cooperation despite *Mueller*'s requirement that "Commerce must take into account that [the respondent is] a cooperating party and that Commerce's inducement/evasion approach to [the respondent's] rate calculation could discourage [the respondent's] own cooperation." *Mueller*, 753 F.3d at 1236.  The dumping rate at issue in *Mueller* — 48.33 percent — is likewise dwarfed by the margin at issue here.  Commerce's recitation of the ways in which it could have calculated an even higher margin does not satisfy its duty to explain the margin it did calculate.

Shanghai Tainai alleged in detail how Commerce's methodological choices resulted in such a high dumping margin.  Commerce selected facts otherwise available by "applying the highest [factors of production] usage rate reported by Tainai's affiliated suppliers for turned cups and cones, tapered rollers, and cages

within each product type sourced solely from the unaffiliated suppliers for each associated CONNUM." Decision Memo at 13, J.A. at 1,015, ECF No. 43. But rather than select the usage rates "within each product type," Commerce selected them within a more general "component" category. Pls.' Br. at 26, ECF No. 32. Shanghai Tainai produces tapered roller bearings in three different component categories — assembly, cup, or cone — and each category can vary widely in weight and diameter. *See* Revised U.S. Sales Database, J.A. at 83,545, ECF No. 44. In order to sort Shanghai Tainai's bearings into distinct products, or CONNUMs, Commerce asked Shanghai Tainai to provide the product description (that is, the component type), the outer diameter, the inner diameter, and the product weight of each bearing. *See* Request for Information at Section C, J.A. at 1,448–49, ECF No. 43. By not selecting usage rates within the same "product type," surrogate values were calculated for bearings using data that came from different bearings that were up to five times heavier and nearly twice as large in diameter. *See* Pls.' Br. at 28, ECF No. 32. For example, a bearing with a total weight of less than one kilogram was calculated to use many times its total weight in turned cups and rollers — inputs that would not weigh more than the bearing into which they are incorporated. *Cf.* Revised U.S. Sales Database, J.A. at 83,545, ECF No. 44 (reporting tapered roller bearing CONNUMs as sold in the U.S.); Margin Calculation, Calculated Inputs, J.A. at 84,730–40, ECF No. 44 (calculating uniform input usage rates for tapered roller bearings of differing weights). This had the effect of greatly increasing the surrogate value of Shanghai Tainai's bearings. Rather than take into account the

Consol. Court No. 1:22-00038                                     Page 33

other dimensions that Commerce used to sort bearings into distinct products or CONNUMs — inner diameter, outer diameter, and weight — Commerce looked only to the component category, "arbitrarily selecting a value without any consideration as to the enumerated factors identified by the Department as important in dividing, categorizing and analyzing the bearings." Pls.' Br. at 27, ECF. No. 32.

Commerce never explained how this methodological choice reflected "the overriding purpose of the Act of fairness and accuracy." Decision Memo at 13, J.A. at 1,015, ECF No. 43. Instead, it pointed to other, unrelated methodological choices; declared that *these* reflected Commerce's concern with accuracy; and failed to engage with the implications of its key choice to apply factors of production usage rates at the component level without taking diameter or weight into account. *See id.* When Shanghai Tainai challenged Commerce's choice in its ministerial error allegation,[7] Commerce responded that:

> While we were less than exact in our phrasing, the language in our memoranda and programing indicates our intention to apply the AFA on a product description[8] basis as that product was reported in the CONNUM. Thus, while Tainai and PCI may have preferred that we use a different methodology to apply partial AFA to certain of Tainai's [factors of production], we intentionally made the methodological choice to apply the highest [factor of production] usage rate for turned cups and cones, rollers, and cages to each CONNUM based on the product type using the descriptions Tainai provided . . . . Accordingly

---

[7] Because Commerce used facts otherwise available with an adverse inference for the first time in its Final Results, Shanghai Tainai did not have an earlier opportunity to challenge Commerce's methodology.

