A-570-601
Remand
Slip Op. 23-132
POR:  06/01/2019 – 05/31/2020
**Public Version**
E&C/OII:  MP/JX

*Shanghai Tainai Bearing Co., Ltd., et al. v. United States*,
**658 F. Supp. 3d 1269 (CIT September 14, 2023)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination (final redetermination) pursuant to the opinion and remand order of the U.S. Court of International Trade (the Court, or CIT) in *Shanghai Tainai Bearing Co., Ltd. v. United States*, 658 F. Supp. 3d 1269 (CIT September 14, 2023) (*Remand Order*).  This final redetermination concerns Commerce's final results of the 2019-2020 administrative review of the antidumping duty order on tapered roller bearings and parts thereof, finished and unfinished, (tapered roller bearings) from the People's Republic of China (China) for the period June 1, 2019 through May 31, 2020.[1]  The plaintiffs in this litigation are Shanghai Tainai Bearing Co., Ltd. (Tainai) and C&U Americas, LLC, and include consolidated plaintiffs, Precision Components, Inc.; Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd; and Hebei Xintai Bearing Forging Co., Ltd.

In the underlying administrative review, Tainai purchased subject merchandise from several unaffiliated suppliers.  Commerce requested factors of production (FOP) information from each of Tainai's unaffiliated suppliers of subject merchandise, and in response, each

---

[1] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results and Partial Rescission of Review; 2019-2020*, 87 FR 1120 (January 10, 2022) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

supplier refused to provide the requested FOP information.  In the absence of FOP information for the subject merchandise produced by these suppliers and relying upon the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) decision in *Mueller*,[2] Commerce filled the gap in the record.  In the *Final Results*, Commerce valued the unreported FOPs for TRB components produced by the unaffiliated suppliers using Tainai's highest FOP consumption rates for TRBs sold in the United States, where Tainai's unaffiliated suppliers provided 100 percent of the FOPs for turned cups and cones, rollers, or cages.[3]  Separately, Tainai reported additional revenue related to section 301 duties, which Commerce capped by the amount of the expenses associated with the section 301 duty imposed, in accordance with the Tariff Act of 1930, as amended (the Act), and our practice when calculating the net U.S. price.[4]

In its *Remand Order*, the Court remanded the *Final Results* to Commerce with respect to Commerce's decisions to apply partial facts available (FA) with an adverse inference (AFA) as a result of Tainai's unaffiliated suppliers' failure to report their FOP information, and to cap the adjustment to U.S. price of additional revenue for section 301 duties.[5]  The Court directed Commerce to reconsider or further explain these decisions on remand.[6]

Specifically, the Court held that Commerce failed to consider evidence that Tainai had sufficient control over its unaffiliated suppliers to induce cooperation and failed to properly consider the predominant interest in accuracy.  Thus, the Court held that Commerce's decision lacks "substantial evidence to apply facts available with an adverse inference against a cooperating party on the basis of supplier non-cooperation."[7]  On remand, the Court directed

---

[2] *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) (*Mueller*).
[3] *See Final Results* IDM at Comment 3.
[4] *Id.* at Comment 8.
[5] *See Remand Order*, 658 F. Supp. 3d at 1281-86 and 1289-91.
[6] *Id.*
[7] *Id.* at 1284.

Commerce to consider the record evidence regarding the control that Tainai could have exerted over its unaffiliated suppliers, to recognize that "a deterrence rationale applied against a cooperating party that lacks the ability to control its suppliers may be unfair to that party," and to explain how "its methodological choices … comported with its duty to prioritize accuracy over deterrence when dealing with a cooperating respondent."[8]  The Court directed Commerce to take new actions to bring its *Final Results* into conformity with the Federal Circuit's mandates if it lacks substantial evidence to conclude that Tainai can induce cooperation from its unaffiliated suppliers or that its methodology did not prioritize accuracy over deterrence.[9]

Regarding the capping of additional revenue related to section 301 duties, on remand, the Court directed Commerce to explain why the revenue at issue is related to profits on the sale of services rather than on the sale of subject merchandise.  In addition, the Court asked Commerce to consider whether there is any basis to exclude the additional revenue related to section 301 duties from the price adjustments defined in 19 CFR 351.401(c) and 351.102(b)(38).[10]

In this final redetermination, regarding the issue of Tainai's non-cooperative unaffiliated suppliers, in accordance with the *Remand Order*, Commerce clarifies that it is operating under section 776(a) of the Act to determine the FOP information for turned cups and cones, rollers, and cages Tainai sourced from unaffiliated suppliers.  Moreover, as described below, we find that we are unable to demonstrate on the record of this review that Tainai has "sufficient control over its suppliers to force their cooperation."[11]  Therefore, pursuant to the *Remand Order*, but under respectful protest, Commerce modified our calculations for Tainai by relying on partial

---

[8] *Id.* at 1285-89.
[9] *Id.*
[10] *Id.* at 1295-96.
[11] *Id.* at 1284.

neutral FA to fill in the missing the FOP information caused by the unaffiliated suppliers' non-cooperation.

Regarding the issue of capping revenue related to section 301 duties, Commerce continues to cap the revenue related to section 301 duties in instances where "the amount of the 301 duties were reported separately" on invoices issued to Tainai's customers.[12]  Commerce clarifies that when revenue related to movement expenses under section 772(c)(2)(A) of the Act are itemized on the invoice for the sale of subject merchandise, Commerce's practice is not to attribute revenue from such movement-related expenses to the price of subject merchandise and not to treat movement-related revenue as price adjustments under 19 CFR 351.104(c).  As a result of re-examining the record for these final results of redetermination, Commerce also modified its calculations so that in instances where an "additional '301' invoice for additional duty was issued," we made no adjustment to constructed export price (CEP) with respect to section 301 duties.[13]

## II.    BACKGROUND

Commerce published the *Final Results* on January 10, 2022.[14]  In the *Final Results*, Commerce explained that partial AFA was warranted with respect to FOP information from Tainai's unaffiliated suppliers, which had been requested by Commerce.  In particular, Commerce explained that in a non-market economy (NME) proceeding, Commerce requests that a respondent report the FOPs for their sales of subject merchandise.  When the respondent is the producer of the subject merchandise, it reports its own FOPs.  The respondent is also responsible for reporting the FOPs for merchandise that it purchases from affiliated and unaffiliated