[8] "Product description" is one of four fields that Commerce used to create CONNUMs, each of which is a distinct tapered roller bearing product. The other fields were inner diameter, outer diameter, and weight. Shanghai Tainai used the "product description" field to capture the component type: assembly, cup, or cone. *See* Pls.' Br. at 27, ECF No. 32; *see also* Request For Information at Section C, J.A. at 1,448–49, ECF No. 43.

> we find this allegation does not qualify as a ministerial error pursuant
> to 19 CFR 351.224(f).

Ministerial Error Response at 3, J.A. at 13,469, ECF No. 43.  The Government's

brief merely cited this rationale and concluded that "Commerce fully considered the

physical characteristics of the reported CONNUMs."  Def.'s Br. at 27, ECF No. 37.

But simply resting on Commerce's discretion to do what it did fails to satisfy the

requirement to "carry out a case-specific analysis of the applicability of deterrence

and similar policies" when dealing with a cooperating respondent.  *Mueller*, 753

F.3d at 1234.   In such situations, Commerce must carefully explain how its

methodological choices — certainly including those that result in a 538.79 percent

dumping margin — prioritize accuracy over deterrence.  *See id.* at 1234.  Because

Commerce did not do so, it failed to ensure that "the predominant interest in

accuracy is properly taken into account," as the Federal Circuit requires.  *Id.* at

1233.

In making this finding, the Court does not accept Shanghai Tainai's separate

argument that Commerce's dumping margin "is inherently excessive and must be

discarded" because the margin "def[ies] commercial and economic reality."  Pls.' Br.

at 31, 34, ECF No. 32.  Although *Baoding Mantong Fine Chemistry Co., Ltd. v.

United States*, 113 F. Supp. 3d at 1338, found that the "assignment of so prohibitive

a dumping margin as 453.79% as a remedial measure is difficult to comprehend

from a commercial or economic standpoint," the Federal Circuit later clarified that

there is no independent "commercial and economic reality" test.  *See Nan Ya

Plastics*, 810 F.3d at 1344 (holding that "[w]hen Congress directs the agency to

measure pricing behavior and otherwise execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties specifically, or of the industry more generally, in some broader sense," and that Commerce's determination "reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with the law.").

Nor does the Court decide Shanghai Tainai's claim that, because it purchased finished inputs, surrogate values for the materials used in these inputs were not needed so that there were no gaps in the record to fill.  *See* Pls.' Br. at 23–24, ECF No. 32 ("Simply put, since it was a roller, or a turned cup or cone or a cage, and since the surrogate value data valued the roller, turned cup or cone or cage, the amount of raw material consumed, the labor and energy expended and the like which went into the roller was irrelevant.  Such values were already included in the finished components.").  The Court does not wish to tie the agency's hands given the breadth of the remand necessary to cure Commerce's errors.  Should Commerce decide to base its calculations on the finished inputs rather than the materials used to make those inputs, it remains free to do so.

The Federal Circuit permits Commerce to draw an adverse inference against a cooperating party for the actions of its non-cooperative suppliers based on case-specific facts and analyses.  Commerce's decision to invoke generalities to draw such an inference against Shanghai Tainai fails to meet this burden.  Commerce also fails to discuss the incentives created by its decision to assess such a high dumping margin on a party the agency found to be cooperative.  On remand, Commerce must

first consider the record evidence regarding the control that Shanghai Tainai could have exerted over its diversified suppliers and recognize that a deterrence rationale applied against a cooperating party that lacks the ability to control its suppliers may be unfair to that party. Commerce must then explain how its methodological choices — specifically those that tended to increase Shanghai Tainai's dumping margin — comported with its duty to prioritize accuracy over deterrence when dealing with a cooperating respondent. In doing so, Commerce must be attuned to the risk that calculating a dumping margin for a cooperating respondent that is significantly higher than the all-others rate given to non-participating entities "could discourage [the respondent's] own cooperation." *Mueller*, 753 F.3d at 1236. If Commerce finds that it lacks substantial evidence to conclude that Shanghai Tainai was in a position to induce cooperation from its suppliers or that its methodology of selecting facts otherwise available with an adverse inference did not sufficiently prioritize accuracy over deterrence, Commerce should take new action to bring its Final Results into conformity with the Federal Circuit's mandates.