---

[12] *See* Tainai's Letter, "Response to Supplemental Section A, C, and D Supplemental Questionnaire," dated May 17, 2021 (Tainai's SACDQR), at 11-12.
[13] *Id.*
[14] *See Final Results.*

producers.  Commerce issued the antidumping duty questionnaire to Tainai's unaffiliated TRB component suppliers (*i.e.*, subject merchandise), who refused to respond to the questionnaire. When a respondent is unable to report the FOPs for its purchases from unaffiliated producers, Commerce may use either partial neutral FA or partial AFA to value the missing FOPs.[15]  In selecting from among the facts available, Commerce determined that an adverse inference was warranted pursuant to section 776(b) of the Act because the suppliers in question failed to cooperate to the best of their ability in providing the FOP information.[16]

Using partial AFA, where Tainai's unaffiliated producers/suppliers provided 100 percent of the FOPs for turned cups and cones, rollers or cages, Commerce valued the unreported TRB component FOPs using Tainai's highest FOP consumption rates for TRBs sold in the United States.  Commerce emphasized that the methodology uses Tainai's own submitted FOP data and by applying the highest FOP usage rate only where non-cooperative suppliers provided 100 percent of the FOPs, the remedy is calibrated so that only purchases from uncooperative producers impact Tainai's weighted-average dumping margin.  Commerce explained that this methodology comported with the Federal Circuit's ruling in *Mueller* because it was consistent

---

[15] *See Final Results* IDM at Comment 3 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 62275 (October 2, 2020), and accompanying IDM at Comment 1; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 FR 39905 (June 20, 2016), and accompanying IDM at Comment 19; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*, 82 FR 29033 (June 27, 2017), and accompanying IDM at Comments 1 and 3; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 FR 36886 (July 30, 2019), and accompanying IDM at Comment 1; *SolarWorld Americas, Inc. v. United States*, 273 F. Supp. 3d 1254, 1277 (CIT 2017); *Mueller*; *Venus Wire Industries Pvt. Ltd. v. United States*, 471 F. Supp. 3d 1289, 1309 (CIT 2020) (*Venus Wire*); and *Stainless Steel Bar from India:  Final Results of Administrative Review of the Antidumping Duty Order; 2017-2018*, 84 FR 56179 (October 21, 2019), and accompanying IDM at Comment 2).
[16] *See Final Results* IDM at Comment 3.

with the overriding purpose of the Act with respect to fairness and accuracy as well as deterring non-cooperation without being punitive.

Tainai appealed Commerce's decision to apply partial AFA to its unaffiliated suppliers' non-cooperation, arguing that Tainai attempted to elicit the requested information from its suppliers, but was unable to do so because Tainai was not a "significant enough customer of any of {its suppliers} to assert any market power over these entities."[17]  Further, Tainai argues that by selecting usage rates based on the component category, Commerce greatly increased the surrogate value of Tainai's bearings.[18]

Also in the *Final Results*, Commerce continued to cap Tainai's additional revenue related to section 301 duties by the amount of expenses associated with the section 301 duty imposed, in accordance with the Act and Commerce's practice.[19]  In its initial questionnaire response, Tainai reported TARCHARU, which is an amount that Tainai charged its customers related to section 301 duties imposed on certain sales of TRBs.[20]  In a supplemental questionnaire response, Tainai reported that, "for certain sales an invoice was issued and the amount of the tariff was built directly into the price."[21]  In addition, Tainai reported that, "{O}n other invoices, the amount of the 301 duties were also reported separately…" and that "…for other invoices an additional "301" invoice for additional duty was issued."[22]  Further, for each customer, Tainai reported whether the additional charge was "always," "frequently," or "never" included "in the price," "invoiced on the same invoice," or "invoiced separately."[23]

---

[17] *See Remand Order*, 658 F. Supp. 3d at 1284.
[18] *Id.* at 1279, 1288.
[19] *See Final Results* IDM at Comment 8.
[20] *See* Tainai's Letter, "Response to Section C of the Department's Initial Questionnaire," dated November 16, 2020 (Tainai's CQR) at C-18.
[21] *See* Tainai's SACDQR at 11-12.
[22] *Id.*
[23] *Id.* at 13.

In the *Final Results*, Commerce found that it would be inappropriate to treat the excess revenues associated with Tainai's expenses as price adjustments under 19 CFR 351.401(c) because the revenues do not represent "changes in the price for subject merchandise," such as discounts, rebates, and post-sale price adjustments.[24]  Further, U.S. import duty revenues are not included in the list provided in 19 CFR 351.102(b)(38), which defines price adjustments.

Therefore, Commerce made deductions from CEP for movement expenses, including, where appropriate, an amount for section 301 duties, in accordance with section 772(c)(2)(A) of the Act.  Then, Commerce capped any additional revenue resulting from the section 301 tariff charge reported in data field "TARCHARU" by the related section 301 duty expenses. Commerce stated that its general practice is not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profit on the sale of services, not product on the sale of merchandise.[25]  Because the additional revenue directly related to U.S. import duties (including section 301 duties) and not the TRBs themselves, we found it would be inappropriate to attribute this revenue to subject merchandise when it is attributable to U.S. import duties.

Tainai appealed Commerce's decision to cap the additional section 301 revenue, arguing that Tainai increased the price of subject merchandise by invoicing a section 301 duty payment to its customers.  Tainai requests that the U.S price include the price paid for the good and the price charged for the section 301 duties.[26]

---

[24] *Id.* at 24.
[25] *See Final Results* IDM at Comment 8.
[26] *See Remand Order*, 658 F. Supp. 3d at 1294-96.

On December 18, 2022, Commerce released the draft results of the redetermination concerning these two issues to all interested parties and invited parties to comment.[27]  Tainai filed timely comments on December 27, 2023, which are addressed below.[28]

## III.    REMANDED ISSUES

**Application of Partial Facts Available**

A.  <u>Legal Framework</u>

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or if an interested party:  (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination.