### III.  Selection of Surrogate Values

When Commerce investigates an antidumping respondent that is based in a non-market economy country such as China, Commerce must value the subject merchandise using information taken from a market economy country. 19 U.S.C. § 1677b(c). Commerce does this by valuing the factors of production used to create the subject merchandise — such as raw materials, labor, and utilities — based on their value in a market economy country that is (1) at a comparable level of

development to the non-market economy country and (2) a significant producer of comparable merchandise. *Id.* § 1677b(c)(4).   Commerce must select the "best available information" to value the factors of production. *Id.* § 1677b(c)(1). However, Commerce has "broad discretion" to select the market economy information that it uses to calculate surrogate values for a non-market economy respondent. *Zhejiang DunAn Hetian Metal*, 652 F.3d at 1341.

Here, Commerce determined that Brazil, Malaysia, Mexico, Romania, Russia, and Turkey were economically comparable to China and were significant producers of comparable merchandise during the period of review. *See* Preliminary Decision Memo at 6–7, J.A. at 13,076–77, ECF No. 43.   Because the parties only placed complete surrogate value information for Romania on the record and because no party argued in favor of selecting a different country, Commerce did not consider surrogate value data from any country other than Romania. *Id.* at 7, J.A. at 13,077; *see also* Oral Arg. Tr. 41:11–12, ECF No. 52 (Mr. Craven: "We do not object to the use of Romania.").   The Romanian surrogate value information on the record consisted of the financial statements of three Romanian entities: Compa S.A. Sibiu (Compa), URB Rulmenti Suceava (Rulmenti), and Timken Romania.   Commerce determined that Timken Romania's financial statements were the best available information for calculating surrogate values because the company is "a producer of comparable merchandise, [the financial statements] are contemporaneous with the POR, demonstrate profitability, are publicly available, are free of known countervailed subsidies, and generally satisfy Commerce's criteria for selecting

surrogate companies."   Decision Memo at 19–20, J.A. at 1,021–22, ECF No. 43.

Commerce determined that Compa's financial statements were not suitable for use

in deriving surrogate values "because [Compa] is not a producer of comparable

merchandise."   Instead, it "manufactures valves, windscreen wiper components, and

components for turbochargers and injections systems, none of which are comparable

to TRBs."   *Id.* at 18, J.A. at 1,020.   Commerce also determined that Rulmenti's

financial statements were not usable because "[i]t is Commerce's practice to only

consider companies that are profitable for calculation of surrogate financial rations"

and "[d]uring the POR, Rulmenti operated at a loss."   *Id.*

Shanghai Tainai challenges Commerce's decision to rely on Timken

Romania's financial statements and exclude those of Compa and Rulmenti.   *See* Pls.'

Br. at 35, ECF No. 32.   Shanghai Tainai cites Commerce's "preference for multiple

financial statements," alleges that Compa produces comparable merchandise to

Shanghai Tainai because Compa "engages in the precision grinding and finishing of

metal components and assembles them into finished goods," and claims that

Rulmenti's lack of profit is "a defect which can be readily remedied by setting the

profit to zero."   *Id.* at 37–38.   Conversely, Shanghai Tainai argues that Timken

Romania's financial statement "is badly distorted by a significant number of

affiliated party transactions and its active participation as a member of the Timken

Group."   Plaintiff "submits that these distortions are so significant as to require the

non-use of this financial statement."   *Id.* at 38.   In particular, Shanghai Tainai

takes issue with the fact that the Timken Group is "a large group of inter-related

bearing producers including U.S. producers with an incentive to exclude, or otherwise limit, international competitors such as Tainai from the U.S. market" and conducts operations that "are significantly more complex than the operations undertaken by Tainai." *Id.* at 39–40. Shanghai Tainai notes that the Timken Group "was an active participant in the review on behalf of the domestic industry." *Id.* at 38. In the alternative, Shanghai Tainai argues that Commerce should have at least averaged the three financial statements together to "help avoid the distortion that results from the use of a single financial statement." *Id.* at 42.