Section 776(b) of the Act provides that, if Commerce finds that an interested party failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available.  In so doing, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about

---

[27] *See* Draft Results of Redetermination Pursuant to Court Remand, Shanghai Tainai Bearing Co., Ltd. v. United States, Court No. 23-132 (CIT September 14, 2023), dated December 18, 2023 (Draft Remand Redetermination).
[28]  *See* Tainai's Letter, "Comments on Draft Remand Determination," dated December 27, 2023 (Tainai's Comments).

information an interested party would have provided if the interested party had complied with the request for information.[29]

The SAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[30]  The purpose of an adverse inference is "to provide respondents with an incentive to cooperate" with Commerce's investigation.[31]  Because Commerce lacks subpoena power, Commerce's ability to apply AFA is an important one.[32]

As described in more detail below, in *Mueller*, the Federal Circuit held that Commerce, in selecting from among FA to calculate a cooperative respondent's weighted-average dumping margin, may consider an adverse inference against non-cooperative suppliers (who failed to report production costs used in calculating the respondent's weighted-average dumping margin) in certain circumstances.  The Federal Circuit in *Mueller* addressed a scenario where Commerce used an adverse inference to calculate the surrogate production cost for an uncooperative supplier and used the resulting surrogate cost in calculating the cooperative respondent's weighted-average dumping margin.[33]  Specifically, Commerce used the "three highest margin transactions" of the available cost of production data submitted by one supplier, TUNA, as a surrogate for another supplier's missing data, Ternium, in calculating the weighted-average dumping margin for Mueller, a cooperating mandatory respondent.[34]  Although the Federal Circuit observed that Commerce was "acting primarily under subsection (a) {of section 776 of

---

[29] *See* section 776(b)(1)(B) of the Act.
[30] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 870; *see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).
[31] *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012).
[32] *Id.*
[33] *See Mueller*, 753 F.3d at 1232.
[34] *Id.*

the Act} in setting a margin for Mueller, the Federal Circuit "conclude{d} that Commerce may rely on such policies {as deterrence and evasion considerations} as part of a margin determination for a cooperating party…as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account …"[35]

Therefore, in calculating the weighted-average dumping margin for a cooperative respondent, Commerce properly draws an adverse inference against a non-cooperative interested party to fill gaps in the record resulting from the non-cooperative party's failure to provide requested information, and Commerce may consider the gap-filling information as part of the margin calculations for a cooperative respondent. In so doing, Commerce may rely on policies of deterring non-cooperation and duty evasion. A remedy that collaterally impacts a cooperative mandatory respondent has the potential to account for evasion and encourage cooperation.

B. Analysis

Regarding the Court's first finding that Commerce consider record evidence regarding the control Tainai could have exerted over its suppliers, we reevaluated the record evidence in view of the Court's *Remand Order*. Upon a reexamination of record evidence, we are unable to determine, based on this record, whether Tainai has sufficient control over its suppliers to induce their cooperation in the underlying administrative review. Therefore, we are no longer relying on partial AFA when calculating Tainai's rate under section 776(a) of the Act. Instead, we are relying on partial neutral FA in this final redetermination and have determined the FOPs for Tainai's unaffiliated suppliers based on the reported FOP information.

---

[35] *Id.* at 1233.

We, first, clarify at the outset that Commerce is not making an adverse inference against Tainai.  Rather, Commerce finds (consistent with *Mueller*) that Tainai's unaffiliated suppliers are interested parties within the meaning of section 771(9)(A) of the Act that withheld necessary information (*i.e.*, FOP information), failed to provide such information within the established deadline, and significantly impeded the review within the meaning of sections 776(a)(1) and (a)(2)(A)-(C) of the Act.  Therefore, we continue to find that Tainai's unaffiliated suppliers have failed to cooperate to the best of their ability in responding to Commerce's requests for information within the meaning of section 776(b) of the Act.

Due to Tainai's unaffiliated suppliers' non-cooperation, there is a gap in the record with respect to certain FOPs.  Commerce must rely on section 776(a) of the Act to determine these missing data and to calculate Tainai's weighted-average dumping margin.  The statute authorizes Commerce, in place of missing FOP data needed to determine Tainai's weighted-average dumping margin, to consider an adverse inference against non-cooperative suppliers when selecting from among the facts otherwise available under section 776(a) of the Act.[36]  That is, notwithstanding Tainai's own cooperation, Commerce may rely on policy rationales of deterrence and prevention of evasion to calculate Tainai's weighted-average dumping margin "as long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account."[37]  In sum, though we acknowledge that Commerce's *Final Results* were potentially unclear in this respect, we now clarify that we are not treating Tainai as an uncooperative respondent for purposes of this redetermination.

Because Commerce is acting under section 776(a) of the Act to determine the missing FOP information for Tainai's unaffiliated suppliers, we next consider the Court's holding that

---

[36] *See Mueller*, 753 F.3d at 1233-34.
[37] *Id.* at 1233.

Commerce must consider record evidence regarding the control that Tainai could have exerted over its suppliers to induce cooperation, recognizing that a deterrence rationale applied to an operating party that cannot control its suppliers may be unfair.  In this respect, we acknowledge the CIT's finding that Commerce must "carefully consider whether the cooperating respondent has a mechanism to force the non-cooperating supplier's cooperation" to properly invoke adverse inferences under section 776(b) of the Act and *Mueller*.[38]  We also note that the CIT cites its prior opinion in *Venus Wire* in support of this finding, and that the CIT determined that Commerce's reliance on a respondent's "market presence, continued growth, and supplier-specific accounts" did not "reasonably indicate the presence of a long-term relationship creating leverage."[39]  In *Venus Wire*, the CIT held that Commerce did not adequately consider evidence to show that the respondent's efforts to induce cooperation failed, in part, because of circumstances beyond the respondent's control (*i.e.*, the suppliers' concerns that providing cost information did not serve its interests).[40]

We reviewed the record evidence in light of the standard articulated by the CIT in its *Remand Order* and find that we are unable to identify substantial record evidence to support a determination that Tainai possessed control over its unaffiliated suppliers sufficient to induce cooperation.  In Tainai's initial section D questionnaire response, it provides worksheets that report the inputs purchased from its suppliers during the POR.[41]  Tainai reports that it sourced turned cups and cones from [  ] suppliers, rollers from [  ] suppliers, and cages from [  ] suppliers.  Tainai sourced [  ] percent of its turned cups and cones, [  ] percent of its

---

[38] *See Remand Order*, 658 F. Supp. 3d at 1283-84 (citing *Mueller*, 753 F.3d at 1235).
[39] *Id.* at 1284 (citing *Venus Wire*, 471 F.3d at 1310).
[40] *Id.*
[41] *See* Tainai's Letter, "Response to Section D of the Department's Initial Questionnaire," dated November 16, 2020 (Tainai's DQR), at Exhibit D-7.

rollers, and [    ] percent of its cages from affiliated suppliers.  More than half of Tainai's suppliers ([    ] percent), supplied [      ] and [    ] supplied [      ] of TRB inputs. Importantly, [       ], an unaffiliated supplier, supplied [    ] percent of Tainai's turned cups and cones during the POR.