The Government rebuts Shanghai Tainai's claims by first referencing Commerce's determination that the record contained only one usable financial statement — that of Timken Romania — so that Commerce's preference for using multiple financial statements was not applicable here. Def.'s Br. at 33, ECF No. 37. The Government next argues that the distortions alleged by Shanghai Tainai did not render Timken's financial statement unusable. Although Timken Romania belongs to the Timken Group, which participated in the underlying administrative review of the order on the side of the domestic industry, the Government cited to Commerce's explanation that "it has previously used surrogate financial statements of entities that are affiliated with the petitioners and such a status does not disqualify a given financial statement from consideration." *Id.* (citing Decision Memo at 19, J.A. at 13,405, ECF No. 43). Further, the Timken Group's status as a large group of inter-related bearing producers that conducts complex operations should not be disqualifying given that Commerce found that Shanghai Tainai was

itself part of "a multinational group of inter-related bearing producers." *Id.* at 34 (citing Decision Memo at 19, J.A. at 13,405, ECF No. 43). The Government thus concludes that record evidence supported Commerce's determination that Timken Romania's financial statements constituted the best available information for calculating surrogate values. *Id.*

The Government is correct. Because Shanghai Tainai did not object to the selection of Romania as the surrogate country, Commerce had a limited universe of financial statements to choose from in calculating surrogate values. Each financial statement was flawed. In the ensuing "ugly dog contest," Commerce was forced to rank these flaws and come to a reasonable determination regarding which financial statement was "the least bad one." Oral Arg. Tr. 42:15, 43:8, ECF No. 52. At oral argument, the Court registered its concern that Timken Romania's parent "is a competitor of [Shanghai Tainai]" and was "the instigator" of the challenged administrative review. *Id.* at 42:23–24. However, Timken Romania's financial statements were "accompanied by an auditor's report that identifies no irregularities in Timken Romania's reporting." Decision Memo at 19, J.A. at 1,021, ECF No. 43. The Court therefore declines to find that it was unreasonable for Commerce to reject the financial statements of companies that did not manufacture bearings or turn a profit — flaws that are worse than those of Timken Romania. Shanghai Tainai tellingly noted that ranking these flaws amounts to "a weighing question." Oral Arg. Tr. 44:15, ECF No. 52. Yet, this Court may not reweigh the evidence and substitute its judgment for Commerce's. *See Matsushita Elec.*, 750

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 41 of 53

Consol. Court No. 1:22-00038                                    Page 41

F.2d at 936.  Rather, the Court may only review the record to ascertain "whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1300–01 (Fed. Cir. 2016).  The parties bear the burden of building the record from which Commerce makes its decision.  *See Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("The burden of creating an adequate record lies with the interested parties and not with Commerce.") (citing *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  Given the limited options the parties placed on the record, the Court declines to second-guess Commerce's determination.

## IV.  Section 301 Duties

### A.  Deduction of Section 301 Duties from U.S. Price

In calculating Shanghai Tainai's dumping margin, Commerce deducted Section 301 duty payments from the U.S. price of the subject merchandise.  Decision Memo at 22, J.A. at 1,024, ECF No. 43.  This increased Shanghai Tainai's dumping margin by reducing the U.S. price.  Under 19 U.S.C. § 1677a(c)(2)(A), "[U.S. price] shall be reduced by the amount, if any, included in such price, attributable to any . . . . United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  This helps ensure an "apples [to] apples" comparison between merchandise sold in the home market and the U.S. market by

Consol. Court No. 1:22-00038                                              Page 42

deducting costs associated with transporting merchandise to the United States. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983).