Even though certain unaffiliated suppliers provided a significant percentage of Tainai's TRB inputs, Tainai reported that it "received nothing but rejections" in response to its requests to its suppliers to provide responses to Commerce.[42]  Tainai provided one response from [      ], who supplies [    ] percent of cages purchased by Tainai and refused to participate.  Therefore, based on record evidence, we are unable to demonstrate that Tainai possessed control over its suppliers sufficient to induce cooperation.

While Commerce has made this determination based on the record of this review and the Court's conclusions in the *Remand Order*, we are troubled by the implications of the Court's opinion.  When a respondent's supplier fails to cooperate with Commerce's request for information, it may be difficult for Commerce to identify substantial evidence of the respondent's control over the supplier.  This is because the information necessary to make such a determination will be in the possession of the non-cooperating supplier.  For instance, Tainai reported the percentage of its TRB inputs purchased from its suppliers, but the percentage of each supplier's total sales made to Tainai versus other purchasers, indicating the importance of Tainai as a customer, is information that is in the possession of the supplier.  Because none of Tainai's unaffiliated suppliers participated in this review, and Tainai sourced a [

---

[42] *See* Tainai's Letter, "Response to Department's Second Supplemental Questionnaire," dated August 31, 2021, at 6 and Exhibit SSD-2.

] of these inputs from unaffiliated suppliers,[43] Commerce could not obtain complete information necessary to fully assess Tainai's ability to induce the suppliers' cooperation or their possible motives in declining to participate. As such, we are limited in the conclusions that we can draw from the available record evidence precisely because of the suppliers' non-cooperation.

Although, as described above, for the final redetermination, we are not relying on partial AFA, under 776(b) of the Act, to determine the FOPs for the non-cooperating suppliers, we nonetheless briefly address the Court's concern that Commerce's gap-filling in the *Final Results* "failed to properly take into account the predominant interest in accuracy."[44] First, Commerce chose Tainai as a mandatory respondent in the review because it accounted for the largest volume of entries during the POR. Based on Tainai's large volume of entries, we concluded in the *Final Results* that, "Tainai is an important customer to its Chinese TRB suppliers, which means that Tainai is in a position to exercise leverage over its TRB suppliers to induce them to cooperate."[45] Since Tainai is only involved in the grinding and assembling stages in the production of TRBs, it sources turned cups and cones, rollers, and cages from suppliers.[46] The percentage of TRB inputs that Tainai's unaffiliated suppliers provided is significant. Specifically, for all sales of subject merchandise during the POR, Tainai sourced [    ] percent of turned cups and cones, [    ] percent of rollers, and [    ] percent of cages from non-cooperative unaffiliated suppliers.[47]

Therefore, to fill the gap in the record for the *Final Results*, where Tainai's unaffiliated suppliers provided 100 percent of the FOPs for turned cups and cones, rollers, or cages, we

---

[43] *See Final Results* IDM at Comment 3.
[44] *See Remand Order*, 658 F. Supp. 3d at 1284 (citing *Mueller*, 753 F.3d at 1233).
[45] *See Final Results* IDM at Comment 3.
[46] *Id.* at Comment 2 at fn 40.
[47] *See* Tainai's DQR at Exhibit D-7.

valued the unreported TRB components FOPs using Tainai's own data (*i.e.*, highest FOP consumption rates for TRBs sold in the United States).[48]  The calculation methodology used in the *Final Results* is consistent with the Federal Circuit's decision in *Mueller* because by using Tainai's own reported FOP information, we took into account an interest in accuracy as well as the purpose of AFA, which is to deter non-cooperation without being punitive.  From selecting among the FA, Commerce's approach of selecting the highest consumption rate reported in the respondent's FOP data for the same inputs for which consumption data were missing is consistent with Commerce's approach in other cases.[49]  The 538.79 percent dumping margin that Commerce calculated using the aforementioned methodology in the *Final Results* is a direct result of the fact that Tainai's uncooperative suppliers, as a whole, provided a significant portion of the total inputs in question, thereby creating a substantial gap in the record.

Moreover, in *Mueller*, the Federal Circuit found that accuracy concerns must be balanced against relevant policy considerations (including a concern that "calculating too low a rate" might facilitate duty evasion or incentivize future non-cooperation).[50]  When viewed through this lens, the surrogate values calculated for Tainai in the *Final Results* were accurate because the use of FA was calibrated so that only purchases from uncooperative suppliers impacted Tainai's weighted-average dumping margin and relied on Tainai's own data submitted on the record of the review.[51]  In other words, the application of partial AFA was specifically confined to filling the gap caused by the missing FOP information and in all other respects relied on Tainai's data

---

[48] *See Final Results* IDM at Comment 3; *see also* Memorandum, "Calculations for Shanghai Tainai Bearing Co., Ltd. for the Final Results," dated January 4, 2022.

[49] *See Final Results* IDM at Comment 3; *see also, e.g.*, *Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 77 FR 14493 (March 12, 2012), and accompanying IDM at Comment 10; and *Malleable Iron Pipe Fittings from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 71 FR 37051 (June 29, 2006), and accompanying IDM at Comment 14.

[50] *See Mueller*, 753 F.3d at 1235-36.