However, not all duties are deductible as "United States import duties." For instance, antidumping duties are considered "special duties" distinct from "United States import duties" and are not deducted from U.S. price because doing so would create a circularity problem in which the imposition of antidumping duties would itself result in increased antidumping duties. *See Power Steel Co., Ltd. v. United States*, No. 20-03771, 2021 WL 6098309 at *3 (CIT Dec. 23, 2021). Shanghai Tainai argues that this same treatment should be extended to Section 301 duties, which are imposed when the United States Trade Representative determines that the actions of a foreign government are unreasonable or discriminatory and burden or restrict U.S. commerce. *See* 19 U.S.C. § 2411(b)(1). Although Shanghai Tainai did not cite any authority for its argument, it believes these duties are akin to antidumping duties because they are imposed "in response to a specific conditions" [*sic*] and are removed when that condition is resolved. Pls.' Br. at 45–46, ECF No. 32. By contrast, deductible "U.S. import duties" should be interpreted to include only "ordinary customs duties" that "are not contingent on external events, but rather are ordinary duties at bound rates and cannot be 'avoided' by taking actions to comply with demands for action." *Id.* at 46. The Government rejects Shanghai Tainai's argument. It first cites *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1362 (Fed. Cir. 2007) for the proposition that "[n]ormal customs duties . . . have no termination provision and are permanent unless modified by Congress."

Def.'s Br. at 35, ECF No. 37.   The Government then notes that Commerce has determined that Section 301 duties "are normal customs duties as they have been imposed without a termination date" and that Commerce's consistent practice is to deduct them as U.S. import duties.   *Id.*

On March 15, 2023, the Federal Circuit decided *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25 (Fed. Cir. 2023).   There, the Federal Circuit held that certain duties imposed under Section 232, a separate statute that provides for duties to remedy national security threats, were deductible from U.S. price as "United States import duties."   *See* 19 U.S.C. § 1677a(c)(2)(A). The Federal Circuit reasoned that Presidential Proclamation 9705, which enacted the Section 232 duties at issue, "makes clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty."   *Borusan*, 63 F.4th at 34.   The Federal Circuit cited language in Proclamation 9705 declaring that the duties are to be imposed "in addition to any other duties" and that "[a]ll anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed." Proclamation 9705 Adjusting Imports of Steel into the United States, clause 2, 83 Fed. Reg. 11,625, 11,627, 11,629 (Mar. 15, 2018).   The Federal Circuit concluded from this language that:

> [W]hen applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties . . . . *i.e.*, by subtraction of the Proclamation 9705 duty from the U.S. price if the Proclamation 9705 duty is built into it.   Otherwise, the Proclamation 9705 duty would be offset substantially or completely by a reduction in the antidumping

Case 1:22-cv-00038-SAV   Document 56   Filed 09/14/23   Page 44 of 53

Consol. Court No. 1:22-00038                                                    Page 44

> duty itself (through an increase in the U.S. price and therefore a
> decrease in the dumping margin), defeating the evident 'in addition to'
> prescription of Proclamation 9705.

*Borusan*, 63 F.4th at 35.  Declining to deduct the Section 232 duties imposed by

Proclamation 9705 would have the effect of increasing the U.S. price of Borusan's

merchandise and thereby reduce its dumping margin and antidumping liability,

vitiating Proclamation 9705's requirement that its duties add to, rather than

subtract from, any antidumping duties owed on subject merchandise.  The Federal

Circuit therefore upheld Commerce's decision to deduct these Section 232 duties

from U.S. price by treating them as "United States import duties."

The parties did not reference *Borusan* in their briefing.  This Court ordered

supplemental briefing on the applicability of *Borusan* and the Court of

International Trade decision it upheld, *see Borusan Mannesmann Boru Sanayi ve*

*Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365 (CIT 2021), to the deductibility

of Section 301 duties.  *See* Def.'s Supp. Br., ECF No. 53; Pls.' Supp. Br., ECF No. 54.

The Government described Commerce's determination that Section 301 duties are

deductible "United States import duties" as consistent with the Federal Circuit's

reasoning in *Borusan*.  Specifically, the Government invoked the language of the

legal instrument that proposed the Section 301 duties.  *See* Notice of Determination

and Request for Public Comment Concerning Proposed Determination of Action

Pursuant to Section 301:   China's Acts, Policies, and Practices Related to

Technology Transfer, Intellectual Property, and Innovation (Notice of

Determination Pursuant to Section 301), 83 Fed. Reg. 14,906 (U.S. Trade Rep. Apr.