[51] *See Final Results* IDM at Comment 3.

as submitted. Additionally, the evidence relied upon to fill the gap was based on Tainai's

extrapolation of data from certain affiliated suppliers to account for its unaffiliated suppliers'

FOP usage rates.[52] While Commerce found Tainai's allocation methodology to be speculative, it

is nonetheless based on actual inventory quantities during the POR.[53] In any event, the Court

need not reach this "accuracy" question because Commerce is no longer relying on partial AFA,

under 776(b) of the Act, in calculating Tainai's rate under section 776(a) of the Act. In these

final results of redetermination, Commerce modified its calculations. In applying partial neutral

FA, Commerce is relying on Tainai's allocation methodology for its direct input materials FOPs,

consistent with its methodology from the *Preliminary Results*.[54]

**Capping of Amounts Reported as "Additional Revenue for 301"**

    A. <u>Legal Framework</u>

    Pursuant to section 772(c)(2)(A) of the Act, "the price used to establish export price and

constructed export price shall be… reduced by …the amount, if any, included in such price,

attributable to any additional costs, charges, or expenses, and United States import duties, which

are incidental to bringing the subject merchandise from the original place of shipment in the

exporting country to the place of delivery in the United States…" Thus, the statute requires that

"Commerce use { } adjustments when calculating export price or constructed export price 'to

achieve 'a fair, 'apples-to-apples' comparison' between U.S. price and foreign market value."[55]

    Further, 19 CFR 351.401(c) directs Commerce to use, in calculating U.S. price, a price

which is net of price adjustments that are reasonably attributable to the subject merchandise. The

---

[52] *Id.*
[53] *See* Tainai's DQR at 14-21.
[54] *See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Preliminary Results and Intent to Rescind the Review, in Part; 2019–2020*, 86 FR 36099 (July 8, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 20-21.
[55] *See Nexteel Co., Ltd. v. United States*, 392 F. Supp. 3d 1276, 1292-93 (CIT 2019) (internal citations omitted) (*Nexteel*), *affirmed in Nexteel Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022).

term "price adjustment" is defined under 19 CFR 351.102(b)(38) as "any change in the price charged for subject merchandise or the foreign like product, such as discounts, rebates and or other adjustments, including, under certain circumstances, a change that is made after the time of sale that is reflected in the purchaser's net outlay." Thus, revenue that a respondent receives that is not related to the merchandise itself is not treated as a price adjustment because it does not represent changes in the price for subject merchandise.[56] Accordingly, in excluding certain movement-related costs, the Court has found that "a proper comparison between the U.S. price and foreign market value would not include a profit earned from freight rather than from the sale of the subject merchandise."[57]

B. Analysis

Sections 772(a) and (b) of the Act provide that "export price" and "constructed export price," respectively, "means the price at which *the subject merchandise* is first sold …." (emphasis added), *i.e.*, the U.S. price. Pursuant to section 772(c)(2)(A) of the Act, Commerce adjusts U.S. price for "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incidental to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States," (emphasis added), *i.e.*, U.S. movement expenses, which include U.S. import duties. Further, Commerce's regulations under 19 CFR 351.401(c) direct Commerce to use, in calculating U.S. price, a price which is net of any price adjustment that is reasonably attributable to the subject merchandise. As mentioned above the term "price

---

[56] *See Dongguan Sunrise Furniture Co., Ltd. v. United States*, 36 C.I.T. 860, 896, (in discussing "price adjustments" as defined by 19 CFR 351.102(b)(38), "{a}lthough the definition contains the phrase "such as" and is therefore illustrative, the purpose of the price adjustment provision is to account for any changes to the actual starting price of the subject merchandise and not to reflect any related expenses.").

[57] *See Nexteel*, 392 F. Supp. 3d at 1292-93.

adjustment" is defined under 19 CFR 351.102(b)(38) as "any change in the price charged for subject merchandise or the foreign like product, such as discounts, rebates and post-sale adjustments, that are reflected in the purchaser's net outlay."

As an initial matter, Commerce's initial AD questionnaire includes the following instructions regarding price adjustments granted, including discounts and rebates: "Report the unit price recorded on the invoice for sales shipped and invoiced in whole or in part … {t}his value should be the gross price for a single unit of measure.  Discounts and rebates should be reported separately in fields numbered 16.n and 17.n, respectively."[58]  These instructions reflect Commerce's established practice of using the price listed on the invoice as the gross unit price (*i.e.*, GRSUPRU), and the correct use of price adjustments.  Notably, in its initial questionnaire response, Tainai reported the gross unit price and reported no discounts or rebates in fields 16.n and 17.n, respectively.[59]  In addition, Tainai reported additional section 301 tariff charge revenue (*i.e.*, TARCHARU) when such a charge was included as a separate line item on the same invoice as subject merchandise or when invoiced separately.[60]  Tainai explained in its supplemental questionnaire response how it calculated the additional tariff charge revenue and why it did or did not report the additional tariff charge revenue for some U.S. transactions:

> For certain sales where an invoice was issued and the amount of the tariff was built directly into the price.  In other words, on those invoices, there was no break-down for the 301 duties.  On other invoices, the amount of the 301 duties were also reported separately, but such product was still part of the price paid or payable for the goods.  Finally, for other invoices an additional '301' invoice for additional duty was issued.[61]

---

[58] *See* Commerce's Letter, "Request for Information," dated September 21, 2020, at C-11.
[59] *See* Tainai's CQR at C-19-20.
[60] *Id.* at C-18; *see also* Tainai's SACDQR at 11-12.
[61] *See* Tainai's SACDQR at 11-12.

Therefore, for U.S. sales, Tainai reported the total amount that appeared on the invoice for the subject merchandise in the GRSUPRU field. Tainai also reported in the TARCHARU data field the additional tariff charge revenue amounts only where that amount was charged separately to the customer. Tainai, thereby, reported no amount of additional tariff charge revenue in field TARCHARU for sales where the revenue was "built directly into the price"[62] and not itemized separately on the invoice for the subject merchandise.