6, 2018).  Like Proclamation 9705, the Notice of Determination provided that "the proposed action is *an additional duty* of 25 percent on a list of products of Chinese origin identified in the Annex to this Notice."  Notice of Determination Pursuant to Section 301, 83 Fed. Reg. at 14,907 (emphasis added).  To illustrate, the Notice explained that, "if a good of Chinese origin is currently subject to a zero ad valorem rate of duty, the product would be subject to a 25 percent ad valorem rate of duty; if a good of Chinese origin were currently subject to a 10 percent ad valorem rate of duty, the product would be subject to a 35 percent ad valorem rate of duty, and so on."  *Id.*  The Government argues that this language "clearly implies that Section 301 duties are intended to be imposed *in addition* to other duties."  Def.'s Supp. Br. at 8, ECF No. 53.

The Notice of Determination Pursuant to Section 301 did not, by itself, enact the Section 301 duties.  The instrument that did, the Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40,823 (U.S. Trade Rep. Aug. 16, 2018), also refers to the Section 301 duty as an "additional duty."  *Id.* at 40,824.  Indeed, the Notice of Action contains even stronger language than the Notice of Determination, providing that "[p]roducts of China that are provided for in new HTSUS heading 9903.88.02, as established by Annex A of this notice . . . will be subject to an additional ad valorem duty of 25 percent.  The rates of duty applicable to products of China that are provided for in new HTSUS heading 9903.88.2 *apply in addition to all other applicable duties, fees, exactions, and charges*."  *Id.* at 40,824 (emphasis added). This language tracks that of Proclamation 9705, which "directed that the [Section

232 duty] was to be imposed 'in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles.'"  *Borusan*, 63 F.4th at 29 (quoting Proclamation 9705, 83 Fed. Reg. at 11,627).  Under *Borusan*, Commerce's decision to treat Section 301 duties as deductible "United States import duties" is correct.

Shanghai Tainai fails to engage with the order's language and instead argues that Section 301 duties are different in kind from Section 232 duties because the latter "are put in place to protect the National Security and have no end point" whereas the former "are subject to termination after 4 years absent an affirmative determination to extend such duties."  Pls.' Supp. Br. at 7, ECF No. 54.  Shanghai Tainai argues for applying a set of factors from *Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007), which found that yet another class of duties, Section 201 "safeguard" duties, were non-deductible special duties akin to antidumping duties.  The *Wheatland Tube* factors are (1) whether the duties are remedial duties that provide relief from the adverse effects of imports; (2) whether the duties are imposed as a result of a finding of injury or threat to a U.S. industry; and (3) whether the duties provide only temporary relief.  *Id.* at 1362.  Shanghai Tainai asserts that Section 301 duties pass the *Wheatland Tube* test for non-deductibility because the duties "were imposed in order to provide relief from unfair competition in the form of the theft of intellectual property," "were the result of an express finding of threat to the U.S. as a result of the conduct in question," and "provide only temporary relief."  Pls.' Supp. Br. at 8, ECF No. 54.

However, *Borusan* instructs that it is the text of the legal order levying duties that is paramount; and it is unnecessary for a reviewing court to apply the *Wheatland Tube* factors where that text has spoken clearly. *See Borusan*, 63 F.4th at 36 ("We do not decide whether [the holding] could soundly rest on distinctions between § 232 and the § 201 regime more generally, and the distinction between 'normal' and 'special' duties . . . . That approach presents challenges that we may avoid. The Commerce decision sufficiently rests on the proclamation-specific basis set forth above."). If the legal instrument enacting statutory duties provides that such duties are intended to be additional to existing duties, then it is reasonable for Commerce to treat them as "United States import duties" and deduct them from the U.S. price when calculating dumping margins. This principle, as elucidated in *Borusan*, extends beyond Section 232 duties and applies to other statutory duties. *See id.* at 33 ("If a statute merely authorizes a governmental officer or body to impose a duty, as § 232 authorizes the President to do, it is the particular exercise of the authority that determines — based on the character of that exercise — whether the prescribed duty comes within [United States import duties].").  Here, "the particular exercise of the authority" to enact the Section 301 duties at issue intended for these duties to be additional to antidumping duties. The Court therefore affirms Commerce's determination.