In the *Final Results*, Commerce correctly capped the additional tariff charge revenue and continues to apply this methodology in the final redetermination. Commerce continues not to treat Tainai's reported additional tariff charge revenue as an addition to U.S. price pursuant to 19 CFR 351.401(c). Instead, Commerce is following its normal practice for when the movement-related revenue exceeds expenses by treating such movement-related revenue as an offset to the corresponding expense rather than as an addition to U.S. price.[63]

Commerce's practice is to not consider movement-related revenues (such as freight) as a price adjustment, where these revenues exceed the charge of the service provided, but rather to use the revenue to offset the associated expenses which are included in the calculation of net price. Section 773(a) of the Act provides that Commerce make "a fair comparison …. between the export price or constructed export price and normal value." Indeed, in *Wooden Bedroom Furniture from China*, *Orange Juice from Brazil AR 2007-2008*, *Orange Juice from Brazil AR 2008-2009*, and *Orange Juice from Brazil AR 2010-2011*, Commerce rejected arguments that additional freight and freight-related revenue should be considered additional revenue attributed

---

[62] *Id.*
[63] *See, e.g., Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 77 FR 61738 (October 11, 2012), and accompanying IDM at Comment 3; *see also Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less-Than-Fair-Value*, 76 FR 64318 (October 18, 2011), and accompanying IDM at Comment 39; *Stainless Steel Bar from India: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 34337 (June 7, 2013), and accompanying IDM at Comment 5.

to the sale of subject merchandise.[64]  In *Orange Juice from Brazil AR 2010-2011*, Commerce found that "it would be inappropriate to treat the revenues associated with Cutrale's U.S. port and repacking expenses as price adjustments under 19 CFR 351.401(c), because these fees do not represent 'changes in the price for subject merchandise,' such as discounts, rebates, and post-sale price adjustments."[65]  Similarly, Tainai reported no discounts, rebates, or post-sale price adjustments.  Rather, Tainai reported additional tariff charge revenue that it used to "offset" the section 301 duties.[66]  While Commerce acknowledges that the definition of "price adjustment" in 19 CFR 351.102(b)(38) is not exhaustive, it would be inappropriate to increase the gross unit price by revenue that is attributable to a movement-related expense, in this case U.S. import duties, and not to the sale of subject merchandise because this would contravene Commerce's ability to "to achieve a fair, 'apples-to-apples' comparison between U.S. price and foreign market value" in accordance with the statute.[67]  Indeed, section 772(c)(2)(A) of the Act requires Commerce to make certain adjustments to the starting U.S. price for the purpose of bringing it to the same level as normal value, so that a proper comparison can be made with normal value.

Here, Tainai reported section 301 duties paid, which the Court held were correctly deducted from the U.S. price pursuant to section 772(c)(2)(A) of the Act.[68]  Tainai also reported an additional tariff charge revenue amount related to the section 301 duties.  It is Commerce's

---

[64] *See Wooden Bedroom Furniture from the People's Republic of China:  Final Results and Final Rescission, in Part*, 75 FR 50992 (August 18, 2010) (*Wooden Bedroom Furniture from China*), and accompanying IDM at Comment 26; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review*, 74 FR 40167 (August 11, 2009) (*Orange Juice from Brazil AR 2007-2008*), and accompanying IDM at Comment 3; *Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*Orange Juice from Brazil AR 2008-2009*), and accompanying IDM at Comment 2; and *Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 FR 63291 (October 16, 2012) (*Orange Juice from Brazil AR 2010-2011*), and accompanying IDM at Comment 6.
[65] *See Orange Juice from Brazil AR 2010-2011* IDM at Comment 6.
[66] *See* Tainai's CQR at C-18.
[67] *See Nexteel*, 392 F. Supp. 3d 1293 (internal citations omitted).
[68] *See* Tainai's CQR at C-29; *see also Order* at 41-47.

practice to incorporate movement-related revenues as offsets to movement expenses because they relate to the movement services provided "bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."[69]  Tainai's additional tariff charge revenue relates directly to the section 301 duty expense and, therefore, is considered a movement-related revenue attributable to movement services incidental to transporting the subject merchandise to the United States.  In other words, section 301 duty expenses are not related to the price of subject merchandise.  Further, by capping the section 301 duty revenue to the amount of the section 301 duty expense, Commerce ensures a proper comparison between the U.S. price for the subject merchandise and normal value by not artificially inflating the U.S. price of subject merchandise by the profit from the provision of movement services.

In the *Final Results*, Commerce compared the additional tariff charge revenue related to section 301 duties to its long-standing practice regarding offsets to certain movement-related expenses, such as freight revenue.[70]  In cases where respondents reported freight revenue, Commerce's general practice "is not to attribute revenue from related expenses to the price of subject merchandise because that uncapped amount represents profits on the sale of services, not profit on the sale of the merchandise."[71]  In this review, because Tainai invoices the customer an additional tariff charge to "offset" the section 301 duty expense, Commerce is treating it as movement-related revenue where the profits are attributable to the expense of the movement-related service.[72]

---

[69] *See* section 772(c)(2)(A) of the Act;  *see also Orange Juice from Brazil AR 2007-2008* IDM at Comment 3; *Orange Juice from Brazil AR 2008-2009* IDM at Comment 2; and *Orange Juice from Brazil AR 2010-2011* IDM at Comment 6.
[70] *See Final Results* IDM at Comment 8.
[71] *Id.*
[72] *See* Tainai's CQR at C-18.

Commerce acknowledges that Tainai's overcharging of the section 301 duties is a unique source of revenue, but the additional revenue generated by overcharging customers for section 301 duty expenses is incidental to transporting the subject merchandise to the United States, and Commerce finds that it is still appropriate to offset the associated expense with the additional revenue.  When Tainai included the section 301 duty revenue as part of the price invoiced for the subject merchandise, and separately itemized the amount for the section 301 duty revenue on the invoice, Commerce offset the section 301 duty expense by the amount of the separately itemized revenue.  In instances where Tainai's additional tariff charge revenue exceeded the section 301 duty expense, Tainai was fully reimbursed for that expense, and the net adjustment for the section 301 duty expense is zero, in accordance with our practice which has been upheld at the Federal Circuit.[73]  In instances where Tainai received additional tariff charge revenue that was less than the corresponding section 301 duty expense, the net adjustment to U.S. price is the amount of the section 301 duty expense offset by the amount of the section 301 duty revenue.

Finally, in these final redetermination, in a change from our *Final Results*, we modified our calculation for instances where Tainai reported that it issued a separate invoice to the customer for the section 301 duty expense.  In such instances, that separate invoice does not represent the price for the subject merchandise.  In accordance with Commerce's practice, we are not making any adjustments to CEP regarding section 301 duty expenses or the offsetting revenue associated with those expenses as they are not part of the price paid for the subject merchandise.[74]

---

[73] *See Nexteel, affirmed in Nexteel Co., Ltd. v. United States*, 28 F.4th 1226 (Fed. Cir. 2022).