## B. Capping of Amounts Denominated as "Additional Revenue for 301"

In its brief, Shanghai Tainai claims that Commerce wrongly limited "payments denominated as 'additional revenue for 301' to the amount of Section 301

duties paid on the goods." Pls.' Br. at 46, ECF No. 32. The nature of this claim was initially unclear to both the Court and the Government. *See* Oral Arg. Tr. 31:6–16, ECF No. 52. At oral argument, Shanghai Tainai clarified what it believed happened:

> MR. CRAVEN: [T]he price reported in the sales database consisted of two elements. There was the selling price on the invoice to the customer, and there was a second line on the invoice that was denominated as 301 duties for certain customers. We have requested that the price include both the price paid for the good and the price charged to the client for the increase in price for the 301 duties. For certain clients Tainai simply raised the price on the invoice. For other clients, to justify the price increase, they denominated them as 301 duties.
>
> The Commerce Department determined that they would only allow us to raise the price on the 301 duties to the extent that we had paid 301 duties and that any difference between those two was not allowed to be added to the U.S. price. So if, for example, the 301 duties were 95 cents and on the line item called 301 duties Tainai reported a dollar, the Commerce Department reduced the dollar to 95 cents.

*Id.* at 33:14–34:5. Here, Shanghai Tainai was direct — it saw an opportunity to mask a price increase by invoicing the increase as part of the Section 301 duty payment. It did so by billing customers for more than the actual amount of the Section 301 duties. *Id.* That tended to increase the U.S. price of the subject merchandise; but Commerce reduced these overcharges by capping them at the actual amount of the Section 301 duties, reducing the U.S. price and thereby increasing Shanghai Tainai's dumping margin.[9]

---

[9] At oral argument, the Court asked Shanghai Tainai's counsel to clarify how its challenge to Commerce's capping of Section 301 duty charges was distinct from its challenge to Commerce's deduction of Section 301 duties. Shanghai Tainai's counsel responded that its capping claim "has nothing to do" with deduction but rather "is a question simply of what

Commerce justified its decision by invoking its general practice "not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profit on the sale of services, not profit on the sale of the merchandise."  Decision Memo at 24, J.A. at 1,026, ECF No. 43.  Commerce analogized these revenues to revenue that respondents receive from providing U.S. freight, citing to a past determination in which Commerce found "that it would be inappropriate to increase the gross unit price for subject merchandise because of profits earned on the provision or sale of freight; such profits should be attributable to the sale of the freight service, not to the subject merchandise."  *Id.* at 24–25, J.A. at 1,026–27.  Commerce also claimed that it was limited by 19 C.F.R. § 351.501(c), which directs Commerce to calculate U.S. price "net of price adjustments . . . that are reasonably attributable to the subject merchandise[.]"  Price adjustments are defined as "a change in the price charged for subject merchandise . . . such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale, that is reflected in the purchaser's net outlay."  19 C.F.R. § 351.102(b)(38).  Commerce "note[d] that U.S. import duty revenues are not included in the list provided at 19 CFR 351.102(b)(38)."  Decision Memo at 25, J.A. at 1,027, ECF No. 43.  Commerce therefore concluded that it would "continue to cap additional tariff revenue by the amount of Section 301 duties applicable to each sale."  *Id.*

---

the client paid to Tainai for the goods . . . [the amounts] were collected long after the duty was paid and it was collected for the goods."  Oral Arg. Tr. 36:4–15, ECF No. 52.

The Court struggles to see the reason in Commerce's determination that the additional amounts Shanghai Tainai charged its customers in excess of Section 301 duties were "profit[s] on the sale of services, not profit[s] on the sale of the merchandise." *Id.* at 24, J.A. at 1,026. Costs to the customer associated with Section 301 duties were invoiced as part of the cost of the merchandise, and Commerce did not explain what "service" Shanghai Tainai provided its customers by passing along the padded cost of the Section 301 duties to them. At any rate, it is unclear why these amounts were attributable to the sale of services when "uncapped," but could become part of U.S. price up to the amount of the Section 301 duties, as Shanghai Tainai pointed out. *See* Pls.' Supp. Br. at 9, ECF No. 54 ("The United States does not dispute that this additional revenue should be part of the price paid or payable, but rather only disputes that portion of the revenue which exceeds the amount of the 301 duty reported as paid on the entry.").