[74] *See Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 FR 33916 (July 16, 2019), and accompanying PDM at 13-14, unchanged in *Welded Carbon Steel Standard Pipes and Tubes from India:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 2715 (January 16, 2020).

## IV.    INTERESTED PARTY COMMENTS

On December 18, 2023, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[75]   On December 27, 2023, we received comments from Tainai.[76]   We address Tainai's comments below.

### Comment 1:  Application of Partial Facts Available

*Tainai's Comments*

- Commerce's calculations of Tainai's weighted-average dumping margin are flawed because it continues to apply neutral facts with the highest consumption rate reported in Tainai's FOP data for the inputs for which consumption data were missing.  This means the highest consumption rate would come from the largest bearings and result in inaccurate rates for smaller bearings.[77]

- Commerce should calculate the ratio of bearing components based on the weight of the bearing, and then apply neutral facts based on that ratio to ensure smaller bearings are assigned accurate FOPs.

- Although not a part of the *Remand Order*, Commerce should adjust the high surrogate values for rollers, cups, and cages because Commerce's calculations double-count the financial ratios, because these component values are based upon completed components, meaning that the financial ratios were built into the values.[78]

**Commerce's Position:**  We disagree with Tainai's argument that our calculations in the Draft Remand Redetermination are flawed.  Tainai claims that Commerce's calculations in the Draft Remand Redetermination are flawed because Commerce is applying the highest consumption

---

[75] *See* Draft Remand Redetermination.
[76] *See* Tainai's Comments.
[77] *Id at 2-3.*
[78] *Id.* at 4.

rate in Tainai's FOP data to consumption data that are missing.[79]  Tainai states, "the Department, as noted at page 17 of the draft remand determination continued to apply as neutral facts, the 'highest consumption rate reported in the respondent's FOP data for the same inputs for which consumption data were missing."[80]  Commerce disagrees with this assertion.  Tainai's reference is not to Commerce's calculation for the Draft Remand Redetermination, but rather to our methodology applied in the *Final Results*.

Indeed, the reference to "highest consumption rate" merely explains the calculation methodology in the *Final Results*, not that we applied the highest consumption rates in Tainai's FOP in the Draft Remand Redetermination.  Further, as shown in our Draft Calculations Memorandum, we state, "{i}n the draft results of redetermination, we are applying partial neutral facts available to Tainai and are relying on Tainai's allocation methodology for its direct input materials FOPs, consistent with the methodology applied in the *Preliminary Results*."[81] Accordingly, as shown in the Draft Remand Redetermination, Commerce has applied partial neutral FA using Tainai's own allocation methodology, and not, as Tainai alleges, applying neutral facts with the highest consumption rate and distorting rates for smaller bearings.[82]

Tainai also argues that the weighted-average dumping margin is high due to the surrogate values for several inputs which Tanai alleges are double counted in the surrogate financial ratios.[83]  However, because this issue was not the direct subject of this remand, Commerce did not make any adjustments to this approach, and we find it would be inappropriate to revisit this

---

[79] *Id.* at 3.
[80] *Id.*
[81] *See* Memorandum, "Draft Results of Redetermination Calculation Memorandum for Shanghai Tainai Bearing Co., Ltd.," dated December 15, 2023 (Draft Calculations Memorandum) at 2-3.
[82] *See* Draft Remand Redetermination at 17-18.
[83] *See* Tainai's Comments at 4.

issue here.  Moreover, Tainai conceded in its case brief that this surrogate value issue is not a subject of this remand.[84]  Indeed, the Court stated:

> …Nor does the Court decide Shanghai Tainai's claim that, because it purchased finished inputs, surrogate values for the materials used in these inputs were not needed so that there were no gaps in the record to fill. . . Should Commerce decide to base its calculations on the finished inputs rather than the materials used to make those inputs, it remains free to do so.[85]

As the Court held that Commerce may continue its surrogate value calculation methodology and Tainai fails to demonstrate our position was contrary to law or unsupported by substantial evidence, we find that Tainai does not provide sufficient reasoning for this surrogate value argument.[86]  Accordingly, we have not addressed this issue as part of these final redetermination, and are not changing our approach from the *Final Results*.[87]

**Comment 2:  Capping of Amounts Denominated as "Additional Revenue for 301"**

*Tainai's Comments*

- The section 301 duty expenses are not a movement expense, but rather a part of the price paid for the subject merchandise and do not amount to a "service."[88]

- Therefore, any revenue received by Tainai for the section 301 duty expenses should be added and included in full as a part of the U.S. price.  Any amount of revenue in excess of the associated expenses, i.e., "profits," "are not attributable to the movement-related expense{s}."[89]

**Commerce's Position:**  Commerce disagrees with Tainai's assertion that section 301 duty expenses are not movement expenses and that Commerce's capping of the section 301 duty revenue is unwarranted.

---

[84] *Id.*
[85] *See Remand Order*, 658 F. Supp. 3d at 1288-89.
[86] *Id.*; *see also* Tainai's Comments at 4.
[87] *See Final Results* IDM at Comment 6.
[88] *See* Tainai's Comments at 5.
[89] *Id.*

Sections 772(a) and (b) of the Act provide that "export price" and "constructed export price," respectively, "means the price at which *the subject merchandise* is first sold …." (emphasis added), *i.e.*, the U.S. price. Section 772(c)(2)(A) of the Act states that U.S. price shall be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, *and United States import duties*, which are incidental to bring the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States" (emphasis added). The Court affirmed Commerce's finding in the *Final Results* that section 301 duties are "United States import duties" within the meaning of section 772(c)(2)(A) of the Act.[90] Accordingly, the section 301 duty expenses are expenses incidental to bringing the subject merchandise from the exporting country to the United States. As a result, revenue associated with section 301 duty expenses at issue in this remand redetermination is also attributed to the movement of the subject merchandise from the exporter to the U.S. customer. In general, an exporter may provide a service to its U.S. customers of arranging for the delivery of the subject merchandise. Provision of that delivery service, depending upon the terms of sale, may include arranging and payment of freight, brokerage and handling, customs clearance in both the exporting country and the United States, marine insurance, payment of export or import duties and fees, arranging and payment of intermediate warehousing, other insurance, as well as other possible expenses to provide such delivery services. Similarly, depending upon the terms of sale or the terms of payment, the exporter or producer may provide other services to the U.S. customer, such as the extension of credit, technical assistance or installation services. Although related to the subject merchandise, none of these services are part of the price of the subject merchandise as contemplated in section 772(a) or (b) of the Act. The "export price" or

---

[90] *See Remand Order*, 658 F. Supp. 3d at 41-47.