The Court further finds Commerce's textual analysis unreasonable. 19 C.F.R. § 351.401(c) directs Commerce to calculate U.S. price "net of price adjustments," and "price adjustment" is defined as "a change in the price charged for subject merchandise . . . such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale, that is reflected in the purchaser's net outlay." 19 C.F.R. § 351.102(b)(38). Commerce claims that the amounts at issue do not meet this definition of a "price adjustment" because "U.S. import duty revenues are not included in the list provided at 19 CFR 351.102(b)(38)." Decision Memo at 25, J.A. at 1,027, ECF No.

43; *see also* Oral Arg. Tr. 38:22–23, ECF No. 52 (counsel for the Government arguing that the charges are not price adjustments "because, again, these aren't rebates.  These aren't deductions.  This is a 301 duty.").  However, that list is bookended by the terms "such as" and "or other adjustment."  *See* 19 C.F.R. § 351.102(b)(38).  These terms clarify that the regulation's list of price adjustments is not exhaustive, and a change in price need not be enumerated in order to qualify as a "price adjustment" within the meaning of § 351.401(c).  *See Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013) ("[T]he list . . . is preceded by 'such as,' and is therefore non-exhaustive."); *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1373 (Fed. Cir. 2018) (list of contracts that ended with "or other similar agreements" was "non-exhaustive").  Commerce's interpretation of the regulation is at odds with its plain text.  On remand, Commerce must explain why the amounts at issue constitute profits on the sale of services rather than profits on the sale of merchandise and must consider whether there is any basis to exclude such amounts from the "price adjustments" described by § 351.401(c) and § 351.102(b)(38).

## V.  By-Product Offset

Commerce's established practice is to "grant an offset to normal value, for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process."  *Arch Chemicals, Inc. v. United States*, 33 CIT 954, 956 (2009).  The burden is on the respondent to provide

Commerce with sufficient information to support its claim of a by-product offset. *Id.*
A respondent does not meet this burden if it fails to "document the quantity of scrap produced during the period of review" and merely "equate[s] total scrap sold during the period of review with total scrap produced during the period of review." *American Tubular Products, LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017). Here, Shanghai Tainai concedes that "the quantity of scrap produced is not directly recorded" but attempts to argue that "the quantity of scrap produced is the same as the quantity of scrap sold." Pls.' Br. at 52, ECF No. 32. Because that argument is insufficient, Commerce's decision to deny Shanghai Tainai a by-product offset must be upheld.

## CONCLUSION

Shanghai Tainai brings a litany of challenges to Commerce's thirty-third administrative review of the antidumping order on tapered roller bearings from China. These challenges are of varying quality; accordingly, some have found the mark and others have fallen short. Shanghai Tainai is correct that Commerce failed to adequately explain both its use of facts otherwise available with an adverse inference against a cooperating respondent and its capping of price increases that were invoiced as Section 301 duty payments. However, this Court finds that Shanghai Tainai's other complaints — that Commerce's dumping margin defied commercial reality, relied on defective surrogate entity financial statements, wrongly deducted Section 301 duties from U.S. price, and failed to include a by-product offset — are without merit.

The Court therefore **GRANTS IN PART** and **DENIES IN PART** Shanghai Tainai's Motion for Judgment on the Agency Record and **REMANDS** Commerce's Final Results for additional explanation consistent with this opinion. Commerce shall file its Remand Redetermination with the Court within 120 days of today's date. Defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination. Plaintiffs shall have thirty days from the filing of the Remand Redetermination to submit comments to the Court; and Defendant shall have thirty days from the date of Plaintiffs' filing of comments to submit a reply. Any revisions Commerce makes to the dumping margin assigned to Shanghai Tainai will be extended to the Consolidated Plaintiffs.

    **SO ORDERED**.

                                            Stephen Alexander Vaden, Judge

Dated: September 14, 2023
      New York, New York