"constructed export price" of section 772 of the Act defines the price of the subject merchandise at the exporter's (or producer's) premises, ready for shipment to the United States. Accounting for expenses beyond this price of the subject merchandise is provided by sections 772(c) and (d) of the Act, including for the provision of the delivery of the subject merchandise to the U.S. customer.

If the expenses for such services are covered by the invoice price for the subject merchandise, *i.e.*, the gross unit price or the starting price, to the U.S. customer, then pursuant to the Act, Commerce adjusts the starting price to exclude the expenses for such services from the price paid for the subject merchandise.[91]  Further, when the invoice indicates a specific amount for the provision of a given service, Commerce limits the amount for that specific revenue associated with a given expenses to the amount of that expenses.  In other words, Commerce "caps" the amount of the expense-related revenue that is separately itemized on the invoice to the amount of the associated expense.  If the expenses for such services are invoiced separately from the invoice for the subject merchandise, then that second invoice, which is limited to services provided, is not for the subject merchandise.  Accordingly, no adjustment is made to the starting price for the subject merchandise for the expenses associated with such services provided for the sale to the subject merchandise, including an offset for the revenue generated from the payment of the separate, second invoice to the exporter or producer.

Beyond its simple assertion, Tainai provides no logical argument based either on the statute or on the record evidence that the "Tariff Charge was not a 'movement expense.'"[92] Tainai continues to argue that the "tariff charge … was part of the price paid or payable and

---

[91] See *Preliminary Results* PDM at 20.
[92] See Tainai's Comments at 2.

should not have been capped"[93] because "the total value of any money received a 'tariff charge' should continue to be added and included in full as part of U.S. price {where} the 'profits' are not attributable to the movement-related expense."[94]  As noted above, this Court has found that the section 301 duties are "United States import duties" as provided for in section 772(c)(2)(A) of the Act.[95]  Following the Court's holding, Tainai provides no explanation how section 301 duties and the associated revenue should not be consider part of the delivery service which it provided to its U.S. customers.  Tainai's assertion that the section 301 duties are part of the price for the subject merchandise, or that "the 'profits' {which might have accrued when the revenue associated with the section 301 duties exceeded the expense, in other words, Tainai's 'overcharges'} are not attributable to the movement-related expense" is without merit.

Therefore, for this final redetermination, Commerce has continued to adjust for section 301 duties and associated revenue as appropriate:

(1) If Tainai invoices the U.S. customer for the section 301 duties separately from invoicing the U.S. customer for the subject merchandise, then no adjustment is made to the starting price for the subject merchandise, *i.e.*, the reported gross unit price, for either the section 301 duty expense or the associated revenue;

(2) If Tainai invoices the U.S. customer only for the subject merchandise and the section 301 duties are itemized on that invoice, then Commerce adjusts the starting price for the section 301 duty expenses, offset by the amount of the itemized revenue.  The offset to the expenses is limited to the amount of revenue such that the net adjustment for the

---

[93] *Id*.
[94] *Id*. at 5.
[95] *See Remand Order*, 658 F. Supp.3d at 1293 ("Commerce's decision to treat {s}ection 301 duties as deductible 'United States import duties' is correct.").

section 301 will be zero if the revenue is greater than the expenses, *i.e.*, the amount of the revenue included in the U.S. price is capped; or

(3) If the section 301 duties are not itemized on the invoice to the U.S. customer for the subject merchandise, then an adjustment is made to U.S. price for the section 301 duty expenses with no offset for revenue associated with the expenses.

This methodology is consistent with our practice in *Wooden Bedroom Furniture from China*, *Orange Juice from Brazil AR 2007-2008*, *Orange Juice from Brazil AR 2008-2009*, and *Orange Juice from Brazil AR 2010- 2011*, where Commerce capped movement-related revenue to ensure a fair comparison between U.S. price of the subject merchandise and normal value.[96]

## V.    FINAL RESULTS OF REDETERMINATION

In accordance with the Court's *Remand Order*, as discussed above, we recalculated Tainai's weighted-average dumping margin.[97]  Based on the analysis and modifications described above, the recalculated weighted-average dumping margins are as follows:

| Exporter | Final Results of Review Weighted-Average Dumping Margin[98] | Final Results of Redetermination Weighted-Average Dumping Margin[99] |
|---|---|---|
| Shanghai Tainai Bearing Co., Ltd. | 538.79 | 76.58 |
| Non-Examined Companies Under Review that are Subject to this Litigation[100] | 538.79 | 76.58 |

---

[96] *See Orange Juice from Brazil AR 2007-2008* IDM at Comment 3; *see also Orange Juice from Brazil AR 2008-2009* IDM at Comment 2; and *Orange Juice from Brazil AR 2010-2011* IDM at Comment 6.

[97] *See* Memorandum, "Final Results of Redetermination Calculation Memorandum for Shanghai Tainai Bearing Co., Ltd.," dated concurrently with this final redetermination (Final Calculation Memorandum).

[98] *See Final Results*, 87 FR at 1120.

[99] *See* Final Calculation Memorandum at 2-3.

[100] The non-examined separate rate companies under review that are subject to this litigation are Xinchang Newsun Xintianlong Precision Bearing Manufacturing Co., Ltd; and Hebei Xintai Bearing Forging Co., Ltd.

Because the weighted-average dumping margin for Tainai is revised from the dumping margin in the *Final Results*, should the Court affirm this final redetermination, Commerce intends to publish a notice of court decision not in harmony with the results of administrative review[101] and notice of amended final results in the *Federal Register*, and issue appropriate instructions to U.S. Customs and Border Protection, consistent with the discussion above.

1/11/2024

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[101] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990); *see also Diamond Sawblades Manufacturers Coalition* v. *United States,* 626 F.3d 1374 (Fed. Cir. 2010